UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------x

| | | |
|---|---|---|
| SAINT VINCENTS CATHOLIC MEDICAL | : | Civ. No. 1:07-cv-09818 (AKH) |
| CENTERS OF NEW YORK d/b/a SAINT VINCENT | : | |
| CATHOLIC MEDICAL CENTERS, *et al.*, | : | Chapter 11 |
| | : | Case No. 05-14945 (ASH) |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------------------x

McDERMOTT WILL & EMERY LLP,                    :
                                               :
            Appellant and Cross-Appellee,      :
                                               :
        v.                                     :
                                               :
SAINT VINCENTS CATHOLIC MEDICAL                :
CENTERS OF NEW YORK, CREDITORS'                :
COMMITTEE OF SAINT VINCENTS CATHOLIC           :
MEDICAL CENTERS OF NEW YORK and DIANA          :
G. ADAMS, AS UNITED STATES TRUSTEE FOR         :
REGION 2,                                      :
                                               :
            Appellees and Cross-Appellants.    :

--------------------------------------------------------------------x

---

## OPENING BRIEF OF CROSS-APPELLANTS SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK and CREDITORS' COMMITTEE OF SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK

---

*On Appeal from the United States Bankruptcy Court*
*For the Southern District of New York*

Frank A. Oswald (FAO-1223)
Howard Magaliff (HPM-2189)
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, NY  10119
Telephone:  (212) 594-5656
Facsimile:  (212) 967-4258

*Counsel for Appellee and Cross-Appellant*
*Saint Vincents Catholic Medical Centers*
*of New York*

Michael E. Johnson (MJ 0299)
Martin G. Bunin (MB 1602)
Brook A. Clark (BC 1749)
ALSTON & BIRD LLP
90 Park Avenue
New York, NY  10016
Telephone:  (212) 210-9400
Facsimile:  (212) 210-9444

*Counsel for Appellee and Cross-Appellant*
*Creditors Committee of Saint Vincents*
*Catholic Medical Centers of New York*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ............................................1

ISSUES PRESENTED ON CROSS-APPEAL.....................................................................6

STANDARD OF APPELLATE REVIEW..........................................................................6

STATEMENT OF RELEVANT FACTS .............................................................................8

     A.   Procedural Background.................................................................................8

     B.   McDermott's Tenure Aas Counsel ...............................................................8

     C.   McDermott's Failed Efforts to Close St. Mary's Hospital .................................8

ARGUMENT ..........................................................................................................12

I.    THE BANKRUPTCY COURT COMMITTED REVERSIBLE ERROR WHEN IT RULED
     THAT IT COULD NOT REDUCE MCDERMOTT'S COMPENSATION TO ACCOUNT
     FOR HARM CAUSED TO SVCMC'S ESTATE ......................................................12

     A.   The Standard for Compensation ............................................................12

     B.   Reduction of Fees to Account for Harm to SVCMC.........................................13

II.   THE BANKRUPTCY COURT ABUSED ITS DISCRETION BY NOT DISALLOWING
     ALL LEGAL FEES FOR MCDERMOTT'S IN CONNECTION WITH THE CLOSING OF
     SAINT MARY'S HOSPITAL ..........................................................................18

III.  THE BANKRUPTCY COURT ERRED IN EXCLUDING THE SANSONE TESTIMONY....22

A.   HARM TO THE DEBTORS RESULTING FROM MCDERMOTT'S MALPRACTICE.........23

B.   LEGAL FEES INCURRED BY THE DEBTORS TO AMELIORATE THE EFFECTS OF
     MCDERMOTT'S MALPRACTICE....................................................................24

CONCLUSION.......................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of Bessemer*, 470 U.S. 564 (1985) ........................................................ 7

*Feder v. Lazar (In re Lazar),* 83 F.3d 306 (9th Cir. 1996) .............................................. 7

*First Colonial Corp. v. Baddock (In re First Colonial Corp.),*
544 F.2d 1291 (5th Cir. 1977). ....................................................................... 4, 16

*Golloday v. Broach (In re Envirodyne Corp.)*, No. 00-40480,
2006 WL 2010836 (Bankr. N.D. Cal. July 6, 2006) .......................................... 14

*Manville Forest Prods. Corp. v. Gulf States Exploration Co. (In re Manville Forest Prods.
Corp.)*, 896 F.2d 1384 (2d Cir. 1990) ................................................................. 7

*Healthco Int'l., Inc. v. Repco Printers & Lithographics, Inc.* (*In re Healthco Int'l, Inc.),*
132 F.3d 104 (1st Cir. 1997) ............................................................................... 7

*In re Cenargo Int'l., Plc.*, 294 B.R. 571 (Bankr. S.D.N.Y. 2003) ............................... 16, 17

*In re Chin*, 47 B.R. 894 (S.D.N.Y. 1984) ..................................................................... 21

*In re Dalton*, 95 B.R. 857 (Bankr. M.D. Ga. 1989) ...................................................... 21

*In re Davison*, 79 B.R. 859 (Bankr. W.D. Mo. 1987) ................................................... 17

*In re Halstead Energy Corp.*, 36 F.3d 110 (2d Cir. 2004) .............................................. 7

*In re Johns-Manville Corp.*, 340 B.R. 49 (Bankr. S.D.N.Y. 1996), *aff'd*, 517 F.3d 52 (2d Cir.
2008) ................................................................................................................... 6

*In re McVay*, No. 05-74585, 2006 WL 2056682, slip op. (Bankr. N.D. Ohio Apr. 28, 2006) ..... 21

*In re Miller Grain Co.*, No. 02-41324-7, 2004 WL 2191603
(Bankr. D. Kan. Apr. 2, 2004) .......................................................................... 22

*In re Pontarelli*, No. Civ. A. 98-116T, 2000 WL 34019283 (D. R.I. Mar. 6, 2000) ................... 7

*In re Raytech Corp.*, 241 B.R. 785 (D. Conn. 1999) .................................................... 19

*In re Richardson,* 14 B.R. 755 (Bankr. E.D. Pa. 1981) ............................................... 21

*In re Saint Vincents Catholic Med. Ctr. of N.Y.*, No. 05 B 14945 (ASH)
2007 WL 2492787 (Bankr. S.D.N.Y. August 29, 2007) .................................... *passim*

*In re Source Enters.*, No. 06-1177, 2008 WL 850229, slip op.
(Bankr. S.D.N.Y. Mar. 27, 2008) ............................................................ 17

*In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830 (Bankr. C.D. Cal. 1991) ............................. 16

*In re Wilson*, 11 B.R. 986 (Bankr. S.D.N.Y. 1981) ........................................................ 20

*Johnson v. Ga. Highway Express Inc.*, 488 F.2d 714 (5th Cir. 1974) ........................................ 16

*Jones v. Woody (In re W.J. Servs., Inc.)*, 139 B.R. 824 (Bankr. S.D. Tex. 1992) ................. 14, 17

*MacElvain v. IRS*, 180 B.R. 670 (M.D. Ala. 1995) ........................................................ 6

*N.Y. Credit Men's Adjustment Bureau, Inc. v. Ballon, Stoll & Itzler (In re Casco Fashion, Inc.)*,
490 F.2d 1197 (2d Cir. 1973) ............................................................ 19, 20

*Osherow v. Ernst & Young, LLP (In re Interlogic Trace, Inc.)*, 200 F.3d 382 (5th Cir. 2000).... 15

*Servos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001)............................................... 7

*Shaw v. Replole (In re Shaw)*, No. C 00-2820 CRB, 2000 WL 1897344 (N.D. Cal. Dec. 22,
2000) ............................................................ 4, 14

*United States v. Perez*, 387 F.3d 201 (2d Cir. 2004) ........................................................ 25

*United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992) .................................................. 23

*Weiss v. La Suisse, Societe d'Assurances sur la Vie*, 293 F. Supp. 2d 397 (S.D.N.Y. 2003)....... 23

*Zeisler & Zeisler v. Prudential Ins. Co. (In re JLM, Inc.)*, 210 B.R. 19 (2d Cir. BAP 1997) ...... 13

## Statutes and Rules

11 U.S.C. § 330(a)(1).................................................................................. 2, 12

11 U.S.C. § 330(a)(1)(C). ............................................................................. 20

11 U.S.C. § 330(a)(2).................................................................................. 5

11 U.S.C. § 330(a)(3).................................................................................. 13, 16

11 U.S.C. § 330(a)(4)(A)(i). ........................................................................ 21

11 U.S.C. § 330(a)(4)(A)(ii) ......................................................................... 13

Fed. R. Bankr. P. 2016(a) ............................................................................ 2

Fed. R. Bankr. P. 8013................................................................................. 7

# PRELIMINARY STATEMENT
## AND SUMMARY OF ARGUMENT

Saint Vincents Catholic Medical Centers of New York ("SVCMC") and the

Creditors Committee of Saint Vincents Catholic Medical Centers of New York (the "Committee"

and together with SVCMC, "Cross-Appellants"),[1] submit this Opening Brief in support of their

cross-appeal from a final Order of the United States Bankruptcy Court for the Southern District

of New York (Adlai S. Hardin, Jr., J.) dated September 21, 2007, sustaining, in part, objections

filed by SVCMC, the Committee and the United States Trustee for Region 2 (the "U.S. Trustee")

to the first and final application of McDermott Will & Emery LLP ("McDermott" or the "Cross-

Appellee") for compensation for professional services rendered as counsel to SVCMC and its

affiliated debtor entities (the "Debtors") pursuant to chapter 11 of the United States Bankruptcy

Code, 11 U.S.C. § 101, *et al.,* as amended (the "Bankruptcy Code").[2]  A. 1794-1797.[3]  This Court

has appellate jurisdiction pursuant to 28 U.S.C. § 158(a).

Ten weeks into the Debtors' chapter 11 case, SVCMC fired McDermott as bank-

ruptcy counsel.  Richard Boyle, then Chairman of the Board and Interim CEO, explained why in

his trial affidavit: "It became readily apparent to me that the restructuring of SVCMC was in a

quagmire, and that the bankruptcy process could not go forward with MWE continuing as coun-

sel to SVCMC, given the frayed relationships between McDermott, on the one hand, and the

U.S. Trustee and Committee, on the other.  I believed that an immediate change was necessary.  I

could not replace the Judge, I could not replace the U.S. Trustee, and I could not replace the

---

[1]    The U.S. Trustee does not join in this cross-appeal.

[2]    Pursuant to a third Stipulation and Scheduling Order, so ordered by the Court on March 17, 2008, the parties
will simultaneously serve and file opening briefs on May 16, 2008, and reply briefs on June 20, 2008.  This is the
Cross-Appellants' Opening Brief for the three issues presented in the cross-appeal.  The U.S. Trustee is filing a
separate brief.

[3]    Citations to "A. ___" refer to pages in the Joint Appendix filed by the parties.

Committee or its counsel.  Because progress was not being made in terms of turning SVCMC around, and because the Board had lost confidence in MWE's ability to guide SVCMC through the bankruptcy process, we needed to replace MWE as counsel to the Debtors."  A. 0831-32.

After it was fired, McDermott filed an application for compensation as former counsel to the chapter 11 Debtors.  McDermott's Designation, Tab 4 [Bankr. Doc. # 1048[4]].  *See* 11 U.S.C. § 330(a)(1); Fed. R. Bankr. P. 2016(a).  The Debtors, the Committee and the U.S. Trustee each filed an objection to McDermott's application.  A. 1768-1784; A. 1718-1725; A. 1726-2762.  The Bankruptcy Court conducted a trial from October 23 to 25, 2006.  At the conclusion of the trial, the Bankruptcy Court observed:  "I have problems with McDermott Will & Emery's stewardship with regard to these two issues, this Speltz and Weiss [sic] consulting and Huron Consulting retention and the closing of St. Mary's Hospital."  Tr. 10/25/06, p. 41, ll. 11-14, A. 2057.  The Court invited McDermott to submit a post-trial memorandum that addressed these two issues.  The Court also directed SVCMC, the Committee and the U.S. Trustee to submit a statement of the "economic consequence [to the Debtors] in the context of this fee application of the two issues that we've been dealing with here in the Speltz and Weiss [sic] matter and the closure of St. Mary's Hospital."  Tr. 10/25/06, p. 51, ll. 11-14, A. 2067.  In their post-trial submission, the Cross-Appellants demonstrated, among other harms, that McDermott's delay in seeking and obtaining Bankruptcy Court approval to close St. Mary's Hospital, which McDermott did not accomplish, cost the hospital approximately $1,560,000, plus legal fees incurred by replacement counsel.  Statement of Economic Consequences, ¶¶ 1, 4, McDermott's Designation of Record and Statement of Issues on Appeal ("McDermott's Designation"), Tab 40.

---

[4]    Citations to "Bankr. Doc. # ___" refer to the docket number of the document on the Bankruptcy Court's Electronic Case Filing docket for the Debtors' chapter 11 case.  These documents are part of the Record on Appeal, but have not been reproduced in the Joint Appendix.  Copies will be delivered to the Court upon request.

The Bankruptcy Court issued its Decision on Application for Fees and Expenses on August 29, 2007, and reduced McDermott's fees by $460,543. *See In re Saint Vincents Catholic Med. Ctr. of N.Y.*, No. 05 B 14945 (ASH), 2007 WL 2492787 (Bankr. S.D.N.Y. Aug. 29, 2007) (the "Decision"). The Bankruptcy Court identified "two critical issues" underlying its ruling. The first "concern[ed] McDermott's handling of SVCMC's prolonged, divisive and ultimately futile attempt to seek Bankruptcy Court approval of the proposed professional retentions" of Speltz & Weis LLC and Huron Consulting Group as the Debtors' management and financial advisors, respectively. Decision, 2007 WL 2492787, at *6. The Bankruptcy Court found that "the McDermott services relating to retention of professionals, at the time at which those services were rendered, were not only not beneficial to the debtors' estates and not reasonably likely to benefit the debtors' estates – they were affirmatively detrimental to the debtors' estates." *Id.* at *23. The Bankruptcy Court concluded that McDermott should receive no compensation for these services. *Id.* at *22.

The second issue related to McDermott's handling of the closure of St. Mary's Hospital. *Id.* at *8. The Bankruptcy Court found that McDermott's services "were grossly tardy and the work product was plainly inadequate," *id.* at *24, and that the services in connection with the closure of the hospital "were not 'performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed' within the meaning of Section 330(a)(3)(D) [of the Bankruptcy Code] and that McDermott's delay in rendering those services was not 'beneficial at the time at which the service was rendered' within the meaning of Section 330(a)(3)(C)." *Id.* The Bankruptcy Court concluded that it would deduct $200,000 from McDermott's request of $248,704 for services relating to the St. Mary's closing. *Id.*

Notwithstanding its precise directive to the Debtors, Committee and U.S. Trustee to articulate the economic consequences of McDermott's services, the Bankruptcy Court expressly declined to reduce McDermott's fees by any amount that would reflect the damages sustained by SVCMC as a result of the services rendered by McDermott, and for the non-disclosure of the Speltz & Weis and Huron Consulting Group conflicts. In fact, the Bankruptcy Court specifically found that the Debtors suffered a large loss as a direct consequence of McDermott's delay in filing the motion to approve the closure of St. Mary's Hospital,[5] and "reject[ed]" McDermott's contention that there was no proof linking these losses to McDermott's services. Decision, 2007 WL 2492787, at *24. Nonetheless, the Bankruptcy Court concluded that it was inappropriate to litigate what it viewed as a tort claim for professional malpractice in the guise of an objection to legal fees. *Id.*

The Bankruptcy Court committed three reversible errors of law. *First*, the Bankruptcy Court applied the incorrect standard of law when it held that it could not award the Debtors consequential damages that it concluded were directly and proximately caused by the very same legal services whose efficacy and benefit it determined were deficient. Cases interpreting section 330 instruct that a court should consider the quality of services rendered by counsel, including whether the attorney was negligent or committed malpractice. *See, e.g., Shaw v. Replole (In re Shaw)*, No. C 00-2820 CRB, 2006 WL 1897344, at *6 (N.D. Cal. Dec. 22, 2000). Consideration of the amount of fees involved and the results obtained necessarily entails an assessment of any harm caused to the estate by debtor's counsel. *First Colonial Corp. v. Baddock (In re First Colonial Corp.)*, 544 F.2d 1291, 1300-01 (5th Cir. 1977). The statute permits the Bank-

---

[5]    The trial record reflected a loss at St. Mary's of between $71,000 and $100,000 per day. *See* Decision, 2007 WL 2492787, at *11.

ruptcy Court to award compensation that is less than the amount requested. *See* 11 U.S.C.

§ 330(a)(2).

*Second*, the Bankruptcy Court abused its discretion when, after finding that

McDermott's services to close St. Mary's Hospital were not performed within a reasonable

amount of time and were not beneficial at the time they were rendered, Decision, 2007 WL

2492787, at *24, it still awarded McDermott $48,704 in fees for services rendered in connection

with that task. Having found that McDermott did not meet the statutory predicates for an award

of fees, the Bankruptcy Court should have disallowed all fees sought for services pertaining to

St. Mary's. The award of any fees in connection with the closing of St. Mary's Hospital was

particularly inappropriate in light of the Bankruptcy Court's factual finding that McDermott's

conduct resulted in direct pecuniary harm to the Debtors. *See supra* note 4.

*Third*, the Bankruptcy Court improperly excluded the trial declaration of Guy

Sansone, the Debtors' Chief Executive Officer and Chief Restructuring Officer (the "Sansone

Testimony"). *See* Tr. 10/24/06, p. 131, ll. 24-25; p. 132, ll. 1-25, and p. 133, ll. 1-16, A. 1429-

1431. The Sansone Testimony was proffered to describe the harm McDermott's services caused

to the Debtors' estates and to enumerate the fees the Debtors incurred with successor counsel,

which was retained to repair the damage caused by McDermott's deficient services. Because the

Bankruptcy Court should have considered the harm McDermott's services caused in determining

the amount of fees to be awarded (as shown in Point I below) and because the Sansone Testi-

mony included evidence relevant to that issue, the Bankruptcy Court erred in excluding the San-

sone Testimony.

## ISSUES PRESENTED ON CROSS-APPEAL

(1)    Whether the Bankruptcy Court erred in ruling that it could not reduce the amount of compensation to McDermott to account for the harm McDermott's services caused to the Debtors' estates.

(2)    Whether the Bankruptcy Court erred by failing to reduce the award of compensation to McDermott by the full amount of the fees billed in connection with the closure of St. Mary's Hospital ($248,704) after the court ruled that McDermott's services were not performed within a reasonable amount of time and were not beneficial at the time at which the services were rendered within the meaning of sections 330(a)(3)(D) and 330(a)(3)(C) of the Bankruptcy Code, respectively.

(3)    Whether the Bankruptcy Court improperly excluded the Declaration of Guy Sansone in Support of Debtors' Response and Objection to First Interim Application of McDermott Will & Emery LLP for Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred on Behalf of the Debtors for the Period July 5, 2005 through September 30, 2005, sworn to October 17, 2006, from the trial record.

## STANDARD OF APPELLATE REVIEW

The Cross-Appeal is confined to three questions of law.  The Cross-Appellants do not challenge any of the Bankruptcy Court's findings of fact.

"District courts function as tribunals of appellate jurisdiction when reviewing the determination of bankruptcy courts and, therefore, apply the identical standards as those tribunals governing appellate review in other cases."  *MacElvain v. IRS*, 180 B.R. 670, 672 (M.D. Ala. 1995).  A district court reviews a bankruptcy court's conclusions of law *de novo*, but accepts the bankruptcy court's findings of fact unless "clearly erroneous."  *In re Johns-Manville Corp.*, 340

B.R. 49, 58 (Bankr. S.D.N.Y. 1996), *aff'd*, 517 F.3d 52 (2d Cir. 2008); *In re Halstead Energy Corp.*, 367 F.3d 110, 114 (2d Cir. 2004); *Healthco Int'l., Inc. v. Repco Printers & Lithographics, Inc.* (*In re Healthco Int'l, Inc.),* 132 F.3d 104, 107 (1st Cir. 1997); *Feder v. Lazar (In re Lazar),* 83 F.3d 306, 308 (9th Cir. 1996). *See also* Fed. R. Bankr. P. 8013; *Manville Forest Prods. Corp. v. Gulf States Exploration Co. (In re Manville Forest Prods. Corp.),* 896 F.2d 1384, 1388 (2d Cir. 1990). A factual finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Servos v. Verizon N.Y., Inc.,* 252 F.3d 163, 168 (2d Cir. 2001) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948)). The deference accorded to the bankruptcy court's factual findings is especially applicable to determinations regarding the reasonableness of requested fees, where the bankruptcy court "enjoys particularly great leeway." *In re Pontarelli,* No. Civ. A. 98-116T, 2000 WL 34019283, at *2 (D. R.I. Mar. 6, 2000) (quoting *In re I Don't Trust*, 143 F.3d 1, 3 (1st Cir. 1998). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer*, 470 U.S. 564, 573-74 (1985).

The Bankruptcy Court stated that its findings of fact "are based on the parties' joint statement of Undisputed and Admissible Facts, the documentary exhibits admitted in evidence including deposition transcripts, transcripts of Court proceedings, and the testimony of the witnesses." Decision, 2007 WL 2492787, at *1 (footnote omitted).

## STATEMENT OF RELEVANT FACTS

### A.    Procedural Background

SVCMC and its affiliated debtor entities filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on July 5, 2005 (the "Petition Date").  On July 27, 2007, the Bankruptcy Court confirmed the Debtors' First Amended Chapter 11 Plan of Reorganization.

### B.    McDermott's Tenure as Counsel

On April 13, 2004, SVCMC engaged Speltz & Weis LLC to provide management advisory services to SVCMC pursuant to the terms of a management agreement, for a period of one year.  Agreed Statement of Undisputed Facts (hereafter, "Agreed Stmt."), ¶ 12, A. 0903. The Board of SVCMC appointed David Speltz as Chief Executive Officer, and Timothy Weis as Chief Financial Officer.  Agreed Stmt., ¶¶ 13-15, A. 0903.  The management agreement was re-newed until October 31, 2005.  Agreed Stmt., ¶ 15, A. 0903.

In September 2004, the Board retained McDermott to provide advice to SVCMC about a possible debt restructuring.  Agreed Stmt., ¶ 17, A. 0904.  After the Debtors filed for bankruptcy, the Bankruptcy Court authorized McDermott's retention as counsel to the Debtors, retroactive to the Petition Date by final order dated August 8, 2005.  Agreed Stmt., ¶ 8, A. 0903. McDermott  served as the Debtors' primary bankruptcy counsel from July 5, 2005 through September 13, 2005.  Agreed Stmt., ¶ 7, A. 0903.  The Debtors fired McDermott as counsel and re-placed it with Weil, Gotshal & Manges LLP ("Weil") on September 13, 2005.  Agreed Stmt., ¶ 11, A. 0903.

### C.    McDermott's Failed Efforts to Close St. Mary's Hospital

On June 1, 2005, prior to the Petition Date, the Debtors' Board of Directors (the "Board") resolved to close St. Mary's Hospital.  Agreed Stmt., ¶ 105, A. 0913.  Smith attended

the Board meeting.  The Board instructed management and counsel, including McDermott, to

take the necessary and appropriate action to close the hospital.  Agreed Stmt., ¶¶ 106-8, A. 0913.

At a June 17, 2005 meeting, the Executive Committee of the Board set September 1, 2005 as the

target date for closure.  Smith also attended that meeting.  Agreed Stmt., ¶¶ 116-117, A. 0914.

Closure of St. Mary's Hospital was subject to the Bankruptcy Code and the Bank-

ruptcy Rules.  McDermott was primarily responsible for obtaining Bankruptcy Court approval of

the closure, while the Debtors' internal management was primarily responsible for the steps re-

quired to obtain canonical and regulatory approval.  Agreed Stmt., ¶¶ 109-110, A. 0913.  By late

June 2005, the Debtors had obtained canonical authority to close St. Mary's Hospital, and made

application to the New York State Department of Health (the "DOH") for approval.  Agreed

Stmt., ¶¶ 111, 113, A. 0913.

Harriet McCloud, a former patient at St. Mary's Hospital, obtained an *ex-parte*

temporary restraining order in Kings County Supreme Court on July 22, 2005, restraining the

DOH from approving a closure plan for St. Mary's (the "State Court Litigation").  On July 29,

2005, McDermott filed a complaint with the Bankruptcy Court, seeking a preliminary and per-

manent injunction to enjoin Ms. McCloud from prosecuting the State Court Litigation.  On

August 4, 2005, Stephen Selbst, a partner in McDermott's New York office, appeared on behalf

of the Debtors at a hearing in the Bankruptcy Court on the application for an injunction.  Agreed

Stmt., ¶¶ 124-126, A. 0915.

McDermott did not file a motion seeking permission to close St. Mary's Hospital

on the Petition Date, even though the Board had directed McDermott on June 1, 2005 to effect

closure as soon as possible.  In fact, McDermott first began work on a motion seeking permission

from the Bankruptcy Court to close St. Mary's Hospital (the "St. Mary's Motion") no earlier

than August 5, 2005, a full month after the commencement of the bankruptcy case, and finally filed the St. Mary's Motion on August 18, 2005.  Agreed Stmt., ¶¶ 128-129, A. 0915.  The DOH approved the closure of St. Mary's Hospital on August 31, 2005, Agreed Stmt., ¶ 131, A. 0916, but closure could not proceed because McDermott had failed to secure Bankruptcy Court approval.

Various objections to the St. Mary's Motion were filed.  Agreed Stmt., ¶ 132, A. 0916.  McDermott prepared and filed the Debtors' omnibus reply to the objections to the St. Mary's Motion on September 2, 2005.  Agreed Stmt., ¶ 135, A. 0916.  McDermott did not file any affidavits or declarations to support the St. Mary's Motion, nor in response to any of the objections.  Agreed Stmt., ¶ 136, A. 0916.  The Court held a hearing on the St. Mary's Motion on September 7, 2005.  Agreed Stmt., ¶ 138, A. 0916.  Selbst represented the Debtors at the September 7 hearing, but offered no testimony from any witnesses to support closure.  Agreed Stmt., ¶¶ 139-140, A. 0916.  The Court did not grant the St. Mary's Motion on September 7, 2005, and the hearing was adjourned.  Agreed Stmt., ¶ 142, A. 0917.

On September 19, 2005, just days after the Debtors had replaced McDermott, Weil, on behalf of the Debtors, filed the declarations of Linda Brady, M.D., Kingsbrook HealthCare System LLC's president; Thomas M. Barry, Managing Director of Cain Brothers & Company, LLC (as supplemented on September 19, 2005); Dawn Gideon, the Debtors' then-Interim Chief Restructuring Officer; and Sister Jane Iannucelli, vice chairperson of the Board, in support of the St. Mary's Motion.  The Bankruptcy Court resumed the hearing on the St. Mary's Motion on September 20, 2005, and Weil appeared on behalf of the Debtors.  At the hearing, Weil presented testimony from Sister Jane Iannucelli.  The Court approved the closure of St. Mary's Hospital at the September 20, 2005 hearing.  Agreed Stmt., ¶¶ 143-147, A. 0917.

On October 31, 2005, the Bankruptcy Court authorized the Debtors to employ Guy Sansone of Alvarez & Marsal LLC as Chief Executive Officer and Chief Restructuring Officer of SVCMC. Bankr. Doc. # 572. Starting in October 2005, Mr. Sansone served as CEO and CRO of SVCMC.

During the trial of this dispute, the Debtors sought to introduce the Sansone Testimony.[6] Had he been permitted to testify, Mr. Sansone would have provided the following evidence:

- "When I first arrived at SVCMC, based on my personal observations, the chapter 11 case was chaotic and in disarray." Decl. of Guy Sansone, ¶ 2, A. 0701.

- "The case was just 3 months old, yet there was no firm commitment for debtor in possession financing, even though forecasts showed the company running out of cash by the end of January 2006, and the then current draft of the company's business plan was unrealistic." *Id.*

- "Physicians within the hospital system had lost confidence in the bankruptcy process – they felt they were being ignored and not receiving information about the reorganization, so much so that physician groups from Queens, Staten Island and Manhattan were all trying to form separate creditors' committees." *Id.*

- "Employees at SVCMC expressed a lack of trust with senior management." *Id.*

- "I fairly quickly came to the conclusion that much of the chaos and disarray appeared to trace directly back to the efforts of McDermott – never successful – to retain Speltz & Weis, LLC and Huron Consulting Group. It seemed to me that these efforts had diverted attention away from other, more critical needs such as solidifying financing to ensure adequate capital and liquidity to make it through the chapter 11 process and emerge with a confirmable and confirmed plan." *Id.*

- "In my experience as CEO and CRO of SVCMC, I do not believe that any of the problems that I learned about which existed during McDermott's tenure as

---

[6]     The parties proffered direct testimony in the form of affidavits and declarations. Counsel for the parties cross-examined and re-direct examined the witnesses in person.

counsel continued after Weil replaced McDermott."  Decl. of Guy Sansone,
¶ 5, A. 0703.

- "I believe that Weil has effectively helped the Debtors to achieve many of
  their objectives in this case smoothly and without acrimony, both in and out of
  court, and that Weil has assiduously and accurately conveyed my expectations
  and directions as CEO/CRO to all parties concerned."  *Id.*

The Bankruptcy Court refused to permit Mr. Sansone to testify because it "did not

feel that [Mr. Sansone] had any fact testimony to provide that would be illuminating," *see* Tr.

10/24/06, p. 132, ll. 1-2, A. 1430, Mr. Sansone did not participate in the events giving rise to this

dispute, *i.e.* at p. 132, ll. 11-14, A. 1430, and "the substance of [Mr. Sansone's] submission is

more appropriately presented through the arguments of counsel."  *Id.* at p. 132, ll. 6-7, A. 1430.

## ARGUMENT

### I.
### THE BANKRUPTCY COURT COMMITTED REVERSIBLE ERROR WHEN IT RULED THAT IT COULD NOT REDUCE McDERMOTT'S COMPENSATION TO ACCOUNT FOR HARM CAUSED TO SVCMC'S ESTATE

**A.    The Standard for Compensation**

Compensation to professionals in bankruptcy cases is governed by section 330 of

the Bankruptcy Code, which provides, in pertinent part, for payment of:

> (A)    reasonable compensation for actual, necessary services rendered by
> the trustee, examiner, professional person, or attorney and by any
> paraprofessional persons employed by such person;  and
>
> (B)    reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).  In determining the amount of reasonable compensation to be awarded,

"the court shall consider the nature, the extent, and the value of such services, taking into ac-

count all relevant factors, including –

> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;

12

(C)     whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D)     whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E)     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3). The "applicant bears the burden of proving reasonableness of compensation from a bankruptcy estate." *Zeisler & Zeisler v. Prudential Ins. Co. (In re JLM, Inc.)*, 210 B.R. 19, 24 (2d Cir. BAP 1997). As the Bankruptcy Court observed, the analysis is retrospective, and the court determines after the fact whether the services were beneficial at the time they were rendered. Decision, 2007 WL 2492787, at *1. The court shall not allow compensation for services that were not –

(I)     reasonably likely to benefit the debtors' estate; or

(II)    necessary to the administration of the case.

11 U.S.C. § 330(a)(4)(A)(ii).

**B.    Reduction of Fees to Account for Harm to SVCMC**

Applying the statutory framework of section 330(a) of the Bankruptcy Code, the Bankruptcy Court found that McDermott's services "were not 'performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed' within the meaning of Section 330(a)(3)(D) [of the Bankruptcy Code] and that McDermott's delay in rendering those services was not 'beneficial at the time at which the service was rendered' within the meaning of Section 330(a)(3)(C)." Decision, 2007 WL 2492787, at *24. Focusing specifically on the closure of St. Mary's Hospital, the Bankruptcy Court "re-

13

ject[ed] McDermott's argument that 'there is no proof linking these purported losses to McDer-
mott's services . . . *The fact that St. Mary's Hospital was operated at a loss is neither speculative
nor disputed*. The precise quantum of loss sustained during this specific twenty-day period may
be impossible to quantify with dollar and cents precision on the trial record. *But there can be no
doubt that the debtors suffered a large loss as a consequence of McDermott's delay in filing the
motion*" to close the hospital. *Id*. (emphasis added).

The Bankruptcy Court erred, however, in concluding that it could not reduce
McDermott's fees by any amount that reflected the harm caused to the Debtors by McDermott's
deficient services. It is well settled that consideration of the quality of services rendered by a
bankruptcy attorney necessarily encompasses whether the attorney was negligent or committed
malpractice. *See, e.g.*, *Shaw*, 2000 WL 1897344 at *6; *Golloday v. Broach (In re Envirodyne
Corp.)*, No. 00-40480, 2006 WL 2010836 (Bankr. N.D. Cal. July 6, 2006). In *Shaw*, the district
court observed that "[c]ourts awarding attorney's fees under [sections 329, 330 or 331 of the
Bankruptcy Code] regularly consider the quality of services rendered by a bankruptcy attorney,
including whether the attorney was negligent or committed malpractice." 2000 WL 1897344, at
*6. Dismissing a claim for malpractice brought subsequent to an order granting a fee applica-
tion, the *Shaw* court stated, "Shaw was free to (and did) raise her malpractice claim . . . in *object-
ing* to Replole's application for fees, and the court properly considered her claim in deciding to
award fees . . . in spite of her malpractice allegations." *Id*. (emphasis added). As in this case, the
plaintiff in *Shaw* did not bring formal counterclaims for malpractice in response to debtor's
counsel's fee application, but submitted a written opposition to counsel's application. *Id*. at *3;
*see also Golloday*, 2006 WL 2010836, at *6 (claims of malfeasance or nonfeasance could be as-
serted as an objection to a fee application); *see also Jones v. Woody (In re W.J. Servs., Inc.)*, 139

B.R. 824, 827-28 (Bankr. S.D. Tex. 1992) ("plaintiff was under a duty to bring up facts relevant to the quality, reasonableness and necessity of the defendant's work in the *hearings* on the application for allowance of attorney's fees") (emphasis added); *cf. Osherow v. Ernst & Young, LLP (In re Interlogic Trace, Inc.),* 200 F.3d 382, 389-90 (5th Cir. 2000) (addressing the trustee's argument that malpractice claims are counterclaims that can only be raised in an adversary preceding, the court stated, "Had [the debtor] objected to the fee application and included with its objection a claim for *affirmative* relief on account of the alleged malpractice, the matter would have become an adversary proceeding.") (emphasis added).

   Taken together, these cases stand for the clear proposition that the quality of counsel's services can and *must* be evaluated in the context of a fee application. Judge Hardin concluded otherwise, observing that "[t]he standards for determining the merits of a malpractice claim and the quantum of damages to be awarded, if any, are not necessarily the same as the standards for determining the appropriateness of legal fees under the Bankruptcy Code." Decision, 2007 WL 2492787, at *24. While this may be true, it is reversible error to conclude that the Bankruptcy Court *could not* consider whether McDermott was negligent, and assess the resulting harm to the Debtors. The Bankruptcy Court equated reducing a fee application because of harm caused by debtor's counsel with granting an award of affirmative relief pursuant to a claim of malpractice, rather than examining McDermott's deficient services as a component of the proper analysis under section 330(a).

   Sections 330(a)(1) and (a)(2) of the Bankruptcy Code recognize that an award of "reasonable compensation" can be reduced under justified circumstances such as harm to the debtor caused by counsel's actions. Section 330(a)(3) instructs the Bankruptcy Court to "tak[e] into account all relevant factors" when determining what compensation is reasonable. 11 U.S.C.

§ 330(a)(3). This includes harm caused to the debtor's estate through McDermott's negligence. *See In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 844 (Bankr. C.D. Cal. 1991) (holding that "actual competence in performing services must be a mandatory factor in awarding fees"); *see also First Colonial Corp.* 544 F.2d at 1300.

       The Fifth Circuit held in *First Colonial* that the twelve factors for assessing reasonable compensation to attorneys articulated in *Johnson v. Ga. Highway Express Inc.*, 488 F.2d 714 (5th Cir. 1974) (concerning employment discrimination), applied to bankruptcy fee applications. *First Colonial* recognized that the eighth *Johnson* factor, "the amount involved and the results obtained," includes harm caused to the estate by debtor's counsel. 544 F.2d at 1300-01. The trustee in *First Colonial* objected to debtor's counsel's fee application on the basis that the debtor's legal claims were settled for a fraction of their value. *Id.* Based on the particular facts in *First Colonial*, the court overruled the trustee's objection, but acknowledged that whether debtor's counsel compromised the value of legal claims should be considered when ruling on a fee application. *Id.*

       In *In re Cenargo Int'l., Plc.*, 294 B.R. 571, 604-06 (Bankr. S.D.N.Y. 2003), the Bankruptcy Court for the Southern District of New York (Drain, J.) reduced debtor's counsel's fee award to account for its flawed decision to file for bankruptcy protection only in the United States and failure to make preparations for a rapid protective filing in England. In determining the appropriate fee reduction, the court considered all of the "negative consequences," *id.* at 604, that resulted from counsel's flawed strategy, including additional legal fees incurred by the debtor, additional legal fees incurred by the creditors' committee, and the cost of paying foreign creditors when some of those payments may not have been necessary under English insolvency laws. *Id.* The *Cenargo* court, unlike the Bankruptcy Court below, recognized that the harm suf-

fered by the debtor from counsel's advice and actions must be considered when ruling on a final

fee application under section 330.  *See id.*  Moreover, the bankruptcy court considered all dam-

ages suffered by the debtor resulting from counsel's action even though the damages were "diffi-

cult to quantify."  *Id.*

        In *In re Davison,* 79 B.R. 859, 865 (Bankr. W.D. Mo. 1987), the bankruptcy court

denied debtor's counsel's fee application in its entirety after finding that counsel aided the

debtor's continued incurrence of post-petition debt without formal authorization from the court.

The court held that it is "misconduct of counsel to aid and abet the dissipation of funds and assets

of the estate."  *Id.* at 861.  The court stated, "[i]mproper conduct on the part of officers or attor-

neys has frequently been penalized by withholding compensation or reimbursement or both.  Not

only the statute and the Rules provide for this type of penalty but the courts have repeatedly used

it as the most effective weapon against malpractice."  *Id* (quoting 3A COLLIER ON BANKRUPTCY

¶ 62.05 (14th ed. 1975)); *see also Jones v. Woody (In re W.J. Servs., Inc.),* 139 B.R. at 827-28; *In

re Source Enters.,* No. 06-1177, 2008 WL 8502290, slip op. at 18 (Bankr. S.D.N.Y. Mar. 27,

2008) ("The manner in which [counsel] represented the Debtor and the firm's singular concen-

tration on fees … *caused harm* to the Debtor sufficient to support a denial of all fees sought.")

(emphasis added).

        Judge Hardin should have considered the harm the Debtors suffered as a result of

McDermott's deficiently rendered services.  As in *Davidson*, McDermott should be penalized for

the harm it caused and its fees should be reduced accordingly, particularly given that the delay in

securing approval to close St. Mary's, standing alone, resulted in damages that exceeded the

value of services for which the Bankruptcy Court awarded McDermott compensation.  While the

precise amount of the reduction to be made is properly a matter for the Bankruptcy Court, the refusal to consider *any* reduction at all was a clear error of law.[7]

## II.
### THE BANKRUPTCY COURT ABUSED ITS DISCRETION BY NOT DISALLOWING ALL LEGAL FEES FOR McDERMOTT IN CONNECTION WITH THE CLOSING OF SAINT MARY'S HOSPITAL

The Bankruptcy Court correctly found that McDermott's services in connection with the St. Mary's Hospital closing were not performed within a reasonable amount of time and were not beneficial at the time those services were rendered. Decision, 2007 WL 2492787, at *24. Judge Hardin unequivocally concluded that approval to close St. Mary's Hospital by September 1, 2005 was not obtained due to the untimely and unsatisfactory services of McDermott. Based upon the Agreed Statement of Undisputed Facts and the trial evidence, the Bankruptcy Court made the following relevant findings of fact:

- On June 1, 2005 the SVCMC Board instructed McDermott to work with management to close St. Mary's Hospital as soon as possible. As of June 17, 2005, McDermott knew that the debtors had set September 1, 2005 as the target for closure of St. Mary's Hospital. McDermott was charged with the responsibility of obtaining Bankruptcy Court approval. Decision, 2007 WL 2492787, at **8, 20.

- From June 17 until after July 22, no McDermott attorney was assigned to begin work on a motion for Bankruptcy Court authority to close St. Mary's Hospital. It was not until August 5 that McDermott attorneys first began work on a motion for Bankruptcy Court approval to close St. Mary's Hospital, and the motion was not filed until August 18. *Id*. at ** 9-10, 21-22.

- If work on the motion had been commenced soon after the June 17 Board meeting which set the September 1 deadline, instead of August 5, the motion would have been timely filed. It was the Board that set the September 1 dead-

---

[7] The Cross-Appellants also asserted that McDermott's fees should have been reduced by the amount of legal fees incurred by Weil, as successor counsel, to ameliorate the harm caused by McDermott's myriad failures, specifically to obtain approval to close St. Mary's Hospital and for the transition from McDermott to Weil. *See* Statement of Economic Consequences, ¶¶ 10, 12, McDermott's Designation, Tab 40. The Bankruptcy Court ruled that the additional fees the Debtors were required to pay to Weil were also in the nature of consequential damages, and denied the further reduction to McDermott's award. Decision, 2007 WL 2492787, at *25. *See infra* Point III. This was also reversible error.

line, and it was McDermott's job to do what had to be done to comply with the Board's mandate. *Id*. at *21.

- The motion was unaccompanied by any supporting affidavits or financial analysis to document the economic exigency requiring prompt closure, and defective. *Id*. at *21.

- McDermott's delay in preparing and filing the motion was not the consequence of strategy, but inattention. The failure to support the motion when finally made with affidavits and financial analysis was not the consequence of strategy or the unavailability of data, but inadequate and untimely preparation. *Id*. at *22.

- McDermott's services were grossly tardy and the work product was plainly inadequate because it did not provide the Court with a documented, factual predicate necessary for an order to close the Hospital. *Id*. at *24.

- As a direct consequence of this delay, Court approval was not obtained until September 20. *Id*. at *23.

Despite these explicit findings, Judge Hardin, without explanation or amplification of his reasoning, stated: "I further conclude that $200,000 is an appropriate amount to deduct from McDermott's $248,704 billings for the Hospital closing." Decision, 2007 WL 2492787, at *24.

When services provided are insufficient to bring about their intended result, any associated fees must be denied in their entirety. Judge Hardin's failure to apply this standard was an abuse of discretion. *See In re Raytech Corp*., 241 B.R. 785, 788 (D. Conn. 1999) ("Bankruptcy courts enjoy wide discretion in determining reasonable fee awards, which discretion will not be disturbed by an appellate court absent a showing that it was abused. Such discretion may be abused by failing to apply *proper legal standards*, by failing to follow proper procedures, or by basing the award on findings of fact that are clearly erroneous.") (citations omitted) (emphasis added).

The principle that no compensation should be provided for services that are not likely to bring about their intended result originates with the Second Circuit's ruling in *N.Y.*

*Credit Men's Adjustment Bureau, Inc. v. Ballon, Stoll & Itzler (In re Casco Fashion, Inc.),* 490

F.2d 1197 (2d Cir. 1973).  In *New York Credit*, the Second Circuit held:

> [I]f a court finds that a Ch. XI proceeding was filed without any
> reasonable prospect of success or in an effort to head off an inevi-
> table adjudication of bankruptcy, compensation to a debtor's attor-
> neys should be denied.  It may also be, although we do not now
> decide this, that *services in formulating an arrangement that was
> not accepted should not be compensated* or should be compensated
> only at subnormal rates.

*Id.* at 1204 (citations omitted) (emphasis added); *see also In re Wilson,* 11 B.R. 986, 991 (Bankr.

S.D.N.Y. 1981) (counsel's fee application was denied in the entirety where the services provided

were "neither competently performed nor zealously provided.").  *Wilson* is particularly apt.

There, counsel was charged with protecting the debtor from loss of the family home, which was

only achieved through the efforts of subsequent counsel.  *Wilson,* 11 B.R. at 991.

　　　　The Bankruptcy Court should have denied all of McDermott's fees incurred in

connection with the botched effort to secure an order authorizing the Debtors to close St. Mary's

Hospital.  As Judge Hardin found, the Bankruptcy Court could not have been expected to grant

approval by September 1, 2005 given the untimely and unsatisfactory nature of the motions filed

by McDermott on August 18, 2005.  Decision, 2007 WL 2492787, at *22.   As in *Wilson*, ap-

proval to close St. Mary's Hospital was obtained only through the efforts of Weil, which, within

one week of its appointment, had filed four affidavits in support of the closing and, unlike

McDermott, had "provide[d] the Court with a documented, factual predicate necessary for an

order to close the Hospital."  *See* Decision, 2007 WL 2492787, at *24.

　　　　The Bankruptcy Court also abused its discretion by failing to reduce McDermott's

fees by the full amount requested because McDermott's services relating to the St. Mary's Hos-

pital closing did not benefit the estate.  *See* 11 U.S.C. § 330(a)(1)(C).  This Court can scour the

record and the Decision for any hint that McDermott's services for St. Mary's Hospital in any way benefitted the Debtors' estate, but it would be a fruitless exercise. There is no basis articulated in the Decision or evidence cited in the record to justify fees of $48,704 for McDermott's services. *Any* fees for work relating to St. Mary's are unreasonable. *See, e.g., In re Chin,* 47 B.R. 894, 897-98 (S.D.N.Y. 1984) (suggesting that debtor's counsel should not be compensated for any services performed in connection with state court litigation and a second bankruptcy petition caused by counsel's failure to timely seek an extension of the automatic stay in connection with the first bankruptcy petition); *In re Dalton,* 95 B.R. 857 (Bankr. M.D. Ga. 1989) (fee application denied in the entirety for services that failed to meet minimum acceptable standards and resulted in false information filed with the court and loss of debtor property); *In re Richardson,* 14 B.R. 755 (Bankr. E.D. Pa. 1981) (fee application denied in the entirety for inadequate services that provided no value to debtor).

Finally, section 330(a)(4)(i) of the Bankruptcy Code provides that no compensation can be awarded for "unnecessary duplication of services." 11 U.S.C. § 330(a)(4)(A)(i). Because of McDermott's abject failure to obtain timely approval of the St. Mary's Hospital closing, replacement counsel was required essentially to restart the process from the ground up, particularly to proffer a sufficient evidentiary record to support the closing. The Debtors paid Weil approximately $230,000 for these services.[8] *See* Statement of Economic Consequences, ¶ 4, McDermott's Designation, Tab 40. An award of fees to McDermott for its work on the St. Mary's Hospital closure would amount to compensation for unnecessary duplication of services. *See, e.g., In re McVay,* No. 05-74585, 2006 WL 2056682, slip op. at 2 (Bankr. N.D. Ohio Apr.

---

[8]    The declaration of Guy Sansone, which was improperly excluded from the record below by the Bankruptcy Court, would have provided a concrete evidentiary basis for the amount of legal fees incurred by Weil. (*See infra* Point III.)

28, 2006) (discounting trustee fee application for information that could have more efficiently been obtained from debtor's counsel); *In re Miller Grain Co.*, No. 02-41324-7, 2004 WL 2191603, at *3 (Bankr. D. Kan. Apr. 2, 2004) (fee application of trustee and counsel reduced because it was unnecessary for both to attend evidentiary hearing opposing a motion).

The Bankruptcy Court's findings of fact regarding McDermott's services relating to the St. Mary's Hospital closing, the vast majority of which are undisputed, are amply supported by the record evidence and not clearly erroneous. McDermott's services demonstrably failed to achieve the intended result – an order of closure. On the basis of these facts, and in the absence of any findings of fact that McDermott's services benefitted the Debtors or otherwise satisfied the relevant statutory criteria, it was an abuse of discretion for the Bankruptcy Court to summarily conclude that it would only reduce McDermott's fees by $200,000, rather than the full amount requested for St. Mary's Hospital work, $248,704.

### III.
### THE BANKRUPTCY COURT ERRED
### IN EXCLUDING THE SANSONE TESTIMONY

As set forth in Point I above, the Bankruptcy Court erred in refusing to reduce McDermott's fee award by an amount that takes account of the adverse impact McDermott's services had on the Debtors. To determine the amount by which McDermott's fees should have been reduced, the Bankruptcy Court should have considered evidence of the harm that McDermott's services caused. During the trial of this matter, the Debtors sought to introduce the Sansone Testimony to (a) demonstrate the impact McDermott's mishandling of the bankruptcy case had on the Debtors and (b) quantify the successor counsel legal fees incurred by the Debtors, required to rectify the harm caused by McDermott. Because the Sansone Testimony directly related to the impact McDermott's services had on the Debtors, the Bankruptcy Court abused its

discretion in refusing to consider that testimony. *Weiss v. La Suisse, Societe d'Assurances sur la Vie*, 293 F. Supp. 2d 397, 409 (S.D.N.Y. 2003) ("Exclusion of relevant information is 'an extraordinary remedy that must be used sparingly.'" quoting *George v. Celotex Corp.*, 914 F.2d 26, 31 (2d Cir. 1990)).

A.    **Harm to the Debtors Resulting From McDermott's Malpractice**

        The Bankruptcy Court should have permitted the Sansone Testimony because it would have provided direct evidence of the harm McDermott's services caused to the Debtors' estates. The Sansone Testimony would have demonstrated: (a) the disarray that existed in the bankruptcy case at the time the Debtors transitioned to new bankruptcy counsel; (b) that McDermott had failed to obtain a firm commitment for debtor in possession financing despite impending cash flow issues; (c) the physicians' loss of confidence in the bankruptcy process during McDermott's tenure; (d) the employees' loss of trust in senior management while management was being advised by McDermott; (e) that much of the chaos and disarray traced directly back to the failed efforts of McDermott to retain Speltz & Weis, LLC and Huron Consulting Group; (f) the problems that existed during McDermott's tenure as counsel ceased once Weil replaced McDermott; and (g) that Weil effectively helped the Debtors to achieve many of their objectives in this case smoothly and without acrimony.

        Judge Hardin excluded the Sansone Testimony because he "did not feel that [Mr. Sansone] had any fact testimony to provide that would be illuminating," *see* Tr. 10/24/06, p. 132, ll. 1-2, A. 1430, and because Mr. Sansone did not participate in the events giving rise to this dispute, *id*. at p. 132, ll. 11-14, A. 1430. The Bankruptcy Court's rationale is flawed because Mr. Sansone had direct, first-hand knowledge of the impact of McDermott's services on the Debtors' estates. *United States v. Rodriguez*, 968 F.2d 130, 143 (2d Cir. 1992) ("The result of a witness's

observations need not be positive or absolutely certain to make his testimony admissible and lack of certainty is a matter to be argued to the jury rather than a reason for excluding the evidence.") (citations omitted). Engaged to serve as the Debtors' CEO and CRO in very shortly after McDermott's tenure as Debtors' bankruptcy counsel came to a close, Mr. Sansone was uniquely situated to witness first-hand the cumulative impact McDermott's services had on the Debtors. Ultimately responsible for the oversight of successor counsel, Mr. Sansone was also well positioned to observe the measures Weil was required to take to remedy the harm McDermott had inflicted. Although the Sansone Testimony would have included a limited number of clarifying hearsay statements, the core testimony (in paragraphs "2," "5," "6," "7" and "8") was indisputably based on Mr. Sansone's own observations and experience. The Bankruptcy Court abused its discretion by excluding the Sansone Testimony because it would have provided important evidence relevant to the Bankruptcy Court's assessment of the harm caused by McDermott's defectively performed services.

**B.    Legal Fees Incurred by the Debtors to Ameliorate the Effects of McDermott's Malpractice**

The Sansone Testimony would also have quantified successor counsel's legal fees incurred in connection with ameliorating the harms that McDermott caused to the Debtors' estates. Through the Sansone Testimony, the Debtors sought to introduce copies of the time records that Weil submitted for the period September 12 through October 31, 2005. Mr. Sansone would have testified that successor counsel's fees included services associated with: (a) the transition of counsel from McDermott to Weil; (b) negotiating a compromise with the U.S. Trustee and the Committee, which permitted former Speltz & Weis, LLC employees and Huron employees to remain on the job at SVCMC; (c) finally obtaining approval to close St. Mary's Hospital; and (d) efforts to identify and obtain court approval for the retention of interim chief restructur-

ing and financial officers during the chapter 11 case. None of these fees would have been incurred by Weil had McDermott performed competently during its tenure.

In explaining his decision to disregard this portion of the Sansone Testimony, Judge Hardin stated "should I decide that any part or all of the challenged activities of McDermott, Will and Emery should result in a diminution in their fees, that is to say, if I reach that conclusion, then I will look to counsel for assistance in presenting me with argument and a rational grounds for attributing a dollar cost. I am not saying I'm going to reach any such conclusion or that I'm not. But if I did or, if I do, then I will be looking to counsel not so much to Sansone." *See* Tr. 10/24/06, p. 132, ll. 23-25; p. 133, ll. 1-6, A. 1430-1431.

By refusing to admit the Sansone Testimony, the Bankruptcy Court improperly excluded direct, objective evidence of the consequential damages suffered as a result of McDermott's malfeasance. *See United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004) ("As a general matter, all relevant evidence is admissible under the Federal Rules of Evidence unless specifically excluded."). Notwithstanding the Bankruptcy Court's expressed preference for a different form of evidence, the Debtors were entitled to present their evidence in a manner and form of their choosing so long as the proffered evidence did not violate the Federal Rules of Evidence. The Sansone Testimony clearly satisfied FRE 402's relevance requirement, as the evidence of successor counsel's fees directly pertained to the consequential harm suffered by the Debtors and the redundancy of the services rendered by McDermott.[9] (*See* Points I and II *supra*.) The Sansone Testimony should thus have been admitted, and its exclusion was an abuse of discretion.

---

[9]    The Bankruptcy Court did not hold, nor could it have held, that the portion of the Sansone Testimony pertaining to the fees to be paid to Weil constituted hearsay.

## CONCLUSION

For the reasons discussed above, the Cross-Appellants submit that the Decision and Order of the Bankruptcy Court should be reversed to the extent of the issues that are the subject of the Cross-Appeal, and if further evidence is required to quantify damages caused by McDermott's deficient services, the case should be remanded to the Bankruptcy Court for that purpose.  In all other respects, the Decision and Order of the Bankruptcy Court should be affirmed.

Dated: New York, New York
       May 16, 2008

TOGUT SEGAL & SEGAL LLP
*Counsel for Appellee and Cross-Appellant*
*Saint Vincents Catholic Medical Centers*
*of New York*


By: /s/ Frank A. Oswald
    Frank A. Oswald (FAO-1223)
    Howard P. Magaliff (HPM-2189)
One Penn Plaza
New York NY 10119
(212) 594-5656

ALSTON & BIRD LLP
*Counsel for Appellee and Cross-Appellant*
*Creditors Committee of Saint Vincents*
*Catholic Medical Centers of New York*


By: /s/ Michael E. Johnson
    Michael E. Johnson  (MJ 1602)
    Martin G. Bunin (MB 0299)
    Brook A. Clark (BC 1749)
90 Park Avenue
New York, NY  10016
(212) 210-9400

## CERTIFICATE OF SERVICE

On May 16, 2008, I served a copy of the *Opening Brief of Cross-Appellants Saint Vincents Catholic Medical Centers of New York and Creditors' Committee of Saint Vincents Catholic Medical Centers of New York* by first-class mail upon:

Michael L. Cook, Esq.
David M. Hillman, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York  10022

Alan S. Rutkoff, Esq.
William P. Smith, Esq.
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, Illinois  60606

Stephen B. Selbst, Esq.
James M. Sullivan, Esq.
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10017-4613

Tracy Hope Davis, Esq.
Alicia M. Leonhard, Esq.
Office of the United States Trustee
 for Region 2
33 Whitehall Street, 21st Floor
New York, New York  10004

/s/ Howard P. Magaliff
Howard P. Magaliff