Michael L. Cook (MC 7887)
David M. Hillman (DH 8666)
SCHULTE ROTH & ZABEL LLP
Counsel for McDermott Will & Emery LLP
919 Third Avenue
New York, New York  10022
Telephone:  (212) 756-2000
Facsimile:  (212) 593-5955

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Civ No. 1:07-CV-09818-AKH |
| SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a SAINT VINCENT CATHOLIC MEDICAL CENTERS, *et al.*, | Chapter 11<br>Case No. 05-14945 (ASH)<br><br>(Jointly Administered) |
| Debtors. | |
| McDERMOTT WILL & EMERY LLP, | |
| Appellant. | |
| v. | |
| SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK, CREDITORS' COMMITTEE OF SAINT VINCENT CATHOLIC MEDICAL CENTERS OF NEW YORK and DIANA G. ADAMS, AS UNITED STATES TRUSTEE FOR REGION 2, | |
| Appellees. | |

## BRIEF OF APPELLANT MCDERMOTT WILL & EMERY LLP

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. i

Preliminary Statement ................................................................................. 1

Statement of Appellate Jurisdiction ........................................................... 3

Statement of Issues Presented .................................................................... 4

Applicable Standard of Appellate Review ................................................. 4

Statement of Facts ....................................................................................... 5

    A.   McDermott Advises the Debtors as they Faced Bankruptcy ................... 5

    B.   The Debtors Select S&W and Huron as Management Professionals and Consider Potential Conflicts ............................. 7

    C.   The Debtors Waive Potential Conflicts Presented by the S&W and Huron Retentions .................................................. 10

    D.   The Trustee At First Supports, But Then Temporarily Opposes, The Retention of S&W. ......................................... 13

    E.   McDermott Investigates Tortious Interference Allegations Arising from the S&W Dismissal ...................................... 18

    F.   The Debtors Terminate McDermott as a Peace Offering, But Continue Their Efforts to Retain Huron and S&W. ........... 19

    G.   McDermott Handles the Closure of St. Mary's Hospital and Meets the "Key Date" for Approval. ............................ 21

ARGUMENT ............................................................................................... 28

    I.   THE LOWER COURT CLEARLY ERRED IN DENYING MCDERMOTT'S FEES ON MATTERS PERTAINING TO THE RETENTION OF S&W ........................... 28

    A.   McDermott Is Entitled to $98,382 in Fees For Its Efforts to Maintain the Services of S&W. ......................... 29

        1.   The Record Does Not Support the Court's Finding that S&W's Retention Was "Futile." ..................... 29

        2.   The Court Erred in Considering Pre-Petition Facts Regarding McDermott's Candor as to S&W's Conflict of Interest ................................. 36

        3.   The Trustee Had Adequate and Timely Information Regarding S&W and Huron ....................... 38

    B.   McDermott Should Not Bear $74,180 in Fees Related to the Post-S&W Change in Management and Appointment of a CRO. ........ 39

# TABLE OF CONTENTS
(continued)

C.    McDermott is Entitled to $44,523 for Its Reasonable and Efficient Investigation of a Possible Tortious Interference Claim Stemming From the S&W Retention Matter...................................................... 40

II.    THE LOWER COURT ERRED BY PREMISING ITS CRITICISM OF McDERMOTT'S HANDLING OF THE ST. MARY'S CLOSURE ON A FALSE DEADLINE AND NONEXISTENT MISTAKES BY McDERMOTT .................................................................................................. 41

A.    The September 1st "Deadline" Was a Fiction Created by the Lower Court. ........................................................................................................ 41

B.    The Lower Court's Finding that McDermott Filed an Inadequate Motion Has No Support in the Record. ................................................. 44

III.    McDERMOTT WAS NOT DISMISSED FOR POOR PERFORMANCE AND THEREFORE SHOULD NOT BEAR THE COST OF TRANSITION TO SUCCESSOR COUNSEL .................................................. 47

CONCLUSION ................................................................................................................ 48

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Ames Department Stores, Inc.*, 76 F.3d 66 (2d Cir. 1996) ...................................34, 35

*Anderson v. Anderson* (In re Anderson), 936 F.2d 199 (5th Cir. 1991) ............................4

*In re Aquatic Development Group, Inc.*, 352 F.3d 671 (2d Cir. 2003)...............................4

*Casco Northern Bank v. D.N. Associates* (In re D.N. Assocs.), 160 B.R. 20 (D.

   Me.), aff'd, 3 F.3d 512 (1st Cir. 1993) .........................................................................4

*In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y. 1990) ..................................48

*In re Cenargo International PLC*, 294 B.R. 571 (Bankr. S.D.N.Y. 2003).......................34

*In re City Mattress, Inc.*, 174 B.R. 23 (Bankr. W.D.N.Y. 1994).....................................37

*Coppola v. Bear Stearns & Co., Inc.*, 499 F.3d 144 (2d Cir. 2007) ...........................23, 24

*In re Crivillo*, 134 F.3d 831 (7th Cir. 1998) ................................................................5, 6

*In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991)

   ...............................................................................................................34, 35, 37

*In re First NLC Finan. Serv. LLC, et al.*, 382 B.R. 547 (Bankr. S.D. Fla. 2008)..............36

*In re Gilead Baptist Church of Taylor, Inc.*, 806 F.Supp. 644 (E.D. Mich. 1992)............49

*Jiminez v. Mary Washington College*, 57 F.3d 369 (4th Cir. 1995) ...........................32, 33

*In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758  (Bankr. E.D.N.Y. 2005) ...............34

*In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998)..............................5

*New York State Association for Retarded Children, Inc. v. Carey*, 711 F.2d 1136

   (2d Cir. 1983)................................................................................................49

*Qmect, Inc. v. Burlingame Capital Partn. II, L.P.* (In re Qmect, Inc.), 2007 Bankr.

   LEXIS 3099 (Bankr. N.D. Cal. 2007) .......................................................................34

*United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948) ....................................................32

*Weissman v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) ........................................................33

*In re XEBEC*, 147 B.R. 518 (B.A.P. 9th Cir. 1992) ....................................................34, 35

*Zeisler & Zeisler v. Prudential Insurance Co.* (In re JLM, Inc.) 210 B.R. 19

    (B.A.P. 2d Cir. 1997) ....................................................................................................4

*Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001) ..................................................4

## FEDERAL STATUTES

11 U.S.C. § 330 ....................................................................................................................4

11 U.S.C. § 330(a) ...............................................................................................................4

11 U.S.C. § 330(a)(3) .........................................................................................................37

11 U.S.C. § 330(e)(3) .........................................................................................................34

28 U.S.C. § 158(a) ...............................................................................................................3

The Worker Adjustment & Retraining Act, 29 U.S.C. § 2102 ...........................................23

## MISCELLANEOUS

3 COLLIERS, BANKRUPTCY, ¶ 330.04[1][b][iii] (15th rev. ed. 2007) ................................35

## PRELIMINARY STATEMENT

McDermott Will & Emery LLP ("McDermott"), counsel to Saint Vincent's Catholic Medical Centers of New York and its debtor affiliates (collectively the "Debtors") in this action, appeals the bankruptcy court's improper decision to deny $460,543.00 in McDermott's fees during the period July 5, 2005 to September 13, 2005. The court's findings, as described below, were not only wrong in light of the applicable law and undisputed facts, but also gratuitously harmful.

The lower court focused primarily on three aspects of McDermott's engagement by the Debtors: McDermott's (i) attempt to secure the retention of restructuring consultants Speltz & Weis LLC ("S&W"), (ii) participation in the closing of St. Mary's Hospital, and (iii) overall performance prior to termination as counsel.

*First*, the court's decision to deny all of McDermott's fees relating to the retention of S&W was based on a misapplication of the law and a disregard of the record. The court's primary finding – that McDermott's attempt to win approval for the retention of S&W was a self-evident waste of time due to a fatal conflict of interest – was a decision that the court could come to only by ignoring significant contrary evidence in the record. McDermott, the Debtors, special counsel to the Debtors, and even the United States Trustee for the Southern District of New York (the "U.S. Trustee"), believed during the relevant time period, that retaining S&W was both possible and in the Debtors' best interests. The fact that certain conflicts were <u>later</u> deemed insurmountable is "hindsight analysis," which the court explicitly stated it was employing, but which the law forbids. McDermott used reasonable professional judgment when it pursued court approval for S&W's retention, and the court erred in disallowing its fees. The court's remaining findings related to the S&W retention – that McDermott failed to inform the

- 1 -

Debtors that retaining S&W and Huron Consulting Services LLC ("Huron") would trigger a serious conflict of interest, withheld information from the U.S. Trustee, and conducted an unnecessary investigation into a potential claim for tortious interference – suffer from additional errors of law and fact and appear to have been based primarily on events occurring prior to the beginning of the fee period at issue (July 5, 2005 through September 13, 2005). Finally, because McDermott acted appropriately with respect to the S&W retention matter, the court erred when it forced the firm to bear the cost of the subsequent management changes and imposition of a Chief Restructuring Officer.

*Second*, the lower court erred when it denied $200,000 in fees relating to McDermott's services in connection with the closing of St. Mary's, a failing Brooklyn hospital owned by the Debtors. In justifying this decision, the court: (1) found that McDermott had failed to win court approval for St. Mary's closure by the "target date" of September 1, 2005, and thereby "simply did not get the job done," and (2) traced McDermott's inability to meet this purported deadline to its failure to file sufficient papers before the prior lower court judge. Neither of these facts has any support whatsoever in the record. Undisputed testimony from McDermott and the Debtors shows that there was no "magic" to the September 1st date. Everyone involved in the closure process understood that it might occur later in time because, among many other things, the timing of the required regulatory and judicial approvals was not controlled by McDermott. In fact, the date identified by the Debtors as the "key date" for St. Mary's closure – September 20, 2005 – is the date on which approval was actually granted. Furthermore, not a single fact in the record (as distinct from the rhetoric) points to defects in McDermott's filings or attributes any delay in approval to faulty filings. In fact, given the community opposition to and government red tape surrounding the closure of St. Mary's, getting final approval from the court less than

three months after the Petition Date (as defined below) and within three weeks of the Department of Health's approval was a remarkable achievement.

*Third*, the court's summary conclusion that McDermott was terminated "because of shortcomings in the firm's performance" is unsupported and must be reversed. The contemporaneous record contains no fact supporting the claim that the Debtors terminated McDermott because they believed the firm had behaved improperly or not done its job. Instead, the record shows only that the Debtors, faced with growing discontent among the parties involved in the bankruptcy, saw removing McDermott as the easiest way to attempt to defuse the situation. Moreover, at the time of McDermott's dismissal, the Debtors expressed no dissatisfaction with their representation.

The lower court's misapplication of the law and facts led to an erroneous judgment. Furthermore, its decision contains myriad unnecessary findings and conclusions which unfairly impugn McDermott's honesty and professional judgment and which are particularly insupportable, given that the court issuing the decision had <u>no</u> first-hand knowledge of McDermott's performance and was instead reviewing events that took place before another bankruptcy judge, the Honorable Prudence C. Beatty.[1] Accordingly, the lower court's order should be reversed and vacated, and McDermott should be awarded its reasonable fees.

## STATEMENT OF APPELLATE JURISDICTION

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1). McDermott appeals from a final order of the lower court, dated September 21, 2007, A1794–

---

[1] Judge Beatty's medical leave in January 2006 resulted in the transfer of the Debtors' cases to Judge Hardin, four months after the Debtors terminated the McDermott engagement.

A1797,[2] partially sustaining objections to McDermott's application, dated January 31, 2006, for

final compensation under Bankruptcy Code § 330(a).

## STATEMENT OF ISSUES PRESENTED

Whether the lower court abused its discretion when it sustained objections to

McDermott's fee application pursuant to 11 U.S.C. § 330(a)(2) and disallowed fees relating to:

      1.      McDermott's efforts to retain S&W as managers of the Debtor ($98,382),

and certain related matters, namely McDermott's time charges relating to the subsequent change

in management and retention of a Chief Restructuring Officer ($74,180) and McDermott's

investigation of possible tortious interference with the Debtor's business ($44,523);

      2.      McDermott's work regarding the closing of St. Mary's ($200,000); and

      3.      Time spent by McDermott transferring the Debtors' case to replacement

counsel ($43,457).

## APPLICABLE STANDARD OF APPELLATE REVIEW

The standard of review is whether the lower court abused its discretion in determining

that a total reduction of $460,543.00 in the professional fees sought by McDermott was justified

by the record.  Zeisler & Zeisler v. Prudential Ins. Co. (In re JLM, Inc.), 210 B.R. 19, 23 (B.A.P.

2d Cir. 1997) (fee award subject to abuse of discretion standard of review); Anderson v.

Anderson (In re Anderson), 936 F.2d 199, 293 (5th Cir. 1991) (fee award); Casco Northern Bank

v. D.N. Assocs.(In re D.N. Assocs.), 160 B.R. 20, 22 (D. Me.) (fee award), aff'd, 3 F.3d 512 (1st

Cir. 1993).

---

[2] Numbers preceded by "A" refer to page numbers of the Joint Appendix submitted jointly by the parties
on this appeal.

A lower court abuses its discretion when it misapplies the law or makes a clearly erroneous finding of fact.  In re Aquatic Development Group, Inc., 352 F.3d 671, 678 (2d Cir. 2003) (quoting Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir. 2001) (abuse of discretion "defined as (i) a decision 'rest[ing] on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding,' or (ii) a decision that, 'though not necessarily the product of a legal error or a clearly erroneous factual finding[,] cannot be located within the range of permissible decisions.'")); In re Marvel Entertainment Group, Inc., 140 F.3d 463 (3d Cir. 1998) (same).  Bankruptcy courts may have wide discretion, but "[a]n exercise of discretion which is based on erroneous findings of fact is an abuse of discretion."  In re Crivillo, 134 F.3d 831, 841 (7th Cir. 1998); see also id. ("that independent grounds exist for a finding does not relieve a reviewing court from examining whether erroneous findings may have affected a lower court's exercise of discretion") (citing WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2883, at 445 (1995) (Updated 2008)).

## STATEMENT OF FACTS

### A.    McDermott Advised the Debtors as they Faced Bankruptcy

McDermott's relationship as Debtors' special restructuring counsel began in September 2004.  A0904, ¶ 17.  At the time, the Debtors were in the midst of serious financial problems. A0003, ¶¶ 15–17.  The Debtors' board of directors (the "Board") was working to solve a number of financial crises, including a steadily deteriorating working capital position.  A0057, ¶ 76. McDermott inherited these problems, as well as the Debtors' outmoded system of accounting. A0678, p. 172:21 – 173:4; A0685, p. 201:17–19.  As the former U.S. Trustee, Deirdre Martini, observed:  "The data system was antiquated.  The accounts payable, accounts receivable, things were done by hand and not by computer.  And it just seemed like it was a tremendous amount of

human capital that was required to operate the financial controls within the hospital." A0678, p. 172:21 – 173:4. McDermott's services for the Debtors were complicated by such problems.

McDermott presented legal options to the Board on September 22, 2004, including Chapter 11 reorganization relief, "describing the advantages and disadvantages" of each alternative. A0904, ¶ 18; A0006, ¶ 43. Among other things, McDermott discussed "the obligations of a debtor under chapter 11, including the reporting and disclosure requirements of 'life in a fish bowl.'" A0006, ¶ 44.

When the Debtors' senior management was unsuccessful in its efforts to obtain sufficient financing outside Chapter 11, A1089–A1090, pp. 92:7–10, 92:20–23, filing for bankruptcy and locating financing within Chapter 11 became the best option. A1090, p. 92:20–24. Accordingly, the Debtors filed Chapter 11 petitions on July 5, 2005 (the "Petition Date"). A0111; see also Bankruptcy Court Docket Entry ("D.E.") No. 1. At this point, at the request of the Debtors' senior management, McDermott directed its efforts toward meeting its client's most immediate needs – financing and cash. "[F]inance was a number one priority at all times. Improving the [Debtors'] liquidity was a paramount responsibility for McDermott…." A1091–A1092, p. 94:14–16.

McDermott indisputably performed this task well. On behalf of the Debtors, McDermott obtained an emergency court order shortly after the bankruptcy filing, allowing the Debtors to obtain up to $100 million in financing and, at the outset of the case, "forty or fifty million dollars in brand new credit…." A1090, p. 93:2–4. McDermott also avoided unnecessary litigation early in the reorganization by obtaining agreements with several asset-based lenders, enabling the Debtors to use cash collateral. A1094, pp. 96:23 – 97:4. According to the uncontradicted testimony of Thomas Allison (former interim chief financial officer of the Debtors), because of

McDermott's work on the financing and cash collateral matters, by late summer 2005, the "Debtors' cash and cash availability exceeded $70 million;" "more liquidity [existed] than had been available at any time during the prior year."  A0064, ¶ 23.  Michael B. Solow (counsel for HFG, the Debtors' pre- and post-bankruptcy "working capital lender") also said, without contradiction:

> Absent the efforts of McDermott, the Debtors would have experienced an extremely hard landing in bankruptcy … rather than the soft landing, with a first day DIP interim financing approved, that the Debtors actually experienced. … McDermott ably and efficiently dealt with the myriad objections which were filed, both to … financing, but also to the use of cash collateral. … McDermott acted appropriately … [as] Debtor's counsel to … assure that the Debtors were adequately financed and ran an appropriate process to assemble bids for post-petition loans.

A0067–A0068, ¶¶ 7–10.

McDermott also undertook other tasks at the request of the Debtors to significantly better its financial position and operations.  The firm helped the Debtors obtain a larger, $350 million facility, A1093, p. 96:1–5; helped the Debtors identify leases and contracts for rejection and obtain court approval of those rejections, see D.E. Nos. 201 and 260; engaged in regular communications with the Debtors regarding the disposition of underperforming or losing assets, such as Parson's Manor, see D.E. Nos. 317 and 348, St. Mary's, see A1486–A1627, Mary Immaculate Hospital, and St. John's Queens Hospital; prepared a motion to establish medical malpractice arbitration procedures to administer insurance proceeds equitably at a reduced cost to the Debtors; and negotiated favorable deposits with utilities, see D.E. Nos. 327, 361, 368 and 474.

B.    **The Debtors Select S&W and Huron as Management Professionals and Consider Potential Conflicts**

The Debtors' relationship with the management firm of S&W dates back even further than its relationship with McDermott.  On April 13, 2004, the Board signed an agreement ("Management Agreement") with the S&W firm calling for it to "provide management advisory services."  A0903, ¶ 12; A0005, ¶ 37.  S&W's two principals, David Speltz ("Speltz") and Timothy Weis ("Weis"), served as the Debtors' Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively.  A0903, ¶¶ 13-14; A0006, ¶¶ 38, 39.  When McDermott was hired several months later, it reported to S&W, but also to other members of the Debtors' senior management, including General Counsel Elizabeth St. Clair ("St. Clair"), Senior Vice President Bernadette Kingham-Bez ("Kingham-Bez"), Senior Vice President James Woods ("Woods"), and Executive Director Dawn Gideon ("Gideon").  A0007, ¶ 50.  In addition, in October 2004, the Debtors retained Huron to provide financial advisory services.  A0904, ¶ 19; A0006, ¶ 45.

By spring 2005, S&W and Huron began discussing a potential acquisition deal.  S&W discussed with William P. Smith ("Smith"), a McDermott partner, during a telephone conversation on April 26, 2005, whether "Huron's potential acquisition of S&W would have any implications in the event SVCMC filed for bankruptcy…."  A0906, ¶ 34; A0009, ¶ 59.  Smith told S&W that it could raise "issues concerning disinterestedness… and other conflicts."  A0906, ¶ 35; A0009, ¶ 61.  Specifically, Smith mentioned the Jay Alix Protocol, "an agreement between the United States Trustee for the District of Delaware and [a financial consulting firm] in the In re Safety-Kleen Corp. [Case No. 00–2303, (Bankr. D. Del.)][3] bankruptcy case which concerns,"

---

[3] The Department of Justice press release can be found at www.justice.gov/ust/eo/public_affairs/docs/pr20011005a.htm.

A1453, n. 3, issues raised when financial advisors act simultaneously in that capacity and as crisis managers in the same case.  A0906, ¶ 35; A1453; A0009, ¶ 61.  Smith understood that S&W's acquisition by Huron, the Debtors' financial advisors, required the consideration of the Jay Alix Protocol.  Id.

Huron entered into an acquisition agreement with S&W on May 5, 2005, and the sale closed four days later.  A0906, ¶¶ 37-38; A0009, ¶¶ 64–65.  Although there are conflicting reports as to when and how the Board first became aware of Huron's acquisition of S&W, it is undisputed that ***the Board knew this information on May 6, 2005.***  A1804; A1808; A0906, ¶ 40.  By that date, Speltz told Richard Boyle, Chairman of the Board, about the Huron acquisition.  Id.  Because of the potential conflicts that arose with the Huron acquisition, the Board hired special counsel Leo Crowley, a bankruptcy partner at Pillsbury Winthrop Shaw Pittman LLP, to conduct an investigation in mid-May 2005.  A0829, ¶ 6.  Crowley's charge was "to investigate and report to the Board any… conflict of interest and similar issues presented by the acquisition of [S&W] by Huron Group."  A0829, ¶ 6; A0010, ¶ 67.  As shown by the hiring of Crowley, the Debtors were fully aware of the need to tread carefully regarding the Huron acquisition and determine the extent of any conflicts of interest.  As Smith testified, "the Board was aware that there was an issue.  It was aware that the issue required resolution.  It was aware that there were adverse possibilities and it was aware that there were multiple ways of solving the problem.  And it was aware that it is conceivable that the problem would not be solved."  A1175, p. 185:10–14; See A0384.

Although Speltz and Weis, individually, remained officers of the Debtors during this time, other members of the Debtors' management – including Chairman Boyle and, most notably, General Counsel St. Clair – were also part of the effort to evaluate the S&W/Huron

issue.  Smith, Boyle, and St. Clair communicated repeatedly regarding the dual retentions.  E.g.,

A0317–A0383; A1268, p. 286:13–17; A0388.  St. Clair, who served as the Debtors' Chief

Compliance Officer and was responsible for "overseeing [St. Vincent's] conflict of interest

policy to ensure compliance by covered employees," A0695, was the person most familiar with

the conflicts of interest identified in Crowley's report.  During the summer of 2005, she attended

Board meetings and had regular communications with Board members, participated regularly in

discussions regarding S&W/Huron, and received correspondence on that issue from the U.S.

Trustee and Creditors' Committee.  A0303; A0307–A0308; A0317–A0383; A0384–A0387;

A0388; A0501–A0502; A0503–A0504; A0511–A0518; A0687, pp. 206:14 – 208:12.

One of the matters that McDermott explicitly discussed with its client during summer

2005 was the Jay Alix Protocol.  As the U.S. Trustee conceded, McDermott never challenged her

view that the Jay Alix Protocol would apply.  A0650, p. 59:13–25 (Martini admitting that she did

not recall anyone at McDermott ever stating that the Jay Alix Protocol did not apply in the

Southern District of New York).

### C.    The Debtors Waive Potential Conflicts Presented by the S&W and Huron Retentions

Crowley presented the results of his investigation to the Board on June 29, 2005.  In his

report, Crowley recommended "that Huron…make the services of Messrs. Speltz and Weis

available as required in the Management Agreement and … otherwise undertake to assure that

[S&W] performs its obligations under the Management Agreement."  See A1808–A1809

(Crowley recommending that (1) Huron "assure that [S&W] performs its obligations," (2) the

Board "undertake detailed hands on supervision of Huron's work," (3) the Debtors "seek any

compensation for the work that S&W was performing and billing with Huron under

subcontracts," and (4) no earnout be received on account of financial advisory services);[4]
A0012, ¶ 86.  This was his recommendation despite his view, stated explicitly in his report, that
the Bankruptcy Code could make it more difficult to retain S&W and Huron after the
acquisition: "[t]he complex arrangements among [S&W], Speltz and Weis personally and Huron
have injected complications into the ability…to engage Huron as an estate professional under
section 327 of the Bankruptcy Code."  A1806, ¶ 2.

Crowley's investigatory report was distributed and discussed among the Board members
and other personnel of the Debtors.  A1377-A1378, pp. 85:25 – 87:1; A1380, p. 89:8-22.  As
Boyle testified, he discussed the remedial measures in Crowley's report with Crowley and
Edward V. Lahey, the former general counsel for PEPSICO and a member of the Debtors'
corporate governance and compliance committees.  "Subsequently, we also discussed it with
other members of the governance committee.  And after I had had discussions with Huron, we
[Boyle, Crowley, and Lahey] discussed it with the Board."  A1381, p. 90:5–8.

Crowley's report underscored the Debtors' belief that the relationship with S&W,
although complicated by the Huron acquisition, provided unique benefits that the Debtors were
unwilling to forgo.  The value of retaining Speltz and Weis, individually, the Debtors' then-
current CEO and CFO, was self-evident.  In addition, more than forty S&W employees had been
providing essential, revenue-generating services to the Debtors during July and August 2005.
According to Chairman Boyle, the S&W employees were critical to the stability of the Debtors'
organization.  At the fee hearing Boyle testified that "[S&W] had so many people in very, very
key positions, that putting those people out of their key positions and putting them out the door
would have been ... ludicrous."  A1381–A1382, p. 91:5–9.  Given Crowley's advice, Boyle

---

[4] The so-called "earn-out" provision allowed Speltz and Weis, individually, to earn a percentage
of what St. Vincent's would pay Huron.

believed, as Smith did, that there was no rational alternative to seeking the retention of S&W. A1382, p. 91:18–19.  Boyle believed that filing a motion "to retain Speltz and Weis as crisis managers ... notwithstanding…the Crowley report, was *in the best interest of St. Vincent's and its creditors."*  A1381, pp. 90:21 – 91:2.

As instructed by its client, McDermott took steps to get the bankruptcy court's approval to continue S&W's Management Agreement through its October 2005 expiration date (about a three month period).  On the Petition Date, McDermott filed seven Chapter 11 petitions, twenty-six First Day motions, and a First Day affidavit on behalf of the Debtors, including a motion to continue S&W's services under the Management Agreement.  A0010, ¶¶ 71–72.  McDermott withdrew this motion after finding that it inadvertently failed to provide all the necessary information.  A0010–A0011, ¶¶ 75–77.  Nonetheless, there was no question that in July 2005, the Debtors remained committed to retaining S&W management for the short-term and instructed McDermott to take the necessary steps to make that happen.  When Smith asked Boyle in a July 25, 2005 e-mail whether McDermott should continue pushing the S&W retention application with the court, Boyle replied that he should "proceed for Speltz and Weis."  A0311.  Boyle added that the Executive Committee of the Board would meet on July 29, 2005 and he expected it "[would] approve the actions being taking by Huron and waive the conflict issue."  Id., A0011, ¶¶ 80–81.

Indeed, the Executive Committee had already been discussing the conflicts presented by the engagement of S&W after its acquisition by Huron as well as the written report on that subject from special counsel Crowley.  On July 21, 2005, the Executive Committee concluded that, "in the short run,"… [it] *"would be very disruptive and therefore inadvisable" to modify those engagements.*  A1325, p. 29:17-25; A1386-A1387, pp. 96:1 – 97:21; A0011–A0012, ¶ 83.

This comported with Boyle's testimony that the Board believed the continued retentions of S&W and Huron to be in the Debtors' best interest, despite the risk of conflicts.  A1381–A1382, pp. 90:17 – 91:9; A0830, ¶ 9.  As Boyle predicted, four days earlier, A0311, on July 29th, "[t]he Executive Committee resolved that conflicts of interest disclosed to the Executive Committee be waived subject to the conditions and limitations recommended by…Crowley in his report." A1382, p. 91:22-25; A0012, ¶¶ 84–85.  Crowley concurred:  "My own feeling is that the board identified a conflict and took appropriate advice and reached a valid decision to waive it based on reasonable conditions."  A0384.

### D.    The Trustee At First Supports, But Then Temporarily Opposes, The Retention of S&W.

During the summer of 2005, McDermott communicated regularly with the U.S. Trustee overseeing the Debtors' case.  Their discussions were cordial.  The U.S. Trustee testified that Smith was "candid" with her regarding Huron's acquisition of S&W.  A0642, pp. 29:13–17, 27:10–13.  In early July, McDermott also explained to her that Speltz and Weis were Huron employees and, shortly thereafter, that there was one particularly controversial aspect of the S&W-Huron relationship (the earn-out provision).  A0683–A0684, pp. 193:12 – 194:5; A0684, p. 194:7–20.  Overall, the U.S. Trustee believed Smith was "compliant" in addressing her concerns.  A0644, p. 37:9–18 (recalling her practice of telling Smith that the "terms of whatever transaction occurred need to be disclosed.  And Mr. Smith was very – you  know, I believe he was very compliant").

In early July 2005, when the Debtors first filed a motion with the lower court to continue S&W's retention, the U.S. Trustee objected and McDermott withdrew the motion.  A0013, ¶ 92. In light of her objection and concerns, McDermott postponed indefinitely the hearing on the S&W retention application.  A0301–A0302.  St. Clair and McDermott met with the U.S. Trustee

later that month to discuss her concerns.  A0910, ¶ 75; A0013, ¶ 99.  St. Clair noted that the U.S. Trustee "continues to be troubled by the affiliate relationship and conflict of interest between [S&W] and Huron.  She is not satisfied with the written presentation of the details and sent us back to redo it.  She has not rejected it out of hand, but…she remains somewhat dubious."  A0303; A0013–A0014, ¶ 100.

After the July 21, 2005 meeting, the U.S. Trustee apparently was convinced to support the retention of S&W if the companies' relationships could be restructured.  "[The U.S. Trustee] would agree in effect to support the retentions of both [entities] through the end of October 2005 by having Huron consultants made available to [the Debtors] as seconded employees of [S&W]."  A0014, ¶ 105.  The U.S. Trustee wanted the motion papers revised to provide that "(i) Huron's application would be withdrawn; (ii) Huron personnel would be used to supplement [S&W's] services; and (iii) the application to approve the Management Agreement otherwise complied with the guidelines of the J. Alix Protocol."  Id., ¶ 106; A0307.  According to the U.S. Trustee, she was willing to "work with [McDermott] to…resolve any issues," A0648, p. 51:13–15, and considered the S&W retention application to be "a work in progress," A0676, pp. 162:23 – 163:2.

St. Clair, in particular, was heavily involved in the discussions with the U.S. Trustee.  Smith advised St. Clair on July 22, 2005 of the U.S. Trustee's concerns about the S&W/Huron retentions and the U.S. Trustee's proposed compromise to deal with those concerns.  A1261–A1262, pp. 278:13 – 279:21; A1263, p. 281:4–14; A0307–A0308 (Smith was "reporting to the client contact the current view of the [Trustee] on the conflict issue of Speltz & Weis and Huron.").  St. Clair understood that Smith was negotiating (in her words) "structural fixes" to deal with the retention of S&W and Huron.  A1344, p. 50:6–8,19–21.  St. Clair also had regular

contact with the U.S. Trustee from July to early September about the S&W/Huron retention and other substantive matters.  A0687, p. 207:13–17.  According to the U.S. Trustee, St. Clair "was listening and she was absorbing everything."  A0687, p. 208:4–8.

Although Smith understood that the Creditors' Committee was unreceptive to the idea of maintaining S&W's management of the Debtors for the short-term, A0015, ¶ 108, he also understood that the U.S. Trustee's apparent cooperation meant the plan eventually could be accepted.  Smith believed that the "[U.S. Trustee]'s requests were reasonable and the Debtors should implement them."  A0016, ¶ 115.  Accordingly, on July 27 and 28, 2005, he circulated revised drafts of a motion for approval of the S&W Management Agreement to Huron's counsel, Speltz, Weis, Crowley, and St. Clair, as well as to the U.S. Trustee and counsel for the Creditors' Committee.  Id., ¶ 117; A0017, ¶¶ 120–121.  As Smith told the U.S. Trustee and Creditors' Committee counsel, the draft addressed as many of their concerns as possible regarding S&W's relationship with Huron, including concern about the "earn-out" provision which incentivized S&W to overbill the estate:

> [B]ecause of concerns by the Board about issues that might be raised by the acquisition (such as the form and manner of billing, management responsibilities for Huron personnel, the fulfillment of certain commitments under the Management Agreement and the potential for conflicts of interest), the Board, [Huron Group] and [S&W] entered into discussions regarding those issues. They have agreed, among other things, that notwithstanding the terms of the acquisition agreement, there will be no additional compensation due or paid directly or indirectly to the former owners of [S&W] as a result of the Saint Vincent's engagement. …In addition, Huron will reimburse Saint Vincent's for attorneys' fees incurred by the Board which retained separate counsel for purposes of those discussions.

A0017, ¶¶ 121–122.

As a result, the Board removed the economic incentive for overbilling (the earn-out) and protected the estate from the additional expense which it had incurred (Crowley's fees).  The

draft thus addressed the U.S. Trustee's concerns about excessive billing by S&W/Huron; provided for Huron's reimbursement of the cost of Crowley's investigation, advice and recommendations; and avoided having one entity serve in conflicting fiduciary capacities. McDermott also withdrew the Huron application on August 1, 2005, as the U.S. Trustee requested. D.E. No. 206; See also A0018, ¶ 125. With respect to the draft retention motion, Smith stressed the need for full, complete disclosure. A0317–A0318 ("My concern is that we disclose adequately…the arrangement …and that [the attached] Affidavit be complete and in no sense misleading.").

The U.S. Trustee's apparent support for the plan to continue S&W's management of the Debtors began to waver in late July 2005. On July 30, 2005, the U.S. Trustee told counsel for the Creditors' Committee that although the revised S&W retention papers were "an improvement," she was "not convinced that [S&W]…are the appropriate professionals" for the engagement. A0389. This change of heart was not, however, communicated to McDermott until later. On August 12, 2005, the U.S. Trustee told McDermott that her "concerns have not been resolved by the amendments" to the motion papers, with no further explanation. A0501; A0018, ¶ 126. McDermott immediately responded, stating its willingness to meet again with the U.S. Trustee and Creditors' Committee. A0503; A0018–A0019, ¶ 129. Nevertheless, Smith recognized that the U.S. Trustee's about-face presented an insurmountable obstacle. He told Boyle that the U.S. Trustee's new position meant that "the tenure of Speltz as CEO has become unsupportable." A0019, ¶ 130.

Smith did what he could to change the opinion of the U.S. Trustee and Creditors' Committee and to fulfill the Debtors' wish to retain the S&W employees in their then-current positions. A1381-A1383, pp. 90:21 – 92:23; A0015-A0020, ¶¶ 99–139. He attended a

Creditors' Committee meeting on August 19, and argued that the Committee should approve the retention, which, as he pointed out, was proposed to last only through October 2005. Despite these efforts, the Committee remained opposed. Id., ¶¶ 131–132. At a meeting later that day between Smith and the U.S. Trustee, the U.S. Trustee stated explicitly –and for the first time– that she would not consent to S&W's retention. A0509–A0510; A0019, ¶¶ 133–135. She further demanded the dismissal of Speltz and Weis from their positions and "the appointment of a 'Chief Restructuring Officer.'" Id.

With this, Smith and the Debtors learned the U.S. Trustee's true motivation for withdrawing her support for the revised retention plan: by arguing that the Debtor had become too conflicted to direct itself in bankruptcy, she could gain enough leverage in this volatile situation to install a Chief Restructuring Officer ("CRO"). Just a few days prior, Leo Crowley predicted that something similar would happen. He warned McDermott and St. Clair in a July 27, 2005 e-mail that although he believed the Board rightfully had resolved to go forward with the S&W retention, he remained "concerned that others… might use this issue as a lever to try to seek some further remedy," such as the imposition of a Chapter 11 trustee or other means of exerting control of the Debtor. A0384. Indeed, the U.S. Trustee confirmed that the installation of a CRO essentially would have all of the benefits afforded by a Chapter 11 Trustee without the need for any judicial approval and, accordingly, require the Board to relinquish control over St. Vincent's. A0667, pp. 127:8 – 128:3.[5]

Without the U.S. Trustee's support, Speltz's and Weis's service as officers of the Debtor became untenable. Based on information from Smith, the Executive Committee asked Speltz and Weis to resign on August 24, 2005. Boyle was named interim President and CEO and

___
[5] The U.S. Trustee obviously knew that Judge Beatty stated that she could not "see where a trustee would be of any use in this case, a chapter 11 trustee." July 5, 2005 Hearing Transcript at 56:2–4, D.E. No. 101.

Thomas Allison (of Huron) was named interim CFO.  A0020, ¶ 140.  McDermott never submitted to the lower court an amended motion seeking the approval of the S&W Management Agreement, as there no longer was any reason to do so.  Id., ¶ 143.

### E.     McDermott Investigates Tortious Interference Allegations Arising from the S&W Dismissal

The replacement of Speltz and Weis as officers of the Debtor raised an independent legal issue that required McDermott, once again, to perform legal services on behalf of the Debtors. In early August 2005, the Creditors' Committee and the U.S. Trustee began the process of replacing S&W.  A0389; A0039, ¶ 285.  This in itself was not unexpected, but the manner in which the search was conducted by the Committee and the U.S. Trustee raised the Debtors' alarm.  The Debtors came to McDermott in mid-August and reported that it "was publicly known that the Committee was either contacting, interviewing or discussing the prospect of replac[ing] management" and that "[p]otential replacement managers were contacting the Debtors' staff and making proposals [to employees]."  A0039, ¶¶ 287–288.  Some of the employees contacted included managers with high-level responsibilities at the debtor companies.  A0039, ¶¶ 286–293. The Debtors were greatly concerned that this was "an attempt to interfere with [their] management."  A0039, ¶ 286.

At the urgent request of management, "McDermott investigated the facts and researched possible causes of action against anyone interfering with the Debtors' management" and employees.  Id., ¶ 290.  McDermott promptly began an investigation.  During this time, Smith e-mailed all senior management personnel of the Debtors, asking those individuals "to cease all communications and information transmittal to the [Creditors'] Committee, cancel all meetings with the Committee's representatives, and 'maintain radio silence.'"  A0600L; A0039, ¶ 291. However, lower level communications continued.  After only four business days, McDermott

concluded that there was insufficient credible evidence of any wrongdoing.  A0040, ¶¶ 294–295.
It therefore ended the investigation and the "radio silence" order.  Id., ¶¶ 295–297.

**F.      The Debtors Terminate McDermott as a Peace Offering, But Continue Their Efforts to Retain Huron and S&W.**

After Speltz and Weis were dismissed as CEO and CFO, respectively, the Debtors found
that the controversy had a lasting effect on the parties involved in the bankruptcy.  The Trustee
and Creditors' Committee, in particular, remained discontented, pressing the demand for
appointment of the equivalent of a Chapter 11 Trustee.  The Debtors reluctantly acknowledged
that McDermott was the only party that could readily be removed to try to relieve this tension
and move forward with the Chapter 11 process.  As Chairman Boyle explained:

> It was clear to me as I went through these different deliberations that we
> could not replace the [U.S. Trustee], we certainly didn't have the power to
> replace the judge, there was no way we had any influence to replace the
> chair of the creditors' committee or any of the advisors to the creditor
> [sic] committee.  I thought long and hard over the weekend just prior to
> around the 10th of September, what we could do to remedy this quagmire
> we were in terms of having all this lack of credibility. And I felt the only
> reasonable thing to do from a business point of view was to have a change
> in counsel.

A1465.

Boyle further explained that it was the increasing demands of the U.S. Trustee that
required him to make some sort of change.  Id.  Because the Board was genuinely fearful of what
could happen (e.g., a motion for a Chapter 11 trustee) if it did not make a significant concession,
it "sacrificed" McDermott.  Id.

Neither Boyle nor St. Clair ever told Smith that McDermott had done anything wrong.
A1250, pp. 266:25 – 268:2.  To the contrary, they expressed complete satisfaction and lodged no
complaints.  Id., p. 267:2–5.  Boyle told Smith at the time "he would make sure that

[McDermott] got paid." <u>Id.</u>, p. 267:7–8. Boyle later testified "that [McDermott] should be compensated for services rendered to" the Debtors. A0831, ¶ 13.

The Debtors terminated McDermott's engagement on September 13, 2005, replacing it with the firm of Weil, Gotshal & Manges LLP. A0903, ¶ 11; A0005, ¶ 32. Following the termination, St. Clair e-mailed Smith, stating "on behalf of the institution I apologize to each of you [i.e., the McDermott team]". <u>Id.</u>, ¶ 33; A0523. Two days later, St. Clair e-mailed Smith again, saying that "I miss you all." A0524; A0005, ¶ 34.

McDermott's exit from the bankruptcy case did not change the Debtors' belief that retaining management by S&W and Huron was in their best interests, even if Messrs. Speltz and Weis had to be dismissed. Therefore, successor bankruptcy counsel for the Debtors submitted a new application for an order authorizing the retention of Huron on October 21, 2005. A2087–A2122; A0021, ¶ 149. In this motion, signed by Chairman Boyle, the Debtors reiterated their longstanding belief that Huron's and S&W's continued management of their business was crucial, and the conflicts presented could be resolved with a few structural changes:[6]

> "2.    The Debtors are seeking to retain Huron as restructuring and management consultants pursuant to sections 105(a), 327(a) of the Bankruptcy Code under an arrangement pursuant to which ***[S&W] personnel will be providing services to the Debtors through their "secondment" to Huron***.
>
> * * *
>
> 21    [S&W] is one of the country's leading healthcare advisory, interim management, and restructuring organizations, with a team of over 25 healthcare managers and consultants. [S&W] specializes in working with companies, creditors, investors and others in out-of-court workouts and chapter 11 cases.
>
> * * *

---

[6] Speltz and Weis, individually, also retained employment contracts with the Huron Group. A0022, ¶¶ 154-155.

32.    As of the filing of this Application [October 21, 2005] fourteen of the twenty-seven different key management positions filled by [S&W] during its engagement have been replaced with permanent staff.  As a result of Saint Vincents' financial condition, [S&W] personnel have continued to perform the remaining interim management positions because qualified candidates have been difficult to attract and are reluctant to accept employment in such positions directly with Saint Vincents….

* * *

43.    *The Debtors believe that the continued services of Huron and [S&W] have been and are important to their reorganization efforts.*  The parties therefore have worked diligently in negotiating and resolving their differences and ultimately in reaching agreement regarding the retention of Huron as restructuring and management consultants.

* * *

45.    *Through their engagement, Huron and [S&W] have developed a great deal of institutional knowledge regarding the Debtors' operations, finances, and systems.  Huron and S&W also possess extensive experience with the financial and reporting aspects of Chapter 11 proceedings.  This experience and knowledge has been of substantial value to the Debtors since the Petition Date [July 5, 2005] and will be valuable to the Debtors in their continuing efforts to reorganize.*  Accordingly, the Debtors wish to continue to employ…Huron (and the "seconded" [S&W] personnel) on the terms described herein (emphasis added).

A2091, A2096, A2099, A2102, A2103.

By orders dated October 28, 2005 and December 14, 2005, the lower court approved,

effective as of the Petition Date, the retention of Huron to provide management and restructuring

consulting services to the Debtors.  D.E. Nos. 574, 856; See also A0022, ¶ 153.

G.    **McDermott Handles the Closure of St. Mary's Hospital and Meets the "Key Date" for Approval.**

At the same time McDermott and the Debtors were managing the S&W retention matter,

they also began to address a pressing financial matter:  the closing of St. Mary's Hospital in

Brooklyn ("St. Mary's").  St. Mary's was becoming a significant drain on the Debtors' resources. A1460.  On June 1, 2005, the Board resolved to close St. Mary's and instructed management and counsel to take the necessary action.  A2124; A0024, ¶¶ 169, 171.  Although the Board never imposed a deadline for the closure, A2124, McDermott nonetheless "knew that the Debtors wanted to close St. Mary's as promptly as applicable regulatory approvals could be obtained." A0025, ¶ 174.

St. Mary's, a health care facility over a century old, could not simply be closed at will. Instead, the Debtors needed to gain the cooperation of government and other authorities, and faced significant challenges in doing so.  The St. Mary's closure was subject to the rules and regulations of the New York State Department of Health ("DOH") and the regulations regarding not-for-profit corporations.  A0025, ¶175.  It is undisputed that primary responsibility for handling these arrangements lay with appropriate personnel of the Debtors, not McDermott. A0025, ¶¶ 176–177.  "The Debtors' internal management, including Bernadette Kingham-Bez [Senior Vice-President] and St. Clair (Debtors' Chief Legal Officer), was primarily responsible for the steps required to obtain canonical and regulatory approval of the closure….  Debtors' management, not McDermott, had primary responsibility for obtaining [DOH] approval to close [St. Mary's]."  Id.  As insiders of the Debtors, these individuals were particularly suited to the task.  St. Clair "is a seasoned health care counselor.  She was quarterbacking…the New York regulatory process for the closure."  A1285, p. 305:11–13.  As general counsel, she was "pulling together the disparate elements."  Id., p. 305:17–18.  Kingham-Bez, in turn, was handling "the community relations side" while "other [St. Vincent's] employees were coordinating other elements."  A1285–A1286, p. 305:13–16.

McDermott's role was limited to handling the filing of the closure application with the lower court and handling any additional court matters as necessary. A0025, ¶ 176. Accordingly, the Debtors handled many of the tasks necessary for the closing, such as applying to the DOH in June 2005, without input from McDermott. Id., ¶¶ 177–178. The Debtors never asked McDermott to review the DOH application prior to its filing. Id., ¶ 179. The Debtor also assumed responsibility for communications about the closure to St. Mary's employees; McDermott shared none of this role. A0027, ¶ 189.

For regulatory and procedural reasons, the date on which St. Mary's would finally close its doors could not be planned in advance with certainty. On June 17, 2005, the Executive Committee of the Board considered the progress of the closure of the hospital and declared "the target date for closure at St. Mary's is September 1st." A1792. Nonetheless, the Committee also recognized that roadblocks could arise: "enormous political pressure is being put on the state to subsidize St. Mary's in an effort to keep it open." Id.

Indeed, closure of the facility after September 1, 2005 was an openly discussed possibility and became more likely as the closure process became more complicated. For example, on July 5, 2005, CFO Timothy Weis filed an affidavit with the court stating that the Debtors expected St. Mary's to be closed "before the end of 2005." A0116, ¶ 14. Shortly thereafter, on July 22nd, the Debtors issued 60-day notices of the closure to St. Mary's employees under the federal WARN Act.[7] A2137; A0027, ¶ 190. Sixty days from July 22nd is September 20th, three full weeks past the September 1 "target date." Furthermore, the expiration date of the notices – October 4, 2005 – is even later. A0027, ¶ 191. This comports with the

---

[7] The Worker Adjustment & Retraining ("WARN") Act, 29 U.S.C. § 2102, requires, inter alia, "employers to give 60 days' advance written notice [to employees] before a plant closing or mass layoff." Coppola v. Bear Stearns & Co., Inc., 499 F.3d 144, 148 (2d Cir. 2007).

- 23 -

statement made by Kingham-Bez to McDermott on August 17, 2005 that the 60-day period

meant **the "key" date for St. Mary's closure was September 20, 2005.**  A0507.  It was only <u>after</u>

that date that Kingham-Bez saw that "the financial exposure would be big."  <u>Id</u>.  Yet Kingham-

Bez also understood that certain events – the reactions of Kingsbrook Healthcare System Inc.

("Kingsbrook")[8] to the closure plan and the fact that "the court has all on hold while an

employee group explores the purchase of St. Mary's" – threatened further delay.  <u>Id</u>.  St. Clair

saw similar difficulties.  She represented to Judge Beatty in open court on August 4th that when

the Debtors had shown the closure plan to DOH, the agency had sent them "back to the drawing

board" to "address additional issues" and was "still not satisfied."  A1665, p. 38:8–16.

     A regulatory plea for discretion regarding the shuttering of St. Mary's also slowed the

pace of the closing process.  St. Clair told McDermott attorney Stephen Selbst, a McDermott

partner ("Selbst"), in July 2005 that DOH "had a strong preference for keeping these matters

confidential until [a closure] was finally approved."  A0052, ¶ 41.  According to Selbst, St. Clair

represented that "DOH was extremely skittish" about attracting more litigation to the closing[9]

and "concerned that if the [closure] plan became public before it had been finally approved…it

increased the likelihood that [DOH] would be the subject of collateral litigation."  A0052–

A0053, ¶ 41.  St. Clair herself testified that "DOH asked us to please not circulate to the

---

[8] Kingsbrook was the closest acute care hospital to St. Mary's, had attempted to purchase the hospital, and was the primary candidate to operate the ancillary clinics which DOH hoped would remain open to deliver services to nearby residents.

[9] One lawsuit attempting to block the St. Mary's closing had already been filed.  Harriet McCloud, a former patient of St. Mary's, obtained an *ex parte* order on July 22, 2005 restraining the DOH from approving a closure plan.  A0027, ¶ 195.  Immediately thereafter, McDermott, on behalf of the Debtors, succeeded in persuading the state court that McCloud's suit had "violated the automatic stay [of litigation under Bankruptcy Code § 362(a)], and that the [state court] lacked jurisdiction."  A0028, ¶ 196.  When McCloud later sought an emergency appeal in the Appellate Division, McDermott successfully opposed it.  A0028, ¶ 197.  McDermott, on behalf of the Debtors, later sued in the bankruptcy court to enjoin McCloud from further prosecuting her state court action to block the closure.  <u>Id</u>., ¶ 200.  On August 4, 200, the lower court stayed McCloud's attempt at blocking DOH approval.  A0053, ¶ 46.

community… [the proposed closure] plan because they were concerned… [the community] could just get out of control and too disorganized…. [T]hey didn't want a draft of it floating around the hospital." A1355, p. 62:12–18.

These circumstances made it unwise – if not impossible – for McDermott to file the St. Mary's closure motion with the lower court before August 2005. Prior to that time, the Debtors were simply "not far enough along in the process of obtaining DOH approval" for them to seek court approval with a formal motion. A0027, ¶ 194. In fact, during an August 4, 2005 court hearing in the related McCloud lawsuit, see supra note 9, during which the closure of St. Mary's was the principal topic, St. Clair explained to Judge Beatty that the DOH had rejected the second draft of the closure plan and required more work to be done. A1665, p. 38:4–16. Therefore, on August 5, 2005, McDermott prepared and filed with the court an interim document: a nine-page page affidavit from Kingham-Bez, attaching the 102-page draft closure plan. A0390–A0500; A0028–A0029, ¶ 253. The affidavit provided financial information regarding St. Mary's, described the Debtors' business rationale for the closure (i.e., losses and underutilization), described the Debtors' prior unsuccessful efforts to transfer ownership of St. Mary's, and described the process of obtaining the requisite regulatory approvals. A0390–A0500; A0053, ¶ 45. After receiving the affidavit, Judge Beatty warned that she would not be able to grant a hearing on the anticipated motion until September 7, 2005. A0054, ¶¶ 49–50.

In the meantime, the Debtors continued to have problems finalizing the details of the closure process that would allow McDermott to file its final motion. A0054, ¶ 51. The Kingsbrook Response, developed in response to the St. Mary's closure plan, contained critical information regarding the transfer of St. Mary's clinics (information of the greatest interest to the St. Mary's community) but was not completed until August 4, 2005. A1609–A1621. An

updated list of employees entitled to WARN notification was not available until August 8, 2005.

Furthermore, "[t]he Debtors were having difficulty confirming (i) certain financial information

contained in the St. Mary's motion, and (ii) which contracts could be rejected as part of the St.

Mary's motion without impacting services at other [of the Debtors'] facilities." A0054, ¶ 51.

McDermott "struggled mightily with the client to verify" such financial details. A1076, p. 77:9–

12. Indeed, the Debtors had not identified the leases and contracts to be rejected for the closure

until the DOH approval process was in its final stages, during mid-August. A1076, p. 77:7–14;

A1241, p. 257:11–18. As described by Selbst, McDermott worked to balance the "trade off

between getting [the St. Mary's Motion] on file quickly and getting facts right." A1076, p. 77:5–

7.

Finally, on August 18, 2005, McDermott had sufficient information to file the St. Mary's

closure motion. A1486–A1627. The motion consisted of:

- 21 pages of text tracking the earlier Kingham-Bez affidavit, A1489–A1509;
- an updated version of the St. Mary's closure plan, A1513–A1602;
- the August 4, 2005 response by Kingsbrook to the updated St. Mary's closure plan, A1609–A1621;
- a commitment letter between the League of Voluntary Hospitals & Homes in New York and the Debtors' unionized employees, dated March 8, 2005, and supplemented with a detailed schedule, dated as of August 8, 2005, which dealt with how terminated employees of St. Mary's could find jobs with other city hospitals, A1603–A1608; and
- a list of nine contracts to be rejected subject to court approval. A1622–A1623.

Even though the motion was on file and set for hearing, DOH did not authorize the

closure until August 31, 2005. A1831. Parties filed or asserted objections to the St. Mary's

closure on August 30, August 31, and September 7, 2005. A0055, ¶ 55. The U.S. Trustee "took

no position," and the "[Creditors'] Committee initially took no position" with respect to the

closure, but later the Creditors' Committee, at the request of the judge, filed "a short response in

support of McDermott's motion to close [St. Mary's] on September 2, 2005." Id., ¶¶ 56–57, 61.

Despite the setbacks and red-tape that the Debtors and McDermott had to endure over the summer months of 2005, in the end, the closure of St. Mary's occurred almost exactly as planned.  In fact, Judge Beatty indicated even before the original "target date" (September 1) that she considered the St. Mary's closure to be a done deal, and simply needed sufficient time to mull it over.  On August 30, 2005, Judge Beatty called Smith of McDermott and told him exactly what to do during the September 7th hearing, the return date of the closure motion:

> [She] . . . told [us] to appear on September 7 and have available all witnesses needed to answer any question that the Judge might ask, but instructed [us] not to open [our] mouth.  She directed [us] to be quiet, humble, and apologetic.[10]  She stated that she was going to take the steam out of the room, and then she was going to close St. Mary's.  She said that she was not going to do it on September 7, but would have another one or two hearings before she approved the closure.

A0031, ¶¶ 221–222.

McDermott prepared for the September 7, 2005 hearing in accordance with Judge Beatty's direction.  Id., ¶¶ 229–232.  The Kingham-Bez affidavit had been in the record since August 5, 2005, A0390–A0500, and its contents were incorporated in the motion filed with the court in advance of the September 7, 2005 hearing.  A1486–A1627.  McDermott also ensured that Kingham-Bez and four other St. Vincent's staff members with specific technical knowledge were available at the hearing to answer the court's questions.  A1104, pp. 107:25 – 108:17.

Judge Beatty was true to her word.  At the end of the September 7 hearing, she reserved decision because, among other things, she still needed "to keep thinking about" it.  A0625, p. 79:7–12.  She explained, "I'm…caught between what… would be the right thing to do and what…I have to do…and I don't have to do anything today and that's good."  A0626, p. 89:9–

---

[10] Judge Beatty apparently used the word "apologetic" here for the Debtors' having to close St. Mary's.  Indeed, the Debtors expressed their "sincere and heartfelt regret" about the closure decision in their July 22, 2005 WARN Act notice to employees.  A2137.

13. "I think…we need to let everyone talk for a week and then we will try to schedule another hearing." A0634B. Judge Beatty later granted the St. Mary's motion on September 20, 2005, A1785–A1787, the "key date." A0507–A0508.

By all accounts, the Debtors were pleased with the way in which McDermott had handled the St. Mary's closing motion. St. Clair and Smith had "discussed that you don't willy-nilly file motions in the lower court early." A1286, p. 305:21–24. Smith testified, without contradiction by any other witness, that St. Clair never disagreed with McDermott on its timing or strategy for court approval, and never disagreed with anything that McDermott did during July and August regarding St. Mary's. A1286, pp. 305:19 – 306:16; See also A1355, p. 62:11-18.

## ARGUMENT

## I.    THE LOWER COURT CLEARLY ERRED IN DENYING MCDERMOTT'S FEES ON MATTERS PERTAINING TO THE RETENTION OF S&W

The lower court's decision to deny the portion of McDermott's fees reflecting its work on the S&W retention ($98,382) relies on one key finding: that fatal conflicts of interest triggered by the S&W acquisition by Huron were "self-evident," rendering any attempt to maintain S&W as the Debtors' managers "from the outset a dead letter." A1469; A1475. Along the way, the court also made other factual findings to support this decision: (i) in the pre-bankruptcy period, McDermott failed to inform the Debtors of Huron's acquisition of S&W in a timely manner, A1467–1469, and (ii) McDermott was not forthcoming with the U.S. Trustee with respect to information relating to the S&W/Huron retentions. A1472–A1473. The court also deducted other amounts from McDermott's fee award connected to the S&W/Huron retention matter: $74,180 in fees relating to the costs of changing the management of the Debtors and installing a Chief Restructuring Officer after Speltz & Weis were dismissed, A1482, and $44,523 in fees for

an investigation that McDermott conducted regarding an allegation of improper interference with the Debtors' employees.  A1472.

Because none of these conclusions was properly based in law or fact, the denial of these fees must be reversed.

### A.    McDermott Is Entitled to $98,382 in Fees For Its Efforts to Maintain the Services of S&W.

#### 1.    The Record Does Not Support the Court's Finding that S&W's Retention Was "Futile."

The lower court did not equivocate in its conclusion that McDermott's efforts to retain S&W and Huron were useless.  A1475 ("from the outset a dead letter"); A1481 ("predictably futile from the outset").  But the court is alone in this assessment.  Throughout June, July, and part of August 2005, major participants in the bankruptcy believed that S&W's and Huron's retention, albeit controversial, was still possible.  *See infra* at 29–30.  And, at all times relevant to this matter, these parties understood that because of S&W's and Huron's unique knowledge of the Debtors' business, attempting to maintain their services and thereby stabilize operations was in the Debtors' interests.  Id.  Concluding that the retention was "futile," therefore, was the product of the lower court's improper hindsight analysis and inexplicable decision to omit a host of undisputed facts.

First, and most important, the Debtors themselves believed that pursuing the retention of S&W and Huron, despite the risks, was beneficial.  A1381–A1382, pp. 90:9 – 91:9.  The Debtors were in dire financial straits in 2005 and relied heavily upon CEO Speltz, CFO Weis, and their supporting staff at S&W to maintain their business in the face of these problems.  More than forty S&W employees provided services to the Debtors, and Chairman Boyle believed the Debtors could not continue efficiently without them.  A1381–A1382, p. 91:4–17.  In his words,

"[S&W] had so many people in very, very key positions, that putting these people out of their key positions and putting them out the door would have been…ludicrous." Id., p. 91:4–9. There was "no rational alternative." Id., p. 91:18–19. Boyle admitted that, even after knowing about potential conflicts of interest posed by Huron's acquisition of S&W (as disclosed in Crowley's report), retaining S&W under certain conditions "was in the best interest of St. Vincent's and its creditors." A1381, pp. 90:9 – 91:4. The Board shared Boyle's view. A0830, ¶ 9; A1381-A1382, pp. 90:21 – 91:25. After digesting Crowley's investigatory report regarding conflicts of interest, the Executive Committee concluded that ending S&W's engagement "would be very disruptive and therefore inadvisable." A0011–A0012, ¶ 83. Accordingly, the Board voted to continue S&W's Management Agreement conditionally. Id., ¶¶ 84–86; A0830, ¶ 9. The lower court failed to mention these facts.

These undisputed facts fly in the face of the lower court's assertion that McDermott must have gotten the green light to proceed with the S&W retention from Speltz and Weis themselves, the parties whose contract was at risk of being cancelled. A1467–A1468. Document after document and witness after witness show that Chairman Boyle, General Counsel St. Clair, special counsel Crowley, and members of several of the Debtors' governance and compliance committees participated in the discussions regarding S&W and Huron. All concurred in the decision to go forward with the plan. See supra at 9–10. When Smith pointedly asked Boyle on July 25, 2005 whether his firm should continue with their plan to seek approval of the S&W and Huron retentions from Judge Beatty, Boyle's instruction was to "proceed." A0309–A0311.

Perhaps the best evidence of the Debtors' firm belief that McDermott's attempts to retain S&W and Huron were anything but "futile" is their representation to the lower court in October 2005, after dismissing McDermott as counsel. A2085–A2122. Through their new counsel, the

Debtors filed a motion and affidavit attesting that "the continued services of Huron and [S&W] have been and are important to [the Debtors'] reorganization efforts… [Their] experience and knowledge has been of substantial value to the Debtors since the Petition Date [July 5, 2005] and will be valuable to the Debtors in their continuing efforts to reorganize."  A2102–A2103, ¶¶ 43, 45.  This information – which unambiguously contradicts the court's finding that McDermott's attempt to retain S&W and Huron was of no benefit whatsoever to its client – was never cited by the lower court.

        In addition to the Debtors, the independent counsel who advised the Debtors' Board on the S&W issue, Leo Crowley, also believed S&W's retention was worth pursuing.  In his post-investigation report, Crowley noted the conflicts posed by Huron's acquisition of S&W, but still advised that Speltz and Weis retain their positions.  A1803–A1811; A1809 ("SVCMC should request…that Huron…make the service of Speltz and Weis available as required under the [M]anagement [A]greement…").  Crowley praised the Board's decision to take his advice.  A0384.  The Board "identified a conflict and took appropriate advice and reached a valid decision to waive it based on reasonable conditions."  Id.

        Finally, the U.S. Trustee supported S&W's retention for a significant period of time.  During July 2005, the key month during which the Debtors were evaluating the S&W/Huron issue and decided to go forward with the retention motion, the U.S. Trustee led McDermott to believe that the S&W retention could be accomplished after an appropriate dialogue.  The U.S. Trustee called the S&W retention application "a work in progress."  A0676, pp. 162:23 – 163:2.  As St. Clair described her conversation with the U.S. Trustee on July 18, 2005, the U.S. Trustee had "not rejected [the S&W motion] out of hand," but rather had comments for its improvement.  A0303; A0013–A0014, ¶ 100.  Later, the U.S. Trustee specifically directed McDermott about

how to revise the application to improve its chances of being approved, and it implemented those revisions.  A1812–A1817, A1818–A1819.  This process involved not only McDermott, but also St. Clair, who spoke directly to the U.S. Trustee and worked for several weeks to address her concerns.  Id.  Not until mid-August 2005 did McDermott learn that the U.S. Trustee had changed her mind.  A0501–A0502, A0018, ¶ 126.  Instead of supporting the retention of S&W, the U.S. Trustee decided to use the issue as a lever to get a chapter 11 trustee or replacement chief restructuring officer appointed to manage the case.  See supra at 16–19; A0384.  The lower court's opinion cited only those facts relating to the U.S. Trustee's misgivings about S&W; none of the information above about the U.S. Trustee's support for the S&W retention was included in the opinion.

When, as here, a lower court disregards material evidence in the record to reach a contrary conclusion, there is clear error.  As the U.S. Supreme Court has explained, a finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed….  Where…testimony is in conflict with contemporaneous documents we can give it little weight."  United States v. U.S. Gypsum Co., 333 U.S. 364, 394–96 (1948).

The Courts of Appeal, including that of the Second Circuit, have followed this rationale.  In Jiminez v. Mary Washington College, 57 F.3d 369, 379 (4th Cir. 1995), the Court of Appeals reversed as clearly erroneous a district court's judgment in favor of the plaintiff, a professor who claimed that he had been terminated from his university because of discrimination based on race and national origin.  In reversing the district court's judgment for the plaintiff, the Fourth Circuit was "left with the definite conviction that the factual findings of the district court [were] clearly erroneous…[because it] ignored substantial evidence or failed to evaluate substantial contrary

evidence in making its findings of fact." Id. at 384. Specifically, the district court had clearly

erred in failing to consider negative student evaluations, which "disclosed that [plaintiff] was an

inferior instructor, disorganized, confused, experienced difficulty in explaining concepts and

answering questions, and these student evaluations coincided with [other] evaluations….

Likewise, the district court disregarded conflicting testimony…[of] a former student…who

stated that [plaintiff] was ineffective and generally a poor professor." Id. at 381. Similarly, the

Second Circuit held in Weissman v. Freeman that the district court's decision was clearly

erroneous because it "implausibly overlooked" and "failed to give detailed consideration to" key

evidence. 868 F.2d 1313, 1322 (2d Cir. 1989). The court further noted that a trial judge cannot

gloss over his or her failure to consider relevant evidence by calling it a matter of "credibility."

See id. at 1322–1323.

      "Implausibly overlooking" and "failing to give detailed consideration" to evidence is an

apt description of what the lower court did here. The court cherry-picked only those facts that

tended to show that the retention of S&W and Huron was fraught with difficulty and led to

strained relationships between McDermott, the Debtor, the U.S. Trustee, and others involved in

the bankruptcy. A1449–A1460; A1467–A1478; A1481. Yet if the court had considered all facts

relevant to the S&W/Huron retention efforts, it could not have reasonably concluded that the

consultants' retention was a "dead letter" – the Debtors' admissions in the S&W/Huron retention

application it filed after dismissing McDermott as counsel, standing alone, refute that fact. See

supra at 20–21. Seeking to retain S&W and Huron cannot have been highly worthwhile when

the Debtors' new counsel did so in October 2005, but worthless when McDermott did so just a

few weeks prior.

The lower court's error in disregarding some facts and placing undue weight on others may have been the result of the erroneous legal principle under which the court rendered its decision. At the outset of the decision, the court announced that it would evaluate McDermott services with "20-20 hindsight":

> "It is an inevitable fact of life that events and conduct are judged after the fact, with the proverbial benefit of 20-20 hindsight…Counsel charge and are paid high compensation in a fair expectation that their foresight and judgment will assess today's facts as the facts would be perceived and judged tomorrow under the searching gaze of 20-20 hindsight."

A1466–A1467. This type of "rear view" analysis is precisely what the Bankruptcy Code and applicable cases require courts to avoid. The Code directs bankruptcy courts to review fee applications by determining, inter alia, "whether the services where necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of…the case." 11 U.S.C. § 330(e)(3)(C); see generally In re Ames Dep't Stores, Inc., 76 F.3d 66 (2d Cir. 1996) (rejecting hindsight-based denial of fees); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 23 (Bankr. S.D.N.Y. 1991) (services should not be evaluated with benefit of "20/20 hindsight," but in light of facts existing when services rendered; fees "should be disallowed only where a Court is convinced that it is readily apparent that no reasonable attorney should have undertaken that activity"); In re Cenargo Int'l PLC, 294 B.R. 571, 595 (Bankr. S.D.N.Y. 2003) ("The focus is on what a reasonable lawyer would have done at the time; the Court should not invoke perfect hindsight."); In re XEBEC, 147 B.R. 518, 524 (B.A.P. 9th Cir. 1992) (holding that "services" need not be "successful in every circumstance" when determining whether legal services were beneficial to estate); In re Korea Chosun Daily Times, Inc., 337 B.R. 758 (Bankr. E.D.N.Y. 2005) ("the Court must not penalize attorneys by viewing the efforts of counsel with the benefit of 20/20 hindsight") (citing Drexel Burnham)

(internal quotes omitted); <u>Qmect, Inc. v. Burlingame Capital Partn. II, L.P. (In re Qmect, Inc.)</u>, 2007 Bankr. LEXIS 3099, *11 (Bankr. N.D. Cal. 2007) ("the test of reasonableness is applied in foresight, not in hindsight").

The Second Circuit rejected a hindsight-based denial of fees to debtor's counsel in <u>In re Ames Dep't Stores, Inc.</u>, 76 F.3d 66. In that case, Debtor's counsel appealed the denial of its fees, which the lower court had justified (and the district court had affirmed) based on counsel's unsuccessful motion to terminate a retiree group life insurance plan. In reversing, the Court of Appeals stressed that when the debtor's counsel had pursued the motion, courts had disagreed in interpreting the applicable law. <u>Id</u>. at 71 ("…a wide open question."). Whether the services of debtor's counsel were "reasonably likely to benefit the estate," reasoned the Second Circuit, should be viewed objectively, based on "what services a reasonable lawyer would have performed in the same circumstances." <u>Id</u>. at 71. Courts within the Second Circuit and elsewhere agree that hindsight is not a proper approach. <u>See</u> <u>In re Drexel Burnham Lambert Group, Inc.</u>, 133 B.R. 13, 23 (holding that services should not be evaluated with benefit of "20/20 hindsight," but in light of facts existing when services rendered); <u>In re XEBEC</u>, 147 B.R. 518, 524 (holding that "services" need not be "successful in every circumstance" when determining whether legal services were beneficial to estate); "The majority of courts have determined the 'necessity' of particular services from the perspective of the time that the services were rendered, rather than based on hindsight after the services had been performed." 3 COLLIER, BANKRUPTCY, ¶ 330.04[1][b][iii] at 330–36 (15th rev. ed. 2007). This is the approach now codified in section 330(a)(3)(C). <u>Id</u>.

Thus, the lower court's attack on McDermott's S&W/Huron related services was premised on an incorrect view of the law. Even though Speltz and Weis were ultimately forced

to leave their positions, the Debtors explicitly instructed McDermott <u>before</u> that occurred, to work toward approving their retention.  A0311.  The Debtors' instruction was objectively reasonable at the time, given that these individuals were performing crucial work for the Debtors, both McDermott and independent counsel advised that the conflict issues presented by S&W's retention were not necessarily fatal, and none of the parties had a crystal ball by which they could have predicted that the U.S. Trustee would withdraw her apparent support for the retention so abruptly.  <u>See supra</u> at pp. 13–17, 29–31.  Therefore, using foresight, not hindsight, and in light of the Debtors' clear instructions and crucial work being performed, McDermott was reasonable to believe that the Debtors may have been irreparably harmed if McDermott did not take steps to get S&W retained.  <u>See</u> <u>In re First NLC Finan. Serv. LLC, et al.</u>, 382 B.R. 547, 548 (Bankr. S.D. Fla. 2008) (holding that debtor would have been "immediately and irreparably harmed" without counsel at inception of case).  When the court announced that it would view these circumstances based on what is known <u>now</u>, rather than what was known <u>then</u>, it committed manifest error.

## 2. The Court Erred in Considering Pre-Petition Facts Regarding McDermott's Candor as to S&W's Conflict of Interest.

In reaching its decision to deny $98,382 in fees relating to McDermott's work on the S&W/Huron retention matter, the lower court placed heavy emphasis on events dating prior to the short period covered by McDermott's fee petition (July 5 to September 13, 2005).  A1451–A1457; A1467–A1469.  Specifically, the court focused on Huron's planned acquisition of S&W and whether McDermott had adequately informed the Debtors of that acquisition as well as the potential conflicts of interest that it posed vis-à-vis S&W.  <u>Id</u>.  This required the court to delve into events occurring in 2004, as well as events in early 2005, when Huron's plans to acquire

S&W hatched.  Id.  During the court's prolonged discussion of these events, it frequently cast

aspersions on McDermott's motives and candor toward its client.  Id.

Yet in its entire decision, the court never mentioned one important, undisputed fact:  that

the Chairman of the Board was informed that Huron had just acquired S&W, the act that

triggered the potential conflicts of interest, ***on May 6, 2005*** – well before the filing of the

bankruptcy petition and the beginning of McDermott's fee application period.  A1804, A1808;

A0828, ¶ 4.  There is no question that the Board understood the potential for conflicts of interest

by this point at the latest because, shortly thereafter, it hired Leo Crowley to investigate them.

See supra at 9–12.  As discussed in more detail above, there is a wealth of evidence that after

May 6th, the Debtors were willing to waive or work to avoid any conflicts of interest in order to

maintain the crucial services of S&W and Huron, which it believed was in their best interests.

See supra at 9–12, 20–21.

When considering an attorney fee application pursuant to section 330 of the Bankruptcy

Code, courts are expected to focus on issues relating to the application and not extraneous

matters.  Part of this duty is to evaluate the attorney's services during the relevant time period,

not before, and not after.  Section 330 directs the lower court to consider "whether the services

were necessary … or beneficial at the time at which the service was rendered."  11 U.S.C. §

330(a)(3) (emphasis added); see also Drexel Burnham, 133 B.R. at 23; In re City Mattress, Inc.,

174 B.R. 23, 26 (Bankr. W.D.N.Y. 1994) ("key issue is whether the services were necessary, not

whether the debtor's activities were, in hindsight, necessary to achieve whatever outcome

eventually occurs.").  Section 330 directs the bankruptcy court to consider "all relevant factors"

to the claims before it. 11 U.S.C. § 330(a)(3) ("taking into account all relevant factors").  In this

instance, it is undisputed that the only claim before the court was McDermott's application for

postpetition fees.  The court, therefore, only should have considered McDermott's postpetition

conduct.  For this reason, McDermott objected to certain pre-bankruptcy evidence as irrelevant

to the claims being litigated.  A1164, p. 173:16–23 (counsel to McDermott objecting to evidence

concerning McDermott's pre-fee period actions and the court ruling that it "will consider how

it's relevant when I hear it.").  Contrary to the law, the lower court nevertheless admitted that

irrelevant evidence into the record.  The court then made findings based on that evidence that

was irrelevant to the postpetition fees at issue in the trial.

As of May 6, 2005, the lower court's findings regarding the Board's <u>prior</u> ignorance of

the S&W conflicts and McDermott's alleged responsibility for that ignorance became a relic of

the past.  The findings do not bear on the events that happened after July 5, 2005, the beginning

of the fee application period, and thus were not properly used against McDermott by the lower

court to support its decision to deny it $98,382 in fees.[11]

### 3.    The Trustee Had Adequate and Timely Information Regarding S&W and Huron.

The lower court also found that McDermott failed to disclose adequately to the U.S.

Trustee the full details of the S&W/Huron acquisition, further supporting its denial of the S&W-

related fees.  A1471–A1478.  In the court's words, McDermott's lack of adequate disclosure was

indicative of the firm's "uncooperative or even adversarial approach to the U.S. Trustee's

office."  A1472.  This finding, based on lawyers' rhetoric, is belied by the undisputed record.

There were, in fact, regular, non-contentious communications between McDermott and the U.S.

Trustee, as shown by the facts described above regarding their cooperation in July 2005 to revise

the S&W retention application.  <u>See supra</u> at 31–32.  In the U.S. Trustee's words, Smith was

---

[11] The extent to which any of Judge Hardin's findings or conclusions might collaterally estop
either party in any subsequent proceedings is not addressed herein and is expressly reserved.

"candid" regarding Huron's acquisition of S&W, disclosing it early on. A0642, pp. 27:10–19, 29:13–17 ("I think Bill Smith disclosed it to me early on"; "I think Bill was candid and told me that [Huron] had purchased Speltz & Weis in May of 2005."). Furthermore, Smith told the U.S. Trustee that Speltz and Weis were Huron employees in early July and, shortly thereafter, more specific details of their financial relationship, promptly after he learned them on July 19, 2005. See supra at 13.

Overall, the U.S. Trustee believed Smith was "compliant" in addressing her concerns. A0644, p. 37:14–15. She told Smith that the "terms of whatever transaction occurred need to be disclosed. And Mr. Smith was very – you know. I believe he was very compliant." Id. The U.S. Trustee "consistently told [Smith] that I would work with him to try to resolve any issues...." A0648, p. 51:13–15.

None of these facts, which contradict the court's blithe assertion that McDermott fostered an "uncooperative or even adversarial relationship" with the U.S. Trustee and kept important information from her, can be found in the court's opinion. The court's unsupported conclusion, therefore, is not a proper ground on which to deny McDermott's fees.

### B.     McDermott Should Not Bear $74,180 in Fees Related to the Post-S&W Change in Management and Appointment of a CRO.

Once the lower court had concluded that McDermott should not be paid for its work to retain S&W, it summarily concluded that McDermott, and not the Debtors, should bear the cost of the changes that followed – namely, McDermott's time charges relating to the installation of new management and the appointment of a chief restructuring officer. A1482. The court offered no other reasoning for this decision. As shown above, McDermott's work to retain S&W (and not Speltz and Weis, individually) was unquestionably client-directed and reasonable under the circumstances at the time (i.e., the debtors only wanted the retention to be limited to a discrete

number of employees for a limited period of time (through October 2005)).  The fact that S&W were ultimately dismissed and the U.S. Trustee ultimately concluded that the appointment of a chief restructuring officer was in her own best interest cannot change these historical facts.  As a result, there is no longer any factual basis to deny these fees.

### C.    McDermott is Entitled to $44,523 for Its Reasonable and Efficient Investigation of a Possible Tortious Interference Claim Stemming From the S&W Retention Matter.

The court also erred in disallowing McDermott's fees on a smaller matter related to the S&W/Huron issue, namely, McDermott's brief investigation of potential tortious interference with the Debtor's employees.  The undisputed record shows that this work was specifically requested by the Debtors at a time when it was perfectly reasonable for it to do so.  McDermott received an urgent request from the Debtors to investigate the Creditors' Committee solicitations of its managerial employees, while the Committee explored replacing the CEO and CFO, Messrs. Speltz and Weis.  See supra at 17–18.  The Debtors were understandably concerned that, after losing Speltz and Weis, further tampering with its managerial ranks would be highly disruptive at a particularly vulnerable time for the business.  After receiving this direct request, McDermott conducted a short and efficient investigation into whether the solicitations were improper.  Id.  After four days, when McDermott could not find any evidence of tortious interference or other wrongdoing, it promptly ended the investigation.  Id.

The court issued no factual findings regarding this episode other than to say, in conclusory fashion, that "there was nothing improper" in the Committee's solicitations.  A1473.  This is the very definition of hindsight analysis.  McDermott also concluded that the Committee had done nothing wrong (or, at least, that there was insufficient evidence of wrongdoing) but only after investigating and discussing the matter in response to their client's direct request.  That

is exactly what lawyers do to earn their fees – investigate concerns of their clients and render reasoned, informed advice.  Thus, this work was "beneficial at the time at which the service was rendered," and the related fees should not have been stricken from McDermott's fee award.

## II.    THE LOWER COURT ERRED BY PREMISING ITS CRITICISM OF McDERMOTT'S HANDLING OF THE ST. MARY'S CLOSURE ON A FALSE DEADLINE AND NONEXISTENT MISTAKES BY MCDERMOTT

The lower court denied $200,000 in fees to McDermott relating to its work on the St. Mary's closing, representing the majority of its fees on that matter.  A1484–A1485.  The court rested its decision on two major premises: first, that September 1, 2005 was a drop-dead date by which St. Mary's needed to close in order to avoid serious harm to the Debtors, and therefore McDermott's failure to receive court approval for the closing by that date means "McDermott simply did not get the job done;" and second, McDermott's supposed failure to provide appropriate documentation to the court was the reason approval was not obtained until September 20, 2005.  A1478; A1482–83.  Neither of these premises is supported by facts from the record, and the court overlooked substantial evidence to the contrary.  Thus, the lower court committed clear error on this point, and its decision to disallow $200,000.00 in McDermott's fees should be reversed.

### A.    The September 1st "Deadline" Was a Fiction Created by the Lower Court.

In its recitation of the facts regarding St. Mary's closure, the lower court relied heavily on the fact that the Board had "charged its professionals to accomplish this objective by September 1 [2005]," the so-called "target date."  A1461; A1464; A1478.  The court frequently referred to this date, sua sponte, as a "deadline" and implied that any deviation from that date would cause harm to the Debtors.  A1464 ("In order to meet the September 1 deadline"), A1464 ("September

1 deadline"; closing St. Mary's was "critical triage"); A1483 (noting "delay" and not gross tardiness by McDermott rendering its services "not 'beneficial'" to the Debtors).

The lower court seems to be the only one concerned about the St. Mary's closure being approved by the 1st of September rather than the 20th; certainly the Debtors were not.  The Board's Executive Committee first mentioned September 1 as a "target date" on June 17, 2005.  A1792.  The word "deadline" was never mentioned, and the Board recognized significant political opposition to the closure.  Id.  Later statements from the Debtor reveal the September 1 target date to be a soft target, at best.  See supra at 23.  CFO Timothy Weis expected closure only sometime "before the end of 2005," and Senior Vice President Kingham-Bez identified the "key" date as September 20, in line with the timing of the 60-day WARN notices to the Debtors' employees.  Id.  In fact, Kingham-Bez stated explicitly that, to the extent there would be any significant financial exposure due to a delay in closing St. Mary's, she would expect that to occur only after September 20.  Id.  None of these facts – every one of which contradicts the court's presumption that September 1 was a firm deadline that McDermott was expected and duty-bound to meet – appears in the lower court's decision.

The witnesses also explained to the court why the September 1 target date was not considered a firm deadline, but the court gave these facts short shrift, to the extent it mentioned them at all.  Everyone involved in the St. Mary's matter understood the difficulties faced in attempting to close a century-old health care facility in the face of community and political pressure.  The Debtor had difficulty winning the approval of DOH and the community, matters for which McDermott, as bankruptcy counsel, had no responsibility.  See supra at pp. 22.  Furthermore, the DOH pleaded with the Debtors not to circulate a draft closure plan prematurely.  Id.  In addition, the plan for the handover of certain of St. Mary's clinical services to

Kingsbrook, also outside of McDermott's bailiwick, was delayed until early August.  Id.  Finally,

the financial details that McDermott needed to include in its final closure motion, including a

decision regarding which contracts St. Mary's would retain and which it would reject, were not

finalized until mid-August.  Id.  In the face of these complications, it is not surprising that the

Debtors and McDermott tentatively expected approval not by September 1, but perhaps by mid-

to-late September – which is exactly when it happened.

Moreover, no evidence exists in the record showing that, at the time the St. Mary's

motion was filed and approved, anyone was unhappy with McDermott's work or its timing.  See

supra at 27-28.  No witness contradicted Smith's testimony that St. Clair was perfectly content

with his firm's handling of the St. Mary's motions.  Neither the U.S. Trustee nor the Committee

ever complained about the St. Mary's closure until six months later, after McDermott filed its fee

application on January 31, 2006.[12]  A0916, ¶¶ 134, 137 ("The [U.S. Trustee] took no position

[on] efforts to close St. Mary's….The Committee [belatedly supported] McDermott's motion to

close St. Mary's… on September 2, 2005"); A0031, ¶ 220 ("The Committee initially took no

position [on closing St. Mary's].").

Because the September 1st "deadline" was illusory, the tongue-lashing that the lower

court delivered to McDermott and its "professional judgment" was wholly gratuitous.  **St.

Mary's closure was approved on the "key date" of September 20, 2005.**  A1785–A1787,

A0507.  Therefore, although the lower court criticized McDermott for not starting the approval

process earlier, A1478, alleging that it was "absolutely essential" for McDermott to have the

closure motion on file "by the second or third week in July *at the very latest*" to meet the

---

[12] Pursuant to a stipulation and order dated, July 14, 2006, the Debtors had to be ordered to and did finally object to McDermott's fee application, after waiting five and a half months to do so.  D.E. Nos. 1898, 1971.  The Committee and UST objected to McDermott's fee application on March 3 and March 7, 2006.  A1718-1725, A1726-1762.

September 1 target (emphasis in original), id, and for generally mishandling the timing of the St.

Mary's matter, A1482–A1483, those findings were completely unnecessary to the court's

decision.

For the same reason, the court's long discussion in which it "reject[ed] McDermott's

contention" that complications in the St. Mary's closing process prevented it from filing the

closure motion in time for a September 1st approval, A1479, is a nullity.  This, too, is premised

on the false notion that September 1st was a rigid deadline.  The court never considered the

possibility, supported by the documentary record, that September 20th, or even a later date, was

well within the range of acceptable outcomes to the Debtors.  Similarly, it also never considered

the possibility that, under all of the trying circumstances surrounding St. Mary's closure (in

addition to everything else that was going on simultaneously), achieving approval by September

20th was truly "beneficial" to the client and McDermott's work was "performed within a

reasonable amount of time commensurate with the complexity, importance, and nature of the

problem, issue or task to be addressed."  A1483 (quoting § 330(a)(3)(C) and (D)).

### B.    The Lower Court's Finding that McDermott Filed an Inadequate Motion Has No Support in the Record.

The lower court took issue not only with the timing of McDermott's work on the St.

Mary's matter, but also with its substance.  Specifically, the court stated that McDermott's

motion was "defective because it was not supported by any affidavits or financial data."  A1482.

According to the court, this meant McDermott's work product "was plainly inadequate because it

did not provide [Judge Beatty] with a documented, factual predicate necessary for an order to

close the hospital."  A1483.  This assertion has no support in the record, and, in fact, is

demonstrably false, as there is no record evidence –absolutely none– even remotely suggesting

that Judge Beatty's closure decision was delayed in any way by the papers McDermott filed in support of the closure motion.

McDermott filed the motion on August 18, 2005, only six weeks after the Debtors entered bankruptcy. At this time, Judge Beatty was already well aware of the many valid reasons for the closure, having held two hearings in which the matter was raised (on August 4 and August 5, 2005) and having already received the August 5th Kingham-Bez affidavit, which explained the closure rationale and attached the 102-page detailed closure plan previously submitted to the DOH by St. Clair and Kingham-Bez. See supra at 25; see also Comments of Judge Beatty at August 23rd Hearing Transcript at 10:11–15; 11:4–9 (advising Debtors what to include in letters to patients stating "Why don't you say: Regretably [sic] St. Mary's . . . after 100 years of operation is no longer able to continue to operate due to its financial problems"; "it is really sad that this hospital that has been here for over a hundred years because of changes in the healthcare industry is no longer able to run the hospital because it was losing money").

Furthermore, when McDermott filed the final motion on August 18, 2005, it did, in fact, attach several exhibits: (i) 21 pages of text tracking the earlier Kingham-Bez affidavit, which described the factual basis for the St. Mary's closure (e.g., losses and underutilization), A1489–A1509; (ii) an updated version of the St. Mary's closure plan, A1513–A1602, previously filed as an exhibit to the Kingham-Bez affidavit, A0390–A0500; (iii) the August 4, 2005 response by Kingsbrook to the updated St. Mary's closure plan, A1609–A1621; (iv) a commitment letter between the League of Voluntary Hospitals and Homes in New York and the Debtors' unionized employees, dated March 8, 2005 and supplemented with a detailed schedule dated as of August 8, 2005, A1603–A1608; and (v) a list of nine contracts to be rejected subject to court approval, A1622–A1623. Therefore, the lower court's assertion that the motion was "not supported by a

single affidavit and did not attach any financial analysis to support the summary and conclusory lawyer assertions in the motion concerning the financial need to close the Hospital," A1479, is manifestly *false*.

It is unclear why the lower court so badly mischaracterized McDermott's St. Mary's motion as "not supported" and, indeed, made no reference to the papers that supported the motion since the full contents of that filing were available in the record. Moreover, the court had no other basis for finding McDermott's papers to be "defective." A1482. Whatever the reason, the court manifestly erred, and the purported "defect" in McDermott's motion cannot properly serve as a basis to deny fees to McDermott.

The court's implication that Judge Beatty failed to approve the motion at the September 7, 2005 hearing because of the "defect" in McDermott's filing, A1482, is also demonstrably false. It is undisputed that Judge Beatty telephoned Smith of McDermott on August 30, 2005 – after receiving McDermott's closure motion and the attached support – and informed him that she would grant the motion. See supra at 27. As Judge Beatty told Smith, she had no intention of approving the motion at the September 7th hearing, A0031, ¶ 222, but this had nothing to do with lack of documentary proof; instead, she wanted to hold off on deciding the motion so she could "keep thinking about it." A0625, p. 79:1–12. In the face of the uncontradicted testimony concerning Judge Beatty's directive to Smith, McDermott could have been criticized, justifiably, had it spent additional time generating more court papers that it knew were deemed to be unnecessary by the ultimate decisionmaker, Judge Beatty.

Judge Beatty did exactly what she said she would do. On September 7, she reserved decision, saying "I'm caught between what I think would be the right thing to do and what I think I have to do…and I don't have to do anything today and that's good." A0626, p. 89:9–13.

She granted the St. Mary's motion at the very next hearing, on September 20, 2005.  A1785–A1787.  Although McDermott's successor, Weil Gotshal, filed additional historical papers before the September 20th hearing, none of this changes the fact that Judge Beatty <u>already</u> decided, on August 30th, that she would grant the motion.  There is no evidence that Judge Beatty requested Weil Gotshal to paper the record with any additional filings, or that she held off making a decision until more papers were filed.  The lower court never mentioned these facts in its opinion, opting instead to come up, for the first time, with its own after-the-fact assessment what it would have wanted to support the closure motion.  Put another way, the fact that another judge would have handled things otherwise does not mean that punishment must be meted to McDermott.

\* \* \*

The major underpinnings of the lower court's ruling regarding the St. Mary's fees – that McDermott missed a key deadline and filed defective papers, thereby failing to provide any benefit to its client – is unsupported by the record.  As a result, its decision was manifestly in error and its decision to deny $200,000 in McDermott's fees connected with its work on the St. Mary's closure motion must be reversed.

## III.    McDERMOTT WAS NOT DISMISSED FOR POOR PERFORMANCE AND THEREFORE SHOULD NOT BEAR THE COST OF TRANSITION TO SUCCESSOR COUNSEL

Finally, the lower court found that McDermott brought about its own replacement as Debtors' counsel, and that, as a result, it should bear the cost associated with transferring the case to the replacement firm ($43,458).  A1482.  Based on its very brief discussion of the issue, the court appeared to consider this to be a "catch-all" deduction to McDermott's fee award.  <u>Id</u>. (stating that deduction is justified because of the "shortcomings in the firm's performance which resulted in a crisis of confidence" amongst those involved in the bankruptcy).

What the court did <u>not</u> do, however, is cite a single fact from the record indicating that at the time the Debtors decided to terminate McDermott's position as counsel, they did so because of "shortcomings in the firm's performance." In fact, there is none. Instead, the contemporaneous record indicates that, in the face of growing dissatisfaction amongst the parties, McDermott was simply the easiest to remove. As Chairman Boyle explained, he could not replace the U.S. Trustee, the judge, the Chair of the Creditors' Committee, or any of the advisors to the Creditors' Committee. After "thinking long and hard" about it, he "felt the only reasonable thing to do from a business point of view was to have a change in counsel." <u>See supra</u> at 18–19. Out of fear that the U.S. Trustee would seek the appointment of a Chapter 11 trustee or otherwise assert more control over the Debtors, Boyle decided to sacrifice McDermott. <u>Id</u>.

Until the filing of the fee application, neither Boyle nor St. Clair ever told Smith that McDermott had done anything wrong. In fact, St. Clair promptly "apologize[d]" to McDermott on the Debtors' behalf." <u>See supra</u> at 19. Boyle told Smith at the time McDermott was dismissed that "he would make sure that [McDermott] got paid" and later testified "that [McDermott] should be compensated for services rendered to" the Debtors. <u>Id</u>.

Thus, the lower court's reference to "shortcomings" in McDermott's performance has no basis in the contemporaneous record. To the extent that the U.S. Trustee or Creditors' Committee may have grown unhappy with McDermott by September 2005 does not mean that McDermott was terminated by its client at that time for poor performance, or did not otherwise earn its fees. The $43,458 deduction made by the lower court to cover the costs of replacement counsel should therefore be reversed.

## CONCLUSION

The lower court's decision and order constitute an abuse of discretion and should be reversed and vacated.  Rather than remand the case, this court, "[i]n the interest of judicial economy," should exercise its power to award reasonable attorneys' fees and expenses based on the complete record.  In re Cena's Fine Furniture, Inc., 109 B.R. 575, 581–82, 583 (E.D.N.Y. 1990) (Bartels, J.) (reversing lower court's partial denial of counsel fees, district court found "an abuse of discretion which resulted from one mistake of fact and at least two mistakes of law"; rejecting lower court's "hostile approach," held, lower court's "finding that the [attorney] time records were incredible is clearly erroneous and unsupported by the evidence."), citing New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1154 (2d Cir. 1983) (after reversing district court, appellate court went on to award "reasonable" attorney fee); In re Gilead Baptist Church of Taylor, Inc., 806 F.Supp. 644, 645 (E.D. Mich. 1992) (reversing lower court's denial of compensation, district court awarded fees).

McDermott worked hard and well for the Debtors.  The firm provided its services in good faith, as requested, and the Debtors benefited from those services.  The court should reverse and vacate the lower court's September 21, 2007 order, set aside its clearly erroneous findings, and award McDermott its reasonable fees.

Dated: May 16, 2008
New York, New York

SCHULTE ROTH & ZABEL LLP,
Counsel for McDermott Will & Emery LLP

By: _____
Michael L. Cook (MC 7887)
David M. Hillman (DH 8666)
919 Third Avenue
New York, New York  10022

Telephone:  (212) 756-2000
Facsimile:  (212) 593-5955
Email:  michael.cook@srz.com
          david.hillman@srz.com