IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————————————————————

In re SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK
d/b/a SAINT VINCENT CATHOLIC MEDICAL CENTERS, *et al.,* Debtors,
Bankruptcy Case No, 05-14945 (ASH) (Jointly Administered)

———————————————————————————————————

Civil No. 1:07-CV-09818-AKH

———————————————————————————————————

McDERMOTT WILL & EMERY LLP,

Appellant,

v.

SAINT VINCENTS CATHOLIC MEDICAL CENTERS
OF NEW YORK, CREDITORS' COMMITTEE OF
SAINT VINCENT CATHOLIC MEDICAL CENTERS OF
NEW YORK and DIANA G. ADAMS, AS UNITED
STATES TRUSTEE FOR REGION 2,

Appellees.

———————————————————————————————————

On Appeal from the United States Bankruptcy Court for the Southern District of New York
———————————————————————————————————

**BRIEF OF APPELLEE UNITED STATES TRUSTEE**

Alicia M. Leonhard
Trial Attorney
Tracy Hope Davis
Assistant United States Trustee
Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, NY 10004
(212) 510.0508
Alicia.M.Leonhard@usdoj.gov

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     i

Table of Authorities  . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . .     iii

I.     PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

II.    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

III.   JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

IV.    STATEMENT OF ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . .     3

V.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     3

VI.    STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4

       A.     Legal and Statutory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4

              1.     The Retention of Professionals under 11 U.S.C. § 327(a) . . . . . . . .     4

              2.     The Award of Fees to Professionals under 11 U.S.C. § 330 . . . . . .     6

       B.     Procedural History of the Debtors' Chapter 11 Case . . . . . . . . . . . . . . . .     7

       C.     The Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

       D.     The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

       E.     The Decision and Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

              1.     McDermott's Handling of the SW and Huron Retention . . . . . . . .     10

                     a.     Findings of Fact                                                                        10

                            i.     St. Vincents' Pre-Petition Retention of SW,
                                   McDermott and Huron . . . . . . . . . . . . . . . . . . . . . . .     10

                            ii.    Huron's Purchase of SW . . . . . . . . . . . . . . . . . . . . .     11

                            iii.   The Crowley Report . . . . . . . . . . . . . . . . . . . . . . . . .     13

                            iv.    The Retention of SW and Huron in the Bankruptcy
                                   Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

                            v.     The Radio Silence Instruction . . . . . . . . . . . . . . . .     15

                     b.     Conclusions of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     16

2.  The Closure of St. Mary's Hospital . . . . . . . . . . . . . . . . . . . . . . . . .  17

    a.  Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

    b.  Conclusions of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

3.  The Bankruptcy Court's Disallowance of McDermott's Fees . . . . .  19

VII.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

A.  The Bankruptcy Court Did Not Abuse Its Discretion When It Disallowed McDermott's Fees Incurred in the Pursuit of the Retention of SW and Huron and the Investigation of the Creditors' Committee's Actions. . . . . .  19

1.  The Bankruptcy Court Properly Found that McDermott's Pursuit of the Retention of SW and Huron Was Unreasonable. . . . . . . . . .  20

2.  The Bankruptcy Court Properly Found that McDermott Failed to Timely Disclose the Issues with the SW and Huron Retention to the Board and the United States Trustee. . . . . . . . . . . . . . . . . . . . . .  24

3.  The Radio Silence Instruction and the Tortious Interference Investigation Were Not Reasonable. . . . . . . . . . . . . . . . . . . . . . . . .  27

B.  The Bankruptcy Court Did Not Abuse Its Discretion in Disallowing McDermott's Fees Because McDermott's Handling of the Closure of St. Mary's Hospital Was Not Reasonable or Performed in a Reasonable Amount of Time. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

C.  The Bankruptcy Court Applied the Proper Legal Standard. . . . . . . . . . . .  31

D.  The Bankruptcy Court Did Not Abuse Its Discretion When It Disallowed McDermott's Fees Incurred in the Transition From McDermott to Weil. .  33

VIII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

Appendix A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A.1

Appendix B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  B.1

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGES**

*In re Ames Department Stores, Inc.*, 76 F.3d 66 (2d Cir.1996)                   31

*In re Anderson*, 349 B.R. 448 (E. D. Va. 2006)                                  27

*In re Angelicka Films, Inc.*, 227 B.R. 29 (Bankr. S.D.N.Y.  1998)               31

*In re AroChem*, 176 F.3d  610 (2d Cir. 1999)                                  5, 20

*In re BH & P, Inc.*, 949 F.2d 1300 (3d Cir. 1991)                               20

*In re Cenargo International*, *PLC*, 294 B.R. 571 (Bankr. S.D.N.Y. 2003)        31

*In re CF Holding Corp.*, 164 B.R. 799 (Bankr. D. Conn. 1994)                    21

*Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956 (10th Cir. 1996)    4

*In re Consupak, Inc.*, 87 B.R. 529 (Bankr. N. D. Ill.1988)                      24

*Dickinson Indus. Site v. Cowan*, 309 U.S. 382 (1940)                            3

*In re Envirodyne Indus., Inc.*, 150 B.R. 1008 (Bankr. N. D. Ill.1993)            5

*In re Ferkauf, Inc.*, 56 B.R. 774 (S.D.N.Y. 1985)                                3

*In re Fibermark, Inc.*, 330 B.R. 480 (Bankr. D. Vt. 2005)                       26

*In re Fibermark, Inc.*, 349 B.R. 385 (D. Vt. 2006)                               6

*In re Fretter, Inc.*, 219 B.R. 769 (Bankr. N. D. Ohio 1998)                     21

*Matter of Futuronics Corp.*, 655 F.2d 463 (2d Cir. 1981)                         3

*In re Granite Partners, L.P.*, 219 B.R. 22 (Bankr. S.D.N.Y. 1998)        20, 21, 23

*In re Harold & Williams Development Co.*, 977 F.2d 906 (4th Cir. 1992)        21

*Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U. S. 1 (2000)       5

*In re Hunt*, 124 B.R. 263 (Bankr. S. D. Ohio 1990)                              31

*Jimenez v. Mary Washington College*, 57 F.3d 369 (4th Cir. 1995)               28

*In re JLM, Inc.*, 210 B.R. 19 (B.A.P. 2d Cir. 1997)                              3

*In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758 (Bankr. E.D.N.Y. 2005)      31

*In re Keren Ltd. Partnership*, 189 F.3d 86 (2d Cir. 1999)                        6

**CASES**                                                                        **PAGES**

*Lamie v. United States Trustee*, 540 U.S. 526 (2004)                              4, 6

*In re Leslie Fay Cos.,* 175 B.R. 525 (Bankr. S.D.N.Y. 1994);                      21, 24

*In re Miniscribe Corp.*, 309 F.3d 1234 (10th Cir. 2002)                           4

*Matter of Nine Associates, Inc.*, 76 B.R. 943 (S.D.N.Y. 1987)                     4

*Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 330 F.2d  548 (3d Cir. 2003).                           27

*In re Pegasus Agency, Inc.*, 101 F.3d 882 (2d Cir. 1996)                          2

*Pineiro v. Pension Benefit Guaranty Corporation*, 318 F. Supp. 67 (S.D.N.Y. 2003)                                                                          27

*In re Plaza Hotel Corp.*, 111 B.R. 882 (Bankr. E. D. Cal.1990)                    25

*In re Refco*, 336 B.R. 187 (Bankr. S.D.N.Y. 2006)                                 27

*Rome v. Braunstein*, 19 F.3d  54 (1st Cir. 1994)                                  20

*Sanford v. C.I.R.*, 412 F.2d 201 (2d Cir. 1969)                                   29

*In re Spillane*, 884 F.2d 642 (1st Cir. 1989)                                     2

*In re Taxman Clothing Co.*, 49 F.3d 310 (7th Cir. 1995)                         7, 31

*In re Tinley Plaza Assocs.*, 142 B.R. 272 (Bankr. N. D. Ill. 1992)               21

*In re Wells Benrus Corp.*, 48 B.R. 196 (Bankr. D. Conn. 1985)                    21, 22

*In re Worldcom*, 311 B.R.151 (Bankr. S.D.N.Y. 2004)                               5, 6, 24

*Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d at 262 (3d Cir. 1995)


**STATUTES**

11 U.S.C. § 101(14)                                                                5, 20,22

11 U.S.C. § 101(14)(A)                                                             22

11 U.S.C. § 101(31)                                                                21,22

11 U.S.C. § 101(31)(B)(i).                                                         21

11 U.S.C. § 101(31)(B)(ii)                                                         21,22

11 U.S.C. § 101(31)(B)(iii)                                                        21

**STATUTES**                                           **PAGES**

11 U.S.C. § 327(a)                                      4,5,6,20,
                                                        21,23,24

11 U.S.C. § 330                                        2, 3, 6, 18,
                                                                20

11 U.S.C. § 330(a)                                       20, 30

11 U.S.C. § 330(a)(1)(A)                                       6

11 U.S.C. § 330(a)(1)(B)                                   6, 30

11 U.S.C. § 330(a)(3)(C)                                 7, 18,32

11 U.S.C. § 330(a)(3)(D)                                3, 18, 32

11 U.S.C. § 330(a)(4)(A)                                  7, 31

11 U.S.C. § 363                                              13

11 U.S.C. § 704(a)(7)                                        26

11 U.S.C. § 1103                                          6, 27

11 U.S.C. § 1103(c)                                          27

11 U.S.C. § 1106(a)(1)                                       26

11 U.S.C. § 1107(a)                                     4, 6, 26

11 U.S.C. § 1109(b)                                          27


**RULES**

Fed. R. Civ. P.  43                                          29

Fed. R. Bankr. P. 2014                                  5, 6, 24

Fed. R. Bankr. R. 2014(a)                                     6

Fed. R. Bankr. P. 8013                                        4

Fed. R. Bankr. P. 9017                                       29

I.    **PRELIMINARY STATEMENT**

McDermott Will & Emery LLP ("McDermott" or "Appellant") has appealed the

Bankruptcy Court's Decision on Objections to Application for Fees and Expenses, entered

August 29, 2007 (the "Decision"), and the Order Sustaining, in Part, Objections to First and

Final Application (the "Application") of McDermott for Compensation for Professional Services

Rendered and Reimbursement of Expenses Incurred on Behalf of the Debtors for the Period July

5, 2005 Through September 30, 2005, entered September 21, 2007 (the "Order") (collectively,

the "Decision and Order").  [JA, at A1149-A1485 and A1794-A1797.][1]  The Decision and Order

sustained, in part, objections (the "Objections") to the Application, filed by the United States

Trustee for Region 2 (the "United States Trustee"), St. Vincents Catholic Medical Centers of

New York, *et al*. ("St. Vincents" or the "Debtors") and the Official Committee of Unsecured

Creditors (the "Creditors' Committee").  Based on testimony adduced at a two day trial, the

Court reduced McDermott's request for final fees by $460,543.00, awarding McDermott fees

totaling $1,767,436.50.  [JA, at A1794-A1797.]

II.    **SUMMARY OF ARGUMENT**

McDermott acted as bankruptcy counsel for the Debtors for seven weeks -- from July 5,

2005 through September 13, 2005 -- when the Debtors fired McDermott because the board of

directors of St. Vincents (the "Board") had lost confidence in McDermott's ability to

competently manage the Debtors' chapter 11 case.  McDermott sought $2,227,979.50 in the

Application, and after trial, the Bankruptcy Court disallowed approximately 21% of

McDermott's fee request.

---

[1]    "JA" refers to the Joint Appendix of documents related to the appeal, submitted to
the Court on May 16, 2008.  "JA, at #" refers to the consecutively numbered pages of the JA.

The Bankruptcy Court did not abuse its discretion in disallowing McDermott's fees.  The Bankruptcy Court properly found that McDermott wrongfully sought the retention of its close business associates, Speltz & Weil, LLC ("SW") and Huron Consulting Services, LLC ("Huron"), in the Debtors' bankruptcy case, even though McDermott knew that SW and Huron had conflicts of interest that barred them from retention in the bankruptcy case.  The Bankruptcy Court also properly found that McDermott failed to timely and competently carry out the Board's instructions to seek Bankruptcy Court approval of the closure of St. Mary's Hospital, which was a key element of the Debtors' plan to reorganize.  Based on a thorough review of the evidence of record, the Bankruptcy Court applied the proper legal standard, under 11 U.S.C. § 330, when it determined McDermott's services were not reasonable and did not benefit the Debtors' bankruptcy estate at the time McDermott rendered the services.  The Bankruptcy Court, therefore, did not abuse its discretion when it reduced McDermott's fee request by $460,543.00.

## III.    JURISDICTION

The Bankruptcy Court had jurisdiction over the Application under 28 U.S.C. §§ 157(b)(2)(A) and 1334.  The Notice of Appeal and Notice of Cross Appeal were timely filed from a final order of the Bankruptcy Court.  The Order is a final order under 28 U.S.C. § 158(a)(1).  *See, e.g., In re Pegasus Agency, Inc.*, 101 F.3d 882, 885 (2d Cir. 1996) (a bankruptcy court order is final if it "completely resolve[s] all of the issues pertaining to a discrete claim, including issues as to the proper relief").  *See also In re Spillane*, 884 F.2d 642, 644 (1st Cir. 1989) (an order granting or denying fees under 11 U.S.C. § 330 is final and appealable where the order conclusively determined the entire award).  On September 21, 2007, the Bankruptcy Court entered the Order.  [JA, at A1794-A1797.]  On October 1, 2007, McDermott filed a timely

Notice of Appeal.  [ECF Doc. No. 3753.][2]  On October 9, 2007, the Debtors and the Creditors'

Committee filed a timely Notice of Cross-Appeal.[3]  [ECF Doc. No. 3796.]  This Court, therefore,

has jurisdiction to hear the appeal under 28 U.S.C. § 158(a)(1).

## IV.    STATEMENT OF ISSUES PRESENTED

A.    Did the Bankruptcy Court abuse its discretion when it disallowed McDermott's fees based on the findings that pursuit of the retention of SW and Huron was not reasonable and did not benefit the Debtors' bankruptcy estate?

B.    Did the Bankruptcy Court abuse its discretion when it disallowed McDermott's fees based on the finding that McDermott's handling of the closure of St. Mary's Hospital was not performed in a reasonable amount of time under 11 U.S.C. § 330(a)(3)(D) or beneficial to the Debtors' bankruptcy estate?

C.    Did the Bankruptcy Court apply the proper legal standard under 11 U.S.C. § 330?

## V.    STANDARD OF REVIEW

"Bankruptcy courts enjoy wide discretion in determining reasonable fee awards."  *In re JLM, Inc*., 210 B.R. 19, 23 (B.A.P. 2d Cir. 1997) (citing *Dickinson Indus. Site v. Cowan*, 309 U.S. 382, 389 (1940)).  On appeal to the District Court, a decision of the Bankruptcy Court with respect to a fee application will be affirmed unless the bankruptcy judge has abused his discretion by failing to apply proper procedures or legal standards or making factual findings that were clearly erroneous.  *In re Ferkauf, Inc.*, 56 B.R. 774, 775 (S.D.N.Y. 1985) (citing *Matter of Futuronics Corp.*, 655 F.2d 463, 471 (2d Cir. 1981)).

---

[2]    "ECF Doc. No." refers to docket entries in *In re St. Vincents Catholic Medical Centers of New York, et al.*, Case No. 05-14945 (ASH).

[3]    The United States Trustee is taking no position with respect to the cross-appeal.

Fed. R. Bankr. P. 8013 provides, in part, that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."  Fed. R. Bankr. P. 8013.  *See* Appendix B.  Thus, the Bankruptcy Court's decision will be reversed only where there is no evidence whatsoever to support the court's findings of fact.  *Matter of Nine Associates, Inc.*, 76 B.R. 943, 944 (S.D.N.Y. 1987).  "The inquiry is not focused on whether the appellate court might have ruled differently if presented with the same evidence, but whether there is a reasonable basis in the record to support the judge's decision."  *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985).  A finding of fact is clearly erroneous if "it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made."  *In re Miniscribe Corp.*, 309 F.3d 1234, 1240 (10th Cir. 2002) (quoting *Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956, 959 (10th Cir.1996)).

## VI.   STATEMENT OF THE CASE

### A.   Legal and Statutory Framework

#### 1.   The Retention of Professionals Under 11 U.S.C. § 327(a)

Sections 327(a) and 1107(a) of the Bankruptcy Code allow chapter 11 debtors in possession to retain, with Bankruptcy Court permission, attorneys, accountants, financial advisors and other professionals to assist them in carrying out their duties under the Bankruptcy Code.  11 U.S.C. §§ 327(a) and 1107(a); *Lamie v. United States Trustee*, 540 U.S. 526, 531-32 (2004) (construing and applying 11 U.S.C. §§ 327(a) and 1107(a)).

4

Section 327(a) provides, in part, that:

> (a) Except as otherwise provided in this section, the trustee,[4] with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers or other professional persons, **that do not hold or represent an interest adverse to the estate,[5] and that are disinterested persons**, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a) (emphasis added).  *See* Appendix A.

The term "disinterested person" is defined in 11 U.S.C. § 101(14) as a person that

> (A)  is not a creditor, an equity security holder or an insider;

> (B)  is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; **and does not have an interest materially adverse to the interest of the estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.**

11 U.S.C. § 101(14) (emphasis added).  *See* Appendix A.

The term adverse interest is not defined in the Bankruptcy Code.  The Second Circuit, however, has defined the term as:

> (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

*In re Worldcom*, 311 B.R.151, 163 (Bankr. S.D.N.Y. 2004) (quoting *In re AroChem*, 176 F.3d

---

[4]    The term "trustee" means the debtor-in-possession in chapter 11 cases because debtors-in-possession are given all of the rights and powers of a trustee under 11 U.S.C. § 1107. *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U. S. 1, 6 n.3 (2000).

[5]    Section 327 distinguishes between "holding" and "representing" an interest.  *In re Worldcom*, 311 B.R. 151, 164 n.9 (Bankr. S.D.N.Y. 2004) (quoting *In re AroChem,* 176 F.3d 610, 629 (2d Cir. 1999)).  Representing an adverse interest "means to serve as an agent or attorney for any individual or entity holding such an adverse interest."  *Id.* (citing *In re Envirodyne Indus., Inc.*, 150 B.R. 1008, 1016-17 (Bankr. N. D. Ill.1993)).

610, 623 (2d Cir. 1999)).

Professionals retained under § 327(a) have a duty of disclosure under Fed. R. Bankr. P.

2014, which provides, in part, that:

> [An employment application] shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed.R.Bankr.P. 2014(a). *See* Appendix B. The purpose of the disclosures required by Rule 2014

is to aid the Court in determining whether a retention is in the best interests of the estate.

*Worldcom*, 311 B.R. at 165.

## 2. The Award of Fees to Professionals Under 11 U.S.C. § 330

The award of fees to professionals retained under 11 U.S.C. § 327 is governed by § 330

of the Bankruptcy Code which provides, in part, that:

> After notice to the parties in interest and the United States trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, . . . an examiner, . . . or a professional person employed under section 327 or 1103-
>
> > (A)  reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, . . . or attorney and by any paraprofessional person employed by any such person; and
> >
> > (B)  reimbursement for actual, necessary expenses.

11 U.S.C. §§ 330(a)(1)(A) and (B). *See* Appendix D. Professionals must satisfy two tests to

receive compensation for a bankruptcy estate. First, they must be employed under § 327(a).

*Lamie*, 540 U.S. at 538-39 (affirming the lower court's ruling that attorneys may not be

compensated from the estate unless the attorney has been appointed under § 327 of the Code).

*See also In re Keren Ltd. Partnership*, 189 F.3d 86, 88 (2d Cir. 1999) (professional who renders

services to the debtor must have the prior approval of the Court under §§ 327(a) and 1107(a) and Fed. R. Bankr. R. 2014(a)); *accord In re Fibermark, Inc.*, 349 B.R. 385, 394, n.3 (D. Vt. 2006). Second, they must receive a fee award under § 330. *Lamie*, 540 U.S. at 538-39.

Fees awarded under § 330 must be reasonable. 11 U.S.C. § 330(a)(1)(A). In determining a reasonable fee, the Bankruptcy Court must consider, among other things,

> whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title.

11 U.S.C. § 330(a)(3)(C). *See* Appendix A.

Under 11 U.S.C. § 330(a)(4)(A),

the court shall not allow compensation for –

> (i) unnecessary duplication of services; or
>
> (ii) services that were not –
>
> > (I) reasonably likely to benefit the debtor's estate; or
> >
> > (II) necessary to the administration of the estate.

11 U.S.C. § 330(a)(4)(A). *See* Appendix A. Under § 330(a)(4)(A), the Bankruptcy Court has the authority to reduce fees or expenses when they are disproportionate to the benefit to the estate, even if it has already approved the professional's retention under § 327 of the Bankruptcy Code. *In re Taxman Clothing Co.*, 49 F.3d 310, 316 (7th Cir. 1995).

**B.    Procedural History of the Debtors' Chapter 11 Case**

On July 5, 2005 (the "Petition Date"), St. Vincents and its affiliates filed petitions for relief under Chapter 11 of the Bankruptcy Code. [JA, at A0902, ¶ 1.] On July 6, 2005, the Bankruptcy Court entered an order approving the joint administration of the Debtors' cases.

[ECF Doc. No. 33.]  The Debtors own and operate a comprehensive healthcare system in the New York metropolitan area.  [JA, at A0902, ¶ 2.]  As of the Petition Date, the Debtors owned seven hospitals: St. Vincent's Hospital in Manhattan, Bayley Seton Hospital and St. Vincent's Hospital on Staten Island, Mary Immaculate Hospital and St. John's Hospital in Queens, St. Mary's Hospital in Brooklyn, and St. Vincent's Hospital in Westchester County.  [*Id.*, ¶ 4.]

On the Petition Date, the Debtors filed an application to retain McDermott as bankruptcy counsel.  [JA, at A1744, ¶ 5.]  On August 5, 2005, the Bankruptcy Court entered an order approving McDermott's retention as of the Petition Date.  [JA, at A0903, ¶ 8.]  On September 13, 2005, the Debtors terminated McDermott and retained Weil Gotshal & Manges ("Weil") as substitute bankruptcy counsel of September 13, 2005.  [JA, at A0903, ¶ 11.]  The Court approved Weil's retention on September 13, 2005.  [ECF Doc. No. 610.]

On July 19, 2005, the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  [ECF Doc. No. 131.]  The Court entered an Order on May 2, 2007 (the "May 2, 2007 Order") directing the United States Trustee to Appoint an Official Committee of Tort Claimants (the "Tort Committee").  [ECF Doc. No. 1454.]  Pursuant to the May 2, 2007 Order, the United States Trustee appointed the Tort Committee on May 17, 2007.  [ECF Doc. No. 1559.]

On June 1, 2007, the Debtors filed an amended Plan of Reorganization (the "First Amended Plan") and Revised Disclosure Statement (the "Revised Disclosure Statement").  [ECF Doc. Nos. 3179 and 3180.]  By Order entered June 5, 2007, this Court approved the Revised Disclosure Statement.  [ECF Doc. No. 3205.]  By Order entered July 27, 2007, the Bankruptcy Court confirmed the First Amended Plan.  [ECF Doc. No. 3490.]  The Plan became

effective on August 30, 2007.  [ECF Doc. No. 3638.]

## C.    The Application

On January 31, 2006, McDermott filed the Application, seeking the allowance and award of fees in the amount of $2,227,979.50 and the reimbursement of expenses totaling $104,314.28, for the period from July 5, 2005 through September 13, 2005.  [JA, at A1794-A1795.]  The Creditors' Committee, the United States Trustee and the Debtors filed objections to the Application on March 3, 2006, March 7, 2006 and July 31, 2006, respectively.  [JA, at A1718-A1725, A1726-A1762 and A1763-A1784.]

## D.    The Trial

A trial on the Application was held before the Honorable Adlai S. Hardin, Jr. on October 23 and 24, 2006.  [JA, at A1006-A1298 and A1299-A1448.]  At trial, the parties presented evidence on, among other things, three disputed issues of fact relating to McDermott's entitlement to the fees requested in the Application: (1) whether McDermott's persistence in seeking to retain SW in the bankruptcy case was reasonable and beneficial to the estate; (2) whether McDermott's instruction to the Debtors to cease all communications with the Creditors' Committee (the "Radio Silence Instruction") and McDermott's investigation of the Creditors' Committee were reasonable and beneficial to the estate, and (3) whether McDermott mishandled the closure of St. Mary's Hospital, which was a key element in the Debtors' reorganization strategy.  The witnesses presented their direct testimony by affidavit subject to cross-examination at trial.  [JA, at A0001-A0061, A0695-A0700 and A0827-A0831.]

E.    **The Decision and Order**

In the Decision, the Bankruptcy Court made extensive findings of fact, based on the parties' Joint Statement of Undisputed and Admissible Facts, documents entered into evidence, including affidavits and deposition transcripts, and the testimony of witnesses at trial as set forth below.  [JA, at A1450-A1463.]  Citations to the Joint Appendix in this section first include citations to the Decision and then citations to the evidence presented at trial that supports the Bankruptcy Court's findings.

1.    **McDermott's Handling of the SW and Huron Retention**

a.    **Findings of Fact**

i.    **St. Vincents' Pre-Petition Retention of SW, McDermott and Huron**

The Bankruptcy Court properly noted that at the time of filing, the Debtors were operating a comprehensive health care system in the New York metropolitan area.  [JA, at A1451.]  [JA, at A0902, ¶ 2.]  On April 13, 2004, St. Vincents retained SW as management consultants for a period of one year under a management agreement (the "Management Agreement").  [JA, at A1451.]  [JA, at A0903, ¶ 13.]  On May 5, 2005, the Debtors extended the Management Agreement through October 31, 2005.  [JA, at A1451.]  [JA, at A0903, ¶ 5.]  David Speltz ("Speltz") and Timothy Weis ("Weis"), the principals of SW, acted as CEO and CFO, respectively, and the Bankruptcy Court found that they remained in this capacity until August 24, 2005.  [JA, at A1451-A1452.]  [JA, at A0903, ¶ 14 and A0904, ¶ 15.]

The Debtors retained McDermott as restructuring counsel in September 2004, the same month that the Board appointed SW, on the recommendation of Speltz, to assist St. Vincents in working out its financial issues in or out of bankruptcy.  [JA, at A1452.]  [JA, at A0904, ¶ 17, and A1804.]  William Smith, Esq., a McDermott partner ("Smith"), was the lead attorney

10

representing St. Vincents.  [JA, at A1451.]  [JA, at A0903, ¶ 10.]  On October 4, 2004, St.

Vincents hired Huron as financial advisors on insolvency issues upon the advice of McDermott.

[JA, at A1452.]  [JA, at A0904, ¶ 10, and 1804.]  SW and McDermott supervised Huron's work.

[JA, at A1452.]  [JA, at A0904, ¶ 22.]

      The Bankruptcy Court noted that in late 2004, SW engaged Huron as a subcontractor to

handle management reporting and claims reconciliation for St. Vincents.  [JA, at A1452.] [JA, at

A1807.]  The Bankruptcy Court found that Huron's subcontractor relationship with SW was not

disclosed to the Board.  [JA, at A1452.] [JA, at 1807-1808.]

### ii.    Huron's Purchase of SW

      The Bankruptcy Court next discussed its findings of fact in connection with what it

termed the "secret SW/Huron Group acquisition negotiations."  [JA, at A1452-A1454.]

Specifically, the Bankruptcy Court found that prior to January 2005, Huron approached SW

about possibly purchasing SW (the "Acquisition").  [JA, at A1452.]  [JA, at A0904, ¶ 23, and

A1804.]  As a condition of the negotiations, SW and Huron entered into a confidentiality

agreement.  [JA, at 1452.]  [JA, at A0904, ¶ 24, and 1804.]  Smith learned of the Acquisition

negotiations no later than February 2005 but did not disclose the negotiations to the Board.  [JA,

at A1453.]  [JA, at A0007, ¶ 51-52, A0904, ¶¶ 25-26 and A1804.]  In April 2005, Smith learned

that the negotiations were progressing and instructed McDermott lawyers to prepare a

memorandum on the legal issues that would arise from the Acquisition in bankruptcy.  [JA, at

A1453.]  [JA, at A0007, ¶ 52, and A0905, ¶ 26.]  In mid-April 2005, Elizabeth St. Clair, St.

Vincents' general counsel ("St. Clair") asked Speltz about a rumor she had heard about the

Acquisition, but Speltz denied the rumor and did not disclose the negotiations to St. Clair.  [JA,

at A1454.]  [JA, at A0696, ¶ 4, and A0905, ¶ 33.]

      The Bankruptcy Court noted that Huron and SW entered into a term sheet for the

(A) such sale or such lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—

(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

(ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

## 11 U.S.C. § 704(a)(7)

(a) The trustee shall—
 . . . .
  (7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest . . . .

## 11 U.S.C. § 1103

  (a) At a scheduled meeting of a committee appointed under section 1102 of this title, at which a majority of the members of such committee are present, and with the court's approval, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other agents, to represent or perform services for such committee.

  (b) An attorney or accountant employed to represent a committee appointed under section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest.

  (c) A committee appointed under section 1102 of this title may—

(1) consult with the trustee or debtor in possession concerning the administration of the case;

(2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan;

(4) request the appointment of a trustee or examiner under section 1104 of this title; and

A.3

Acquisition on April 26, 2005. [JA, at A1453.] [JA, at A0905, ¶ 29.] On April 26, 2005, Smith informed Speltz and Weis that the Acquisition would give rise to issues of disinterestedness, the J. Alix Protocol[6] and conflicts of interest if SW and Huron sought retention in a bankruptcy case. [JA, at A1453.] [JA, at A0906, ¶ 34.] Yet, Smith did not disclose the Acquisition or the conflicts of interest that would arise from the Acquisition in a bankruptcy case to the Board. [JA, at A1453.] [JA, at A0009, ¶ 62, and A1161, lines 19-22.] Huron and SW entered into an agreement (the "Acquisition Agreement") on May 5, 2005. [JA, at A1454.] [JA, at A0906, ¶ 37.]

The Acquisition closed on May 9, 2005 and Speltz and Weis entered into employment agreements with Huron. [JA, at 1454.] [JA, at A0906, ¶ 38.] The Acquisition Agreement, which is part of the record, provided, among other things, that SW would receive payments (the "Earn Out"), based on Huron's gross revenues, including fees earned from St. Vincents, for three years after the closing of the Acquisition. [JA, at A1454.] [JA, at A0082, ¶ 2.04, and A0829, ¶ 8, and A1805.] Under the Acquisition Agreement, SW continued to exist as a subsidiary of Huron. [JA, at A1454.] [JA, at A1805.]

The Bankruptcy Court found that SW finally disclosed the Acquisition to Richard Boyle, president of the Board ("Boyle") on or after May 6, 2005 and to St. Clair a few days later. [JA, at A1454.] [JA, at A0696, ¶ 6.JA, and A0828, ¶¶ 4-5.] After learning of the Acquisition, the Board, on the recommendation of St. Clair, hired Leo Crowley of Pillsbury Winthrop Shaw Pittman, LLP ("Crowley") to prepare a report on whether the Acquisition violated St. Vincents' conflict of interest policy (the "Crowley Report" or the "Report"). [JA, at A1454.] [JA, at A0696, ¶ 6.] Crowley delivered the Report to the Board on July 18, 2005. [JA, at A1454.] [JA,

---

[6]        *See* n.8 *infra*.

at A1803-A1811.]

### iii.    The Crowley Report

The Bankruptcy Court reviewed and summarized the Crowley Report, noting that Crowley found that the negotiations between SW and Huron and the Acquisition gave rise to breaches of SW's management agreement with St. Vincents and breaches of duty and conflicts of interest by SW.  [JA, at A1455.]  [JA, at A1803-A1811.]  Among other things, Crowley found that, by signing the confidentiality agreement and negotiating with Huron, SW undertook obligations that were inconsistent with its duty of disclosure to St. Vincents.  [JA, at A1455.] [JA, at A1805-A1806, ¶ 1.]  In addition, Crowley found that Speltz and Weis became unable to effectively supervise Huron because of the conflict arising from Speltz and Weis's dual role of St. Vincents executives and Huron employees.  [JA, at A1455.]  [JA, at A1806, ¶ 2.]  As the Bankruptcy Court noted, Crowley characterized the Earn Out as follows:

> [Speltz and Weis] entered into a contract with an "earn-out" that pays them a percentage of what SVCMC pays Huron. While the preexisting management agreement gave SWLLC some financial interest in services rendered by their personnel, the Huron insolvency engagement is one that is not within SWLLC's line of business. Moreover, since Huron was willing to in effect cede to Speltz and Weis a portion of the revenues from its engagement with SVCMC, circumstances have the appearance of Speltz and Weis negotiating a discount from Huron for services rendered to SVCMC, and then appropriating for themselves the value of that discount. . . .

[JA, at A1457]  [JA, at A1808.]

In sum, Crowley found that Speltz and Weis violated St. Vincents' conflict of interest policy by engaging in the Acquisition, failing to disclose the actual or potential conflict of interest arising from the Acquisition, and subcontracting with Huron without disclosure to the Board.  [JA, at A1456.]  [JA, at A1807-A1808.]  Crowley also found that SW breached its

fiduciary duties to St. Vincents by failing to comply with St. Vincents' conflicts of interest policy and acquiring an interest adverse to St. Vincents without disclosure to the Board. [JA, at A1457.] [JA, at A1808.]

### iv. The Retention of SW and Huron in the Bankruptcy Case

Based on the parties' Joint Pre-Trial Statement, the Court found that, on July 5, 2005, McDermott filed an application to retain SW as managers of the Debtors under 11 U.S.C. § 363 (the "First SW Application") and a separate application to retain Huron as financial advisors (the "Huron Application"). [JA, at A1457.] [JA, at A0008, ¶ 54, and A0010, ¶ 71.] *See also* Appendix A. McDermott was responsible for determining which disclosures should be made in the First SW Application and the Huron Application. [JA, at A1458.] [JA, at A0010, ¶ 74.]

The Bankruptcy Court also found that the First SW Application referenced the existence of the Acquisition Agreement, but it provided insufficient detail about the Acquisition, including disclosure of the Earn Out or the conflicts arising from the Acquisition Agreement. [JA, at A1458.] [JA, at A0011, ¶¶ 76-77.] Based on testimony at trial, the Court observed that McDermott had acknowledged that the First SW Application was careless, incomplete and inappropriate and, therefore, withdrew the First SW Application and the Huron Application shortly after they were filed. [JA, at A1458.] [JA, at A0011, ¶ 78, and A1219, ¶¶ 11-13.] McDermott filed amended applications to retain Huron and SW on July 13, 2005 but adjourned the hearing on the applications because of objections from the United States Trustee and the Creditors' Committee regarding the disclosures. [JA, at A1458.] [JA, at A0013, ¶¶ 93 and 96, and A1964.] Between July 5 and August 24, 2005, McDermott circulated numerous drafts of applications but the Creditors' Committee and the United States Trustee continued to oppose the retentions. [JA, at A1459.] [JA, at A1187, lines 8-15, and A1864-A1865.] McDermott

14

withdrew the Huron application on August 1, 2005 but continued to press for the SW retention until August 12, 2005, when the United States Trustee informed McDermott that the amendments to the First SW Application did not resolve her concerns. [JA, at A1459.] [JA, at A0505-A056.] At an August 19, 2005 meeting with McDermott, the United States Trustee informed McDermott that she would not consent to the retention of SW in the bankruptcy case. [JA, at A1459.] [JA, at A0509-A0510 and A0911, ¶¶ 88-89.] The Creditors' Committee also informed McDermott that "there were no circumstances under which [the Committee] would agree to the retention of Speltz and Weis." [JA, at A1459.] [JA, at A1830.]

The Court found that it was not until August 24, 2005, just prior to a meeting of the Board, that Smith relayed to the Board the concerns of the United States Trustee and the Creditors' Committee. [JA, at A1460.] [JA, at A0830, ¶ 11, and A0911, ¶ 92.] Based on this disclosure, the Board voted to ask Speltz & Weis to resign.[7] [JA, at A1460.] [JA, at A0811, ¶ 11.] In their place, the Board appointed Board members Boyle as interim CEO. [JA, at 1460.] [JA, at A1830, ¶ 12.]

### v.    The Radio Silence Instruction

The Court found that, on August 11, 2005, Smith sent an e-mail to SW directing the Debtors to cease all communication with the Creditors' Committee after Smith learned that the Creditors' Committee was interviewing replacements for SW. [JA, at A1472.] [JA, at A0039, ¶¶ 287 and 291.] Smith sent the e-mail, which is part of the record, to Speltz, Weis, Thomas Allison at Huron, and Ronald Barlient, Huron's counsel, but not the Board. [JA, at A1472.] [JA, at A0600L.] In the e-mail, Smith stated that the Creditors' Committee had informed Smith

---

[7]    The Bankruptcy Court eventually approved the retention of Huron as financial advisors to the Debtors by order dated October 31, 2005. [ECF Doc. No. 574.]

that it would oppose the retention of SW and Smith directed that :

> Effectively immediately, please stop ALL communication or information transmittal to the Comtee [*sic*], cancel ALL meetings with their representatives, and maintain radio silence. . . .  Lots more will follow, and positions may change, but for now, shut it down.

(Emphasis in original).  [JA, at A1475. n.8.]  [JA, at A0600L.]

During the period of "Radio Silence," McDermott investigated possible causes of action against the Creditors' Committee, including tortious interference with contract.  [JA, at A1472.] [JA, at A0039, ¶ 290, and 1871.]  After about four days of investigation and nearly $45,000 in fees, McDermott determined that there were no viable causes of action against the Creditors' Committee.  [JA, at A1472.]  [JA, at 0040, ¶¶ 297-298.]  Smith then rescinded the Radio Silence Instruction.  [JA, at A1472.]  [JA, at 0040, ¶¶ 297-298.]

### b.    Conclusions of Law

Based on its review and analysis of all of the facts in the record, the Bankruptcy Court held that, even though McDermott knew that the Acquisition created conflicts of interest, breaches of duty for SW and Huron, McDermott failed to provide timely, full and complete disclosure regarding Huron and SW to the Board, the United States Trustee and the Creditors' Committee.  [JA, at A1470-A1471.]  The Bankruptcy Court held that

> Competent counsel, acting in the interests of the client, [St. Vincents], as distinguished from the interests of senior management Speltz and Weis and their new employer Huron, should have recognized from the outset that the dual retention of Huron under § 327 and approval of the SW Management Agreement under the J. Alix Protocol would be a practical impossibility if full disclosure were made . . . .

[JA, at A1467-A1468.]  In addition, McDermott's actions with respect to the SW and Huron retention "were not only not beneficial to the debtors' estates and not reasonably likely to benefit

16

the debtors' estates — they were affirmatively detrimental to the debtors' estates.  [JA, at A1481.]

The Radio Silence Instruction "reflects fundamental misconceptions concerning the stewardship of a chapter 11 case as debtor's counsel."  [JA, at A1472.]  "If the Creditors' Committee were interviewing candidates to manage the Debtors, there was nothing improper in its actions."  [JA, at A1473.]  The Bankruptcy Court concluded that the investigation conducted by McDermott during the period of radio silence was unnecessary and inappropriate and did not confer any benefit on the estate.  [JA, at A1482.]

### 2.    The Closure of St. Mary's Hospital

#### a.    Findings of Fact

Based on the Joint Pre-Trial Statement and evidence at trial, the Bankruptcy Court found that the Board decided to close St. Mary's Hospital at a meeting on June 1, 2005 (the "June 1, 2005 Meeting"), a month before St. Vincents filed its chapter 11 case.  [JA, at A1460.]  [JA, at A0913, ¶ 105, and A1049, lines 12-17.]  The evidence also showed, and the Bankruptcy Court found, that Smith attended the June 1, 2005 Meeting and was instructed to take necessary and appropriate action to close St. Mary's Hospital.  [JA, at A1460.]  [JA, at A913, ¶ 106.]  McDermott's role in the closure was to obtain Bankruptcy Court approval, while St. Clair and others handled the canonical and Department of Health ("DOH") procedures.  [JA, at A1461.]  [JA, at 913, ¶ 110.]  At the June 17, 2005 meeting (the "June 17, 2005 Meeting"), the Board set September 1, 2005 as the target date for the closure.  [JA, at A1461.]  [JA, at A0914, ¶ 115, and A1788-A1793.]  The Court found that Smith attended the June 17 Meeting and was aware of the September 1 target date.  [JA, at 1461.]  [JA, at A0914, ¶ 116.]  McDermott disclosed the

17

Debtors' intention to close St. Mary's in an affidavit filed with the Bankruptcy Court on the first

day of the case (the "First Day Affidavit"), but did not file a motion to close St. Mary's on the

Petition Date.  [JA, at A1461.]  [JA, at A0915, ¶ 121.]  Between July 5, and July 22, 2005,

McDermott took no steps to obtain Bankruptcy Court approval of the closure of St. Mary's. [JA,

at A1462.]  [JA, at A0915, ¶ 123.]  McDermott began working on the motion to close St. Mary's

no earlier than August 5, 2005.  [JA, at A1462.]  [JA, at A0915, ¶ 128.]  McDermott filed the

motion (the "St. Mary's Motion") on August 18, 2005.  [JA, at A1462.]  [JA, at A0915, ¶ 129.]

By that date, St. Vincents was close to obtaining DOH approval to close St. Mary's.  [JA, at

A1462.]  [JA, at A0916, ¶ 130.]  The DOH approved the closure on August 31, 2005.  [JA, at

A1462.]  [JA, at A0916, ¶ 13, and A1831.]  Several parties in interest objected to the St. Mary's

Motion.  [JA, at A1462.]  [JA, at A0916, ¶ 132.]  In replying to the objections, McDermott did

not file any affidavits or declarations.  [JA, at A1463.] [JA, at 916, ¶ 136.]  At the hearing on the

St. Mary's Motion on September 7, 2005, McDermott did not offer any testimony from

witnesses.  [JA, at A1463.]   [JA, at 916, ¶ 140.]  The Bankruptcy Court did not grant the motion

on September 7, 2005 and adjourned the hearing until September 20, 2005.  [JA, at A1463.]  [JA,

at A0917, ¶ 142.]  On September 19, 2005, Weil, which substituted as counsel for the Debtors on

September 13, 2005, filed several declarations in support of the St. Mary's Motion.  [JA, at

A1463.]  [JA, at A0917, ¶ 143, and A0832-A0899.]  After a hearing on September 20, 2005, at

which Weil presented testimony, the Bankruptcy Court granted the Motion.  [JA, at A1463.]

[JA, at 917, ¶¶ 146-147, and 1785-1787.]

### b.    Conclusions of Law

Based on the evidence, the Bankruptcy Court disallowed McDermott's fees related to the

closure of St. Mary's Hospital in the amount of $200,000.  The Court held that McDermott's

services with respect to the St. Mary's closure "were not performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue or task addressed," within the meaning of § 330(a)(3)(D), and that McDermott's delay in rendering those services was not "beneficial at the time at which the service was rendered," within the meaning of § 330(a)(3)(C). [JA, at A1483.]

### 3. The Bankruptcy Court's Disallowance of McDermott's Fees

Based on its exhaustive review the documentary evidence and testimony adduced at trial, together with a review of the law governing compensation to professionals under § 330 of the Bankruptcy code, the Bankruptcy Court disallowed fees in the amount of $98,382.25 for McDermott's work on the SW/Huron retention, $44,523 for time spent on the tortious interference investigation during the period of "Radio Silence," fees in the amount of $43,458 incurred during the transition of counsel from McDermott to Weil; $74,180 for fees incurred in connection with change of management after the firing of SW, and $200,000 for fees incurred with respect to the closure of St. Mary's, based on McDermott's time records. [JA, at A1480-A1483.] After the disallowance of fees of $460,543, the Bankruptcy Court awarded McDermott fees totaling $1,767,436.50 for seven weeks of work. [JA, at A1794-A1797.]

## VII. ARGUMENT

### A. The Bankruptcy Court Did Not Abuse Its Discretion When it Disallowed McDermott's Fees Incurred in the Pursuit of the Retention of SW and Huron and the Investigation of the Creditors' Committees Actions.

The Bankruptcy Court did not abuse its discretion in disallowing McDermott's fees with respect to the SW and Huron retention and the investigation of the Creditors' Committee's actions during the period of the Radio Silence Instruction. The Court properly found that McDermott's services were not reasonable and did not benefit the estate. There is substantial

19

evidence in the record to support the Bankruptcy Court's decision.

### 1. The Bankruptcy Court Properly Found that McDermott's Pursuit of the Retention of SW and Huron Was Unreasonable.

The Bankruptcy Court properly found that McDermott's efforts to obtain Bankruptcy Court approval of the retention of SW and Huron were unreasonable in light of SW's and Huron's conflicts of interest, lack of disinterestedness, the non-compliance of the proposed retention with the J. Alix Protocol,[8] and McDermott's failure to disclose relevant facts related to the retention to United States Trustee and the Board.   There is substantial evidence in the record to support the Bankruptcy Court's findings.

Specifically, as the Bankruptcy Court aptly found, the record shows that McDermott continued its pursuit of the retention of SW and Huron even though it knew that the relationship between SW and Huron created conflicts of interest, lack of disinterestedness and breaches of duty, which disqualified SW and Huron from retention in the bankruptcy case.  [JA, at A1458 and A1470.]  Smith testified that, in April 2005, before the Petition Date, he commissioned research regarding bankruptcy law issues arising from the Acquisition, including disinterestedness and conflicts of interest after he learned of the impending Acquisition.  [JA, at A0007, ¶ 52.]  McDermott also knew that Earn Out would have a negative impact on the Debtors' ability to retain SW and Huron in the bankruptcy case.  [JA, at A1841.] Smith advised SW, but not the Board, that these issues could bar the retention of SW and Huron in the bankruptcy case.  [JA, at A0009, ¶ 61, and A0830, ¶ 11.]

---

[8]    The J. Alix Protocol, which arose from a settlement in a chapter 11 case in the Bankruptcy Court for the District of Delaware, sets forth the United States Trustee's view of the circumstances that give rise to impermissible conflicts of interest between crisis managers, on the one hand, and financial advisors on the other.

Under § 327, a professional retained by the bankruptcy estate must not hold or represent any interest adverse to the estate and the professional must be disinterested.  11 U.S.C. § 330(a). The term "disinterested person" is defined in 11 U.S.C. § 101(14) as a person that, among other reasons,

> (A)    is not a creditor, an equity security holder or an insider; and

> (B)    does not have an interest materially adverse to the interest of the estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14)  *See* Appendix A.  The term adverse interest, as defined by the Second Circuit, means:

> (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

*In re AroChem*, 176 F.3d at 623.  An adverse interest is a competing interest that creates "either a meaningful incentive to act contrary to the best interests of the estate or the reasonable perception of one."  *Rome v. Braunstein*, 19 F.3d  54, 58 (1st Cir. 1994).

"The 'materially adverse' standard incorporated in the disinterestedness test and the 'interest adverse to the estate' language in § 327(a) overlap . . . and form a single test to judge conflicts of interest."  *In re Granite Partners*, L.P., 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998) (citing *In re BH & P, Inc.*, 949 F.2d 1300, 1314 (3d Cir. 1991); *In re Martin*, 817 F.2d 175, 179 n.4 (1st Cir.1987); *In re Leslie Fay Cos.,* 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994); *In re CF Holding Corp*., 164 B.R. 799, 806 (Bankr. D. Conn. 1994); *In re Tinley Plaza Assocs*., 142 B.R. 272, 277 (Bankr. N. D. Ill. 1992)). The disinterestedness provision of Section 327(a) is mandatory.  *Granite Partners*, 219 B.R. at 34.  *See also In re Harold & Williams Development*

21

*Co.*, 977 F.2d 906, 910 (4th Cir. 1992) (the disinterestedness requirement of Section 327(a) is a "congressionally established" *per se* rule). The disinterestedness requirement "serve[s] the important policy of ensuring that all professionals appointed pursuant to § 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." *Id.*

By definition, an insider of the Debtor is not disinterested. *See* 11 U.S.C. § 101(14) and Appendix A. Under 11 U.S.C. § 101(31), the term "insider" includes a director of the debtor, an officer of the debtor and a person in control of the debtor. 11 U.S.C. § 101(31)(B)(i), (ii) and (iii). *See In re Wells Benrus Corp.*, 48 B.R. 196, 197 (Bankr. D. Conn. 1985) (debtor's officer is not disinterested and is disqualified from acting an estate professional under § 327(a)). Likewise, a professional who has a pecuniary interest in the debtor's property has an adverse interest and is not disinterested. *See In re Fretter, Inc.*, 219 B.R. 769, 780 (Bankr. N. D. Ohio 1998) (professional retained under § 327(a) that held a mortgage on property of the debtor's estate had an adverse interest because the mortgage created actual and potential disputes between client and professional).

The Court properly found, based on the entire record, that SW and Huron had "multiple conflicts and breaches of fiduciary duty" and were not disinterested. [JA, at A1458.] Under the Acquisition Agreement, SW became a subsidiary of Huron and Speltz and Weis became employees of Huron. [JA, at A0906, ¶ 38, and A1805.] By definition, SW, as officers of the Debtors and insiders, were not disinterested. *See* 11 U.S.C. §§ 101(14)(A) and 101(31)(B)(ii). In addition, the proposed dual retention of SW, as officers of St. Vincents, and Huron, as financial advisors to St. Vincents, would have resulted in Huron acting as both officers and professionals managed by the officers. This dual role would have created an adverse interest

22

because an insider may not act as an estate professional. *See Wells Benrus*, 48 B.R. at 197 (debtor's officer is disqualified from acting as a professional under § 327 because the officer is an insider who is not disinterested).

The Earn Out provision in the Acquisition Agreement also rendered SW and Huron not disinterested. The Earn Out, which entitled SW to a percentage of the revenues that Huron earned from St. Vincents, [JA, at A0082-A0083, ¶ 2.04, and A1808], created an adverse interest because SW would have conflicting loyalties to increase Huron's revenues (and their income) rather than to limit the Debtors' costs in bankruptcy. Even McDermott recognized this conflict of interest. [JA, at A1841.] Smith admitted in a June 23, 2005 e-mail, the Earn Out gave SW a "personal financial interest in pumping up the Huron revenues." [JA, at 1802.]

McDermott alleges that the United States Trustee supported SW's retention "for a significant period of time" and that she did not "change her mind" until mid-August 2005. *See* Brief of Appellant, at 31-32. The evidence does not support McDermott's contention. Smith knew in July 2005 that the United States Trustee had objections to the retention of SW and Huron. [JA, at A0646.] The United States Trustee testified that she spoke to Smith about her concerns with the SW retention shortly after the Petition Date. [JA, at A0642.] St. Clair informed Smith in a July 18, 2005 e-mail that the United States Trustee "continues to be troubled by the . . . conflict of interest between [SW and Huron] and she is not satisfied with the written presentation of the details and sent it back for us to redo it. She has not rejected it out of hand but she remains somewhat dubious." [JA, at A0303.] The United States Trustee also testified that throughout McDermott's tenure as counsel to the Debtors, she informed Smith that no matter how many applications McDermott filed to retain SW, there was a "standing objection" to the retention. [JA, at A0306.]

23

McDermott alleges that the Debtors' willingness to waive conflicts of interest with respect to SW and Huron resolved all issues relating to their retention in the bankruptcy case. *See* Appellant's Brief, at 35. [JA, at A0011, ¶ 81, and A0012, ¶ 84.] McDermott, however, did not inform the Board of the important principle that waivers of conflicts of interest do not cure lack of disinterestedness or conflicts of interest in bankruptcy cases. *See Granite Partners*, 219 B.R. at 34 (§ 327(a) does not allow for waivers of conflicts of interest).

> **2.     The Bankruptcy Court Properly Found that McDermott Failed to Timely Disclose the issues with the SW and Huron Retention to the Board and the United States Trustee.**

There is also sufficient evidence in the record to support the Bankruptcy Court's finding that Smith failed to timely disclose the issues with the SW and Huron retention to the Board. [JA, at A1467 and A1472-78.] Boyle testified that McDermott did not inform the Board of SW and Huron's serious and disabling conflicts of interest or explain the requirement that professionals be disinterested until just before a Board Meeting on August 24, 2005, more than seven weeks after the Petition Date. [JA, at A0830, ¶ 11.] Smith's own testimony reveals McDermott's abject failure to communicate with the Board regarding the retention of SW and Huron. Smith admitted that he did not timely disclose the results of McDermott's research on disinterestness and to the Board. [JA, at A0007, ¶ 52, and A0009, ¶ 61.] Smith also admitted that he knew in the winter of 2004 that Huron was in talks with SW regarding the Acquisition but did not disclose this information to the Board until after the Acquisition was publicly announced on May 9, 2005. [JA, at A0007, ¶ 51, and A1164, lines 6-15.] The Bankruptcy Court properly rejected Smith's excuse that he thought that Speltz had already informed the Board [JA, at A1467], because, as bankruptcy counsel, McDermott had a fiduciary duty to St. Vincents, not SW, which required McDermott to disclose the Acquisition and the retention issues to the Board.

*See, e.g. In re Consupak, Inc.*, 87 B.R. 529, 548-551 (Bankr. N. D. Ill.1988) (duty of bankruptcy counsel runs to the corporate debtor, not the debtor's principals).

McDermott alleges that the Bankruptcy Court erred in relying on facts related to the pre-petition actions of SW and Huron because only McDermott's acts after the Petition Date may be considered in determining an award of fees. *See* Brief of Appellant, at 38. Under § 327(a) and Fed. R. Bankr. P. 2014, Huron and SW were under an obligation to make full disclosure of all of SW and Huron's connections to "the debtor, creditors and any other parties in interest." *See Leslie Fay*, 175 B.R. at 533 (candid and complete disclosure of connections is a requirement of § 327(a) and Rule 2014). SW and Huron's connections obviously included details of the Acquisition in light of the conflicts of interest it created. Without proper disclosure, the Bankruptcy Court, the United States Trustee and other parties in interest would be unable to determine whether SW and Huron were disinterestedness and whether the retention would benefit the estate. *See*, *e.g., In re Worldcom, Inc.*, 311 B.R. at 165) (the purpose of the disclosures of Fed. R. Bankr. P. 2014 is to aid the Court in determining whether a retention is in the best interests of the estate).

McDermott maintains that the Board supported the retention of SW and Huron in the bankruptcy case because it believed that the benefits outweighed the risks. *See* Brief of Appellant, at 29. It is true, as McDermott asserts, that the Board instructed McDermott to pursue the SW and Huron retention on July 25, 2005. [JA, at A0011, ¶ 81, and A0311.] McDermott's contention, however, belies the fact that, at the time the Board made that instruction, it did not know about or understand the impediments to approval of the retention of SW and Huron in the bankruptcy case. [JA, at A0830, ¶ 11.] Once the Board learned of the bankruptcy issues, it asked SW to resign. [JA, at A0830, ¶ 11.]

25

McDermott alleges that the Bankruptcy Court erred when it found that McDermott did not cooperate with the United States Trustee. *See* Brief of Appellant, at 38. McDermott's characterization of the Court's findings, however, is in error. The Bankruptcy Court properly found that McDermott did not fully and completely disclose the facts related to SW and Huron to the United States Trustee, even though McDermott had a duty of full and candid disclosure. *See In re Plaza Hotel Corp.*, 111 B.R. 882, 891 (Bankr. E. D. Cal.1990) (counsel has a duty to assist and advise debtor respecting the fulfilling of the requirements of the Office of the United States Trustee). The record contains substantial evidence that McDermott failed to timely and completely disclose relevant facts regarding SW and Huron to the United States Trustee For example, McDermott did not provide the United States Trustee with a copy of the Acquisition Agreement – a key disclosure with respect to the retention of SW and Huron – until the end of July 2005, and only after the United States Trustee made numerous requests. [JA, at A1818.] Smith told St. Clair in an e-mail not to give him the Crowley report because he would have to share it with the United States Trustee. [JA, at A0384-A0385.] Smith also admitted that the several applications to retain SW did not make adequate disclosure of the Acquisition Agreement and that it had to repeatedly revise the SW Application to provide disclosure satisfactory to the United States Trustee. [JA, at A0011, ¶¶ 76-77, A A0013, ¶¶ 93 and 96, and A0017, ¶ 120.] The fact that Smith told the United States Trustee that he would cooperate is meaningless in view of McDermott's failure to respond to the United States Trustee's reasonable requests for disclosure. [JA, at A1818.] Accordingly, the evidence amply supports the Bankruptcy Court's determination that McDermott failed to comply with its duty to disclose facts relevant to the SW and Huron retention to the Board and the United States Trustee.

### 3.    The Radio Silence Instruction and the Tortious Interference Investigation Were Not Reasonable.

The Bankruptcy Court did not abuse its discretion when it disallowed the fees that McDermott incurred in investigating the allegations that the Creditors' Committee tortiously interfered with the Debtors' management during the Radio Silence Instruction.   McDermott argues that it was "reasonable" to cut off communication between the Debtors and the Creditors Committee to conduct "a brief investigation of the Creditors' Committee's alleged tortious interference with the Debtors' employees, which McDermott undertook at the request of the Debtors."  *See* Brief of Appellant, at 40.  As the Bankruptcy Court concluded, the Radio Silence Instruction was not reasonable.  [JA, at A1482.]  Specifically, there is no evidence in the record that supports McDermott's contention that Smith issued the Radio Silence Instruction at the request St. Vincents.  The e-mail containing the Radio Silence Instruction shows that Smith acted on his own, [JA, at A0600L.], and Smith admitted that he did not seek the approval of his client, the Board.  [JA, at A1229, lines 22-25 and 1-6.]  In the e-mail, Smith unilaterally directed SW to cease all communication with the Creditors' Committee to allow McDermott an opportunity to investigate whether the Creditors' Committee was tortiously interfering with the Debtors' management.  [JA, at A0606L.]

As the Bankruptcy Court implicitly found, the Radio Silence Instruction was not reasonable because it violated the principle of transparency and full disclosure that is a cornerstone of the bankruptcy system.  *See In re Fibermark, Inc.*, 330 B.R. 480, 504 n.11 (Bankr. D. Vt. 2005) (full disclosure is necessary to serve "the interest of promoting transparency in judicial proceedings, in general, and integrity of the bankruptcy system, in particular").  Under 11 U.S.C. § 704(a)(7), made applicable to chapter 11 cases by 11 U.S.C. §§ 1106(a)(1) and 1107(a), debtors have "an overriding duty to keep parties in interest informed . . . making a request for information difficult for [the debtors] to avoid."  *In re Refco*, 336 B.R. 187, 193

(Bankr. S.D.N.Y. 2006) (quoting *Pineiro v. Pension Benefit Guaranty Corporation*, 318 F. Supp. 67, 102 (S.D.N.Y. 2003). *See also* Appendix A.

　　The investigation of the Creditors' Committee's actions was likewise unreasonable. The duties of committees are set forth in 11 U.S.C. § 1103 and include consulting with the debtor regarding the administration of the case, investigating the acts, conduct, assets liabilities and financial condition of the debtor and performing other services that promote the interests of their constituency. 11 U.S.C. § 1103(c). *See* Appendix A. Under 11 U.S.C. § 1109(b), a creditors' committee "may raise and may appear and be heard on any issue in a case under [chapter 11]." 11 U.S.C. § 1109(b). *See* Appendix A. Section 1109(b) "evinces Congress's intent for creditors' committees to play a vibrant and central role in Chapter 11 adversarial proceedings." *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 330 F.2d 548, 562 (3d Cir. 2003).

　　　The role of a creditors' committee is extremely broad and a committee

　　　"may undertake whatever investigation is appropriate to enable it to fulfill its duty
　　　to monitor the operations of the debtor and participate in the formulation of a
　　　plan." Moreover, in fulfilling its statutory duties "[a] committee should also not
　　　hesitate to oppose actions of the debtor in court."

*In re Anderson*, 349 B.R. 448, 464 n.33 (E. D. Va. 2006) (citation omitted). "The function of a creditors' committee is to aid, assist, and monitor the debtor to ensure that unsecured creditors' views are heard and their interests promoted and protected." *Refco*, 336 B.R. at 196. Thus, the Creditors' Committee's objection to the retention of SW and Huron and its investigation of alternative managers and financial advisors were appropriate and within the scope of its duties under the Bankruptcy Code. Based on the foregoing, the Court did not err in finding that the Radio Silence Instruction and the investigation were unreasonable..

　　The Bankruptcy Court did not abuse its discretion when it disallowed fees relating to the SW and Huron retention in the amount of $44,523 for time incurred on the tortious interference

investigation, $200,000 related to the SW and Huron retention applications, and $74,180 in fees related the change in management arising from the firing of SW on August 24, 2005. As the Bankruptcy Court properly held, the fees incurred with respect to the SW and Huron retention applications and the tortious interference investigation were not reasonable. Disallowing fees with respect to the change of management was also proper because "these matters are inextricably related to the disastrous SW and Huron retention proceedings and events described at length in this Decision." [JA, at A1482.]

The Court did not ignore substantial evidence as McDermott alleges. *See* Brief of Appellant, at 33. In the Decision, the Bankruptcy Court set forth a detailed recitation, analysis and weighing of the facts. [JA, at A1467-A1468 and A1480-A1481.] On appeal, the appellate court must view the record as a whole and "if the [trial court's] account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. . . ." *Jimenez v. Mary Washington College*, 57 F.3d 369, 378 (4th Cir. 1995). In this case, the record as a whole reflects that McDermott's pursuit of the retention of SW and Huron was unreasonable. Based on the record, the Bankruptcy Court did not abuse its discretion in reducing McDermott's fees.

> **B.    The Bankruptcy Court Did Not Abuse Its Discretion in Disallowing McDermott's Fees Because McDermott's Handling of the St. Mary's Closure Was Not Reasonable or Performed in a Reasonable Amount of Time.**

The Bankruptcy Court did not abuse its discretion when it disallowed fees totaling $200,000 with respect to McDermott's handling of the St. Mary's closure. There is substantial evidence in the record that McDermott failed to timely and competently obtain Bankruptcy Court approval of the closure.

The record shows that the Debtors submitted a closure plan to the State Department of Health in June 2005. [JA, at 1049, lines 12-17.] At a June 17, 2005 meeting, the Board set a target date of September 1, 2005 for the closure of St. Mary's. [JA, at 914, ¶ 115, and A1788-A1793.] Smith attended the June 15 meeting at which the Board instructed him to seek Bankruptcy Court approval of the closure of St. Mary's. [JA, at 914, ¶ 116.]

Filing the motion to close St. Mary's was not a priority for McDermott even though it was a clear priority for the Debtors. [JA, at 1050, lines 7-15, and A1058, lines 3-4.] Despite the Debtors' desire to close St. Mary's by September 1, 2005, McDermott lawyers did not begin working on the St. Mary's Motion until August 5, 2005, even though McDermott knew on July 22, 2005, that DOH approval of the closure was imminent. [JA, at A914, ¶¶ 115-116, and 915, ¶ 129.]

The record also shows that the St. Mary's Motion was inadequate despite McDermott's contention that the motion contained several exhibits. *See* Brief of Appellant, at 45. Under Fed. R. Civ. P. 43, made applicable to bankruptcy cases under Fed. R. Bankr. P. 9017, "when a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions." Fed. R. Civ. P. 43. McDermott filed the St. Mary's Motion with no affidavits attesting to the allegations in the St. Mary's Motion or authenticating the exhibits attached to the St. Mary's Motion. [JA, at A0916, ¶ 136, and A1486-A1627.] Smith testified that McDermott intended to examine witnesses at the hearing [JA, at 1103, lines 24-25 and 1-2], but this self-serving statement is insufficient to overcome the other evidence of inadequacy in the absence of any evidence that McDermott filed a witness list or otherwise identified its proposed witnesses. *See, e.g., Sanford v. C.I.R.*, 412 F.2d 201, 202 (2d Cir. 1969) (defendant's self-serving testimony was insufficient proof in the absence of corroborating evidence).

30

McDermott argues the Court erred because it premised the finding regarding the St. Mary's closure on the fictitious deadline of September 1, 2005. *See* Brief of Appellant, at 41. On the contrary, the Court based its findings, not on the deadline, but on McDermott's failure to follow the instructions of the Board and the filing of an incomplete and inadequate motion that the Bankruptcy Court would not approve. [JA, at A1482-A1483.]

Based on the foregoing, the Court did not abuse its discretion when it disallowed McDermott's fees related to the St. Mary's closure. There was substantial evidence in the record that McDermott did not timely and properly obtain Bankruptcy Court approval of the closure of St. Mary's.

### C.    The Bankruptcy Court Applied the Proper Legal Standard.

McDermott argues that the Bankruptcy Court impermissibly reviewed McDermott's services retrospectively. *See* Brief of Appellant, at 34. McDermott focuses on the Bankruptcy Court's self-evident statements that

> It is an inevitable fact of life that events and conduct are judged after the fact, with the proverbial benefit of 20-20 hindsight. What may have been difficult for some to assess at the time may appear self-evident to others in hindsight. . . . Counsel charge and are paid high compensation in a fair expectation that their foresight and judgment will assess today's facts as the facts would be perceived and judged tomorrow under the searching gaze of 20-20 hindsight."

[JA, at A1466–A1467.] The Bankruptcy Court, however, applied the proper legal standard. The Bankruptcy Court recognized that § 330 requires consideration of, among other things,

> whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of a case under this title.

11 U.S.C. § 330(a)(3)(C). [JA, at A1466.]

Under Section 330(a)(4)(A), the Bankruptcy Court has the authority to reduce fees or expenses when they are disproportionate to the benefit to the estate, even if it has already

approved the professional's retention under Section 327 of the Bankruptcy Code. *In re T Clothing Co.*, 49 F.3d at 316; *see also Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d at 262, 263 (3d Cir. 1995) (affirming lower courts' denial of improperly documented and inadequately detailed expenses).  The test of whether the services were reasonably likely to benefit the estate "should be applied in an objective manner, based upon the services a reasonable lawyer would have performed under the same circumstances.*" In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 766 (Bankr. E.D.N.Y. 2005) (citing *In re Ames Department Stores, Inc.*, 76 F.3d 66, 71 (2d Cir.1996)).  *See also In re Cenargo International*, *PLC*, 294 B.R. 571, 596 (Bankr. S.D.N.Y. 2003) (fees should be disallowed where it is apparent that no reasonable attorney would have undertaken the activity for which fees are sought).

The term "beneficial to the estate" mean services that are reasonably calculated to produce benefit to the estate. *In re Angelicka Films, Inc.*, 227 B.R. 29, 43 n.15 (Bankr. S.D.N.Y. 1998).  "This means that if the odds against success are greatly unfavorable, the benefit which would result if the endeavor succeeds should be of a greater value than an activity for which the chances of success appear greater." *In re Hunt*, 124 B.R. 263, 267 (Bankr. S. D. Ohio 1990).

In this case, the Bankruptcy Court applied the correct legal standard. The Bankruptcy Court concluded that McDermott's services with respect to the retention of SW and Huron did not benefit the estate at the time the services were rendered because (a) McDermott knew that SW and Huron had fatal conflict of interest but failed to timely disclose to the Board that SW and Huron could not be retained in the bankruptcy case; (b) McDermott filed three applications to retain SW which contained inadequate disclosures; and (c) McDermott allowed the retention issue to dominate the bankruptcy case and to create friction between the Debtors, the United

32

States Trustee and the Creditors' Committee.  [JA, at A1481-A1482.]

In addition, the Bankruptcy Court held that McDermott's services with respect to the St. Mary's closure were not "performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed" within the meaning of § 330(a)(3)(D) and that McDermott's delay in rendering those services was not "beneficial at the time at which the service was rendered" within the meaning of § 330(a)(3)(C)."   The services were not reasonable because (a) McDermott failed to follow St. Vincent instructions to obtain Bankruptcy Court approval of the closure; (b) McDermott did not timely file the St. Mary's Motion, and when it did, the St. Mary's Motion was defective because it was not supported by affidavits or financial information; and (c) McDermott's failure to act in accordance with St. Vincents' instructions delayed the closure of St. Mary's some twenty days. [JA, at A1482-A1483.]

### D.    The Bankruptcy Court Did Not Abuse its Discretion When it Disallowed McDermott's Fees Incurred in the Transition from McDermott to Weil.

The Bankruptcy Court did not abuse its discretion when it denied McDermott's fees in the amount of $43,458 incurred during the period of transition from McDermott to Weil.  In denying fees related to the transition, the Bankruptcy Court reasoned that "McDermott was terminated by the Board because of the shortcomings in the firm's performance which resulted in a crisis of confidence in SVCMC's management and Board and McDermott on the part of the Creditors' Committee, the U.S. Trustee and the Court."  [JA, at A1482.]

McDermott inexplicably argues that it was not dismissed for poor performance so it should not bear the cost associated with the transfer of the case to Weil.  *See* Brief of Appellant, at 47.  There is, however, substantial evidence in the record that the Debtors had lost confidence

in McDermott's ability to competently handle the bankruptcy case.  [JA, at A0830-A0831, ¶ 12,

A1348, lines 8-25, 1350, lines 16-25, 1351, lines 1013, 1363, lines 6-25, and 1364, lines19-25.]

Boyle's testimony cannot be more clear with respect to the reason that the Debtors fired

McDermott:

> At the August 24, 2005 Board meeting, I was named interim CEO [of the Debtors.] Thereafter, I began to participate in meeting with the U.S. Trustee . . ., the Creditors' Committee and [McDermott].  It became readily apparent to me that the restructuring of [the Debtors] was in a quagmire, and that the bankruptcy process could not go forward with [McDermott] continuing as counsel . . . ., given the frayed relationships between McDermott, the U.S. Trustee and the Creditors' Committee. . . .  Because progress was not being made in turning [the Debtors] around, and because the Board had lost confidence in [McDermott]'s ability to guide [the Debtors] through the bankruptcy process, we needed to replace MWE as counsel to the Debtors."

[JA, at A0830-A0831 ¶ 12.]  Evidence of St. Clair's apology about the dismissal, cited by

McDermott, does not outweigh the fact that the Board was dissatisfied with the lack of progress

in the case during McDermott's tenure.  [JA, at A0523.]  The Bankruptcy Court did not abuse its

discretion in disallowing fees related to the transition.

## VIII.  CONCLUSION

Based on the foregoing, the United States Trustee requests that the Court affirm the

Bankruptcy Court's Decision and Order and grant other relief as is just and proper.

Dated: New York, NY
          July 7, 2008

<div style="margin-left: 50%;">

Respectfully submitted,

DIANA G. ADAMS
UNITED STATES TRUSTEE

By: */s/ Alicia M. Leonhard*
     Alicia M. Leonhard
     Trial Attorney
     Tracy Hope Davis
     Assistant United States Trustee
     Office of the United States Trustee
     33 Whitehall Street, 21st Floor
     New York, NY 10004
     (212) 510.0508

</div>

## APPENDIX A

## STATUTES CITED IN THE BRIEF OF APPELLEE UNITED STATES TRUSTEE

### 11 U.S.C. § 101(14)

(14) The term "disinterested person" means a person that—
(A) is not a creditor, an equity security holder, or an insider;
(B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
(C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

### 11 U.S.C. § 101(31)

(31) The term "insider" includes—
          . . . .
(B) if the debtor is a corporation—
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor;
(iv) partnership in which the debtor is a general partner;
(v) general partner of the debtor; or
(vi) relative of a general partner, director, officer, or person in control of the debtor;

### 11 U.S.C. § 327(a)

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

### 11 U.S.C. § 330

(a) (1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103—

    (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

    (B) reimbursement for actual, necessary expenses.

  (2) The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.

  (3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
  (A) the time spent on such services;

  (B) the rates charged for such services;

  (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

  (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

  (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

  (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for—

  (i) unnecessary duplication of services; or

  (ii) services that were not—

   (I) reasonably likely to benefit the debtor's estate; or

  (II) necessary to the administration of the case.

## 11 U.S.C. § 363

(b) (1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—

(5) perform such other services as are in the interest of those represented.

  (d) As soon as practicable after the appointment of a committee under section 1102 of this title, the trustee shall meet with such committee to transact such business as may be necessary and proper.

## 11 U.S.C. § 1106(a)(1)

(a) A trustee shall—

  (1) perform the duties of the trustee, as specified in paragraphs (2), (5), (7), (8), (9), (10), (11), and (12) of section 704 . . . .

## 11 U.S.C. § 1107(a)

  (a) Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106 (a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

## 11 U.S.C. § 1109(b)

  (b) A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

# APPENDIX B

## RULES CITED IN THE BRIEF OF APPELLANT THE UNITED STATES TRUSTEE

**Fed. R. Civ. P. 43 Taking Testimony (a) in Open Court.**  At trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise. For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location.

**Fed. R. Bankr. P. 2014(a) Application for an order of employment**.  An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327, § 1103, or § 1114 of the Code shall be made only on application of the trustee or committee. The application shall be filed and, unless the case is a chapter 9 municipality case, a copy of the application shall be transmitted by the applicant to the United States trustee. The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

**Fed. R. Bankr. P. 8013  Disposition of Appeal; Weight Accorded Bankruptcy Judge's Findings of Fact.**  On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

**Fed. R. Bankr. P. 9017  Evidence.**  The Federal Rules of Evidence and Rules 43, 44 and 44.1 F. R. Civ. P. apply in cases under the Code.

## CERTIFICATE OF SERVICE

I, Alicia M. Leonhard, hereby certify, under penalty of perjury, that on July 7, 2008, I caused a true and correct copy of the attached Brief of Appellee United States Trustee to be served on the following parties by Federal Express:

Michael Cook, Esq.
Schulte Roth & Zabe
919 Third Avenue
New York, NY 10022

Howard Magaliff, Esq.
Togut Segal & Segal
One Penn Plaza, Suite 3335
New York, NY 10119

Brook A. Clark, Esq.
Alston & Bird 90 Park Avenue
New York, NY 10016

Dated: New York, NY
        July 7, 2008


                              */s/ Alicia M. Leonhard*
                              Alicia M. Leonhard