UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | |
|---|---|
| SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a SAINT VINCENT CATHOLIC MEDICAL CENTERS, *et al.*,<br><br>Debtors. | : Civ. No. 1:07-cv-09818 (AKH)<br>:<br>: Chapter 11<br>: Case No. 05-14945 (ASH)<br>: (Jointly Administered) |

-------------------------------------------------------------------x

| | |
|---|---|
| McDERMOTT WILL & EMERY LLP,<br><br>Appellant,<br><br>v.<br><br>SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK, CREDITORS' COMMITTEE OF SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK and DIANA G. ADAMS, AS UNITED STATES TRUSTEE FOR REGION 2,<br><br>Appellees. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

-------------------------------------------------------------------x

---

## REPLY BRIEF OF APPELLEES SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK and THE CREDITORS' COMMITTEE OF SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK

---

*On Appeal from the United States Bankruptcy Court*
*For the Southern District of New York*

Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, NY 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258

Michael E. Johnson (MJ-0299)
Martin G. Bunin (MB-1602)
Brook A. Clark (BC-1749)
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel for Appellee Saint Vincents Catholic Medical Centers of New York*

*Counsel for Appellee Creditors Committee of Saint Vincents Catholic Medical Centers of New York*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITES ............................................................................iii

PRELIMINARY SATATEMENT AND SUMMARY OF ARGUMENT .........................1

APPLICABLE STANDARD OF APPELLATE REVIEW .................................................5

STATEMENT OF FACTS ...............................................................................6

    I.     SPELTZ & WEIS/HURON RETENTION ISSUES .......................................6

           A.    McDermott's Failure to Disclose and to Adequately Address the Conflicts Associated with Huron's Acquisition of SWLLC................6

           B.    McDermott's Actions Resulted in a "Poisoned Well" Atmosphere That Caused Harm to the Debtors' Estates .........................................11

    II.    MCDERMOTT'S FAILED EFFORTS TO CLOSE ST. MARY'S HOSPITAL ...........................................................................13

    III.   ST. VINCENTS HAD NO CHOICE BUT TO TERMINATE MCDERMOTT ...............................................................17

    IV.   THE FEE APPLICATION DISPUTE ...........................................18

ARGUMENT ...............................................................................19

    I.     THE BANKRUPTCY COURT DID NOT ERR IN DENYING MCDERMOTT'SFEES ON MATTERS PERTAINING TO THE FAILED CAMPAIGN TO SECURE APPROVAL OF THE RETENTION OF SWLLC AND HRON................................................19

           A.    McDermott Is Not Entitled to $98,382 in Fees Its Services in Connection With The Retention of SWLLC and Huron Did Not Benefit St. Vincents ...........................................19

                  1.    The Bankruptcy Court Based Its Decision To Deny McDermott Fees on Several Key Findings of Fact That Are Amply Supported By the Record ...........................................19

                  2.    McDermott Provided Its Client Inadequate Information and Advice on the Dual Retention Issue ...........................21

3.   The United States Trustee Did Not Support the Dual Retention ................................................................................23

4.   The Bankruptcy Court Properly Considered All Material Evidence ini the Record and Did Not Evaluate McDermott's Services Using "20-20 Hindsight" ..............................................24

B.   The Bankruptcy Court Did Not Err In Considering Pre-Petition Facts Regarding McDermott's Failure to Disclose Huron's Acquisition of SWLLC to the Debtors and the Conflicts of Interest Presented by Said Acquisition ..................................29

C.   The Bankruptcy Court Did Not Err in Disallowing $74,180 in Fees to McDermott As a Result of the Post-SWLLC Change in Management and Appointment of a CRO ............................................33

D.   The Bankruptcy Court Did Not Err in Disallowing $44,523 in Fees to McDermott Due to the Harm Caused By McDermott's Radio Silence Instruction ....................................................34

II.   THE BANKRUPTCY COURT DID NOT ERR IN DENYING CERTAIN FEES ON MATTERS PERTAINING TO THE CLOSURE OF ST. MARY'S HOSPITAL ................................................................36

A.   McDermott's Services Were Grossly Tardy and Plainly Inadequate in Connection with the Closure of St. Mary's Hospital .....37

B.    McDermott Bungled the Motion to Close St. Mary's Hospital ..........40

III.   MCDERMOTT SHOULD BEAR THE COST OF TRANSITION TO SUCCESSOR COUNSEL BECAUSE IT WAS DISMISSED FOR POOR PERFORMANCE ..........................................................................42

IV.   REMAND IS REQUIRED IF THE DISTRICT COURT REVERSES ............45

CONCLUSION ..............................................................................................46

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

Anderson v. City of Bessemer,
470 U.S. 564 (1985)....................................................................................6, 25

BT/SAP Pool Assocs., L.P. v. Coltex Loop Central Three Partners,L.P.,
203 B.R. 527 (S.D.N.Y. 1996), aff'd., 138 F.3d 39 (2d Cir. 1998).....................................5

Daubert v. Merrell Dow Pharms., Inc.,
509 U.S. 579 (1993).....................................................................................30

DeMarco v. United States,
415 U.S. 449 (1974).....................................................................................45

George v. Celotex Corp.,
914 F.2d 26 (2d Cir. 1990)..............................................................................30

Healey v. Chelsea Res., Ltd.,
947 F.2d 611 (2d Cir. 1991).............................................................................25

Houlihan Lokey Howard & Zukin Capital v. High River Ltd. P'ship,
369 B.R. 111 (S.D.N.Y. 2007)......................................................................27, 28

In re Ames Dep't Stores,
76 F.3d 66 (2d Cir. 1996),
overruled in part on other grounds by, Lamie v. United States, 540 U.S. 526 (2004) ..........28

In re Angelika Films 57th, Inc.,
227 B.R. 29 (Bankr. S.D.N.Y. 1998), aff'd, 246 B.R. 176 (S.D.N.Y. 2000) ......................27, 28

In re Angelika Films 57th, Inc.,
246 B.R. 176 (S.D.N.Y. 2000)...........................................................................33

In re Bayshore Wire Prods.,
209 F.3d 100 (2d Cir. 2000).............................................................................5

In re Britt,
355 B.R. 427 (S.D.N.Y. 2006)...........................................................................45

In re Casco Fashions, Inc.,
490 F.2d 1197 (2d Cir. 1973)...........................................................................28

In re Cenargo International, Plc.,
294 B.R. 571 (Bankr. S.D.N.Y. 2003)...................................................................34

**Cases**                                                                    **Page(s)**

In re Granite Partners L.P.,
219 B.R. 22 (Bankr. S.D.N.Y. 1998) ...................................................................31

In re Healthco Int'l, Inc.,
132 F.3d 104 (1st Cir. 1997) .............................................................................5

In re I Don't Trust,
143 F.3d 1 (1st Cir. 1998) .................................................................................6

In re JLJ Inc.,
988 F.2d 1112 (11th Cir. 1993) ......................................................................45

In re JLM, Inc.,
210 B.R. 19 (B.A.P. 2d Cir. 1997).....................................................................5

In re Lazar,
83 F.3d 306 (9th Cir. 1996) ...............................................................................5

In re Lederman Enters.,
997 F.2d 1321 (10th Cir. 1993) ......................................................................28

In re Manville Forest Prods. Corp.,
896 F.2d 1384 (2d Cir. 1990)............................................................................5

In re Martin,
817 F.2d 175 (1st Cir. 1987) ...........................................................................33

In re Martin-Trigona,
760 F.2d 1334 (2d Cir. 1985)..........................................................................30

In re Matco Elec. Group, Inc.,
383 B.R. 848 (Bankr. N.D.N.Y. 2008) ...........................................................31

In re Muir Training Technologies, Inc.,
120 B.R. 154 (Bankr. S.D. Cal. 1990) ............................................................28

In re Office Prods. of Am., Inc.,
136 B.R. 983 (Bankr. W.D. Tex. 1992)...........................................................28

In re Pontarelli,
No. Civ. A. 98-116T, 93-11484–ANV, 2000 WL 34019283 (D.R.I. Mar. 6, 2000)............6

In re Saint Vincents Catholic Medical Centers of New York,
No. 05 B 14945 (ASH), 2007 WL 2492787 (Bankr. S.D.N.Y. Aug. 29, 2007)...................*passim*

**Cases**                                                                     **Page(s)**

In re Wonder Corp. of America,
82 B.R. 186 (D. Conn. 1988) .................................................................26-27

Joseph v. New York City Bd. of Educ.,
171 F.3d 87 (2d Cir. 1999)......................................................................26

MacElvain v. IRS,
180 B.R. 670 (M.D. Ala. 1995) ...............................................................5

Pullman-Standard v. Swint,
456 U.S. 273 (1982)................................................................................45

Siewe v. Gonzales,
480 F.3d 160 (2d Cir. 2007).....................................................................25

United States v. United States Gypsum Co.,
333 U.S. 364 (1948)...............................................................................5-6

Zervos v. Verizon New York, Inc.,
252 F.3d 163 (2d Cir. 2001).....................................................................5

**Rules and Statutes**

11 U.S.C. § 330(a)(3).............................................................................4, 26, 30

11 U.S.C. § 330(a)(3)(C) ........................................................................3, 36

11 U.S.C. § 330(a)(3)(D) ........................................................................3, 36

11 U.S.C. § 330(a)(4)(A)(i) .....................................................................42, 43

11 U.S.C. § 1129(a) ................................................................................28

Fed. R. Bankr. P. 2014............................................................................31, 32

Fed. R. Bankr. P. 8013 ...........................................................................5

Fed. R. Evid. 401 ...................................................................................30

Saint Vincents Catholic Medical Centers of New York ("St. Vincents") and the Creditors Committee of Saint Vincents Catholic Medical Centers of New York (the "Committee"), submit this Reply Brief[1] in opposition to McDermott Will & Emery LLP's ("McDermott" or the "Appellant") appeal from a final Order (the "Order") of the United States Bankruptcy Court for the Southern District of New York (Adlai S. Hardin, Jr., J.) dated September 21, 2007, sustaining, in part, objections filed by St. Vincents, the Committee and the United States Trustee for Region 2 (the "United States Trustee") to the first and final application of McDermott for compensation for professional services rendered as counsel to St. Vincents and its affiliated debtor entities (the "Debtors") pursuant to chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, et al., as amended (the "Bankruptcy Code").  A1794-1797.[2]

## PRELIMINARY STATEMENT
## AND SUMMARY OF ARGUMENT

In its Decision on McDermott's Application for Fees and Expenses on August 29, 2007, the Bankruptcy Court reduced McDermott's fees by $460,543.  See In re Saint Vincents Catholic Medical Centers of New York, No. 05 B 14945 (ASH), 2007 WL 2492787 (Bankr. S.D.N.Y., Aug. 29, 2007) (the "Decision").   The Bankruptcy Court's Decision focused primarily on McDermott's performance with respect to two issues: (1) its failed efforts to secure Bankruptcy Court approval of the retention of Speltz & Weis LLC ("SWLLC") and Huron Consulting Group, Inc. ("Huron"), and (2) its failed efforts to secure Bankruptcy Court approval for St. Vincents to close St. Mary's Hospital, which was losing not less than $78,000 per day. A2057, 41:11-14; A1506, ¶ 47.  The Bankruptcy Court based its Decision and Order on an evidentiary

---

[1]  By Order dated May 30, 2008, the Court granted St. Vincents and the Committee leave to file a joint opposition brief of up to 49 pages.

[2]  Citations to "A___" refer to pages in the Joint Appendix filed by the parties.

record developed at a two-and-a-half day trial and included 278 stipulated facts, six live witnesses, the affidavit and deposition testimony of another six witnesses, and 202 documentary exhibits. Based upon its weighing of this well-developed record, the Bankruptcy Court determined that McDermott's services with respect to these two issues were not reasonable or beneficial at the time they were rendered, severely impeded St. Vincents' ability to advance the chapter 11 cases, and caused St. Vincents quantifiable economic harm.[3] Decision, 2007 WL 2492787 at **6, 10-11, 23.

In particular, the Bankruptcy Court held that "the McDermott services relating to retention of [SWLLC and Huron], at the time at which those services were rendered, were not only not beneficial to the debtors' estates and not reasonably likely to benefit the debtors' estates – they were affirmatively detrimental to the debtors' estates." Id. at *23. The Bankruptcy Court further concluded that the retention process "was marked by ever-increasing contention, animosity, and most devastating in a Chapter 11 case, lack of trust between the debtors and their counsel, McDermott, and the Creditors' Committee and the United States Trustee's office. The process culminated disastrously with the forced resignations of Speltz and Weis as CEO and CFO of SVCMC on August 24, 2005 and, three weeks later, the termination of McDermott as debtors' counsel on September 13, 2005." Id. at *6. The Bankruptcy Court concluded that McDermott should receive no compensation for these services. Id. at *23.

With respect to McDermott's efforts to close St. Mary's Hospital, the Bankruptcy Court concluded that St. Vincents suffered significant losses as a direct consequence of McDermott's delay in filing the motion to approve the closure of St. Mary's Hospital, and rejected McDermott's contention that there was no proof linking these losses to McDermott's services.

---

[3] While also perhaps giving rise to malpractice claims against McDermott.

Id. at *21-22.  The Bankruptcy Court found that McDermott's services "were grossly tardy and the work product was plainly inadequate," (id. at *24), and that the services in connection with the closure of the hospital "were not 'performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed' within the meaning of Section 330(a)(3)(D) [of the Bankruptcy Code] and that McDermott's delay in rendering those services was not 'beneficial at the time at which the service was rendered' within the meaning of Section 330(a)(3)(C)."  Id.

The Bankruptcy Court's conclusions on each of the two sets of disputed services are amply supported by the record evidence.  Indeed, McDermott itself admitted to many of the facts that formed the basis of the Decision and Order.  McDermott conceded, among other things, that it made mistakes,[4] that the critically important July 5th motion to approve the SWLLC management agreement was careless, incomplete and inappropriate,[5] that during McDermott's tenure it failed to secure approval to retain SWLLC and Huron (which were both needed to provide critically important management services),[6] that it delayed commencing work on an application to close St. Mary's Hospital until third-party litigation brought the issue to a head,[7] that McDermott could have filed a motion seeking permission from the Bankruptcy Court to close St. Mary's Hospital much earlier in the bankruptcy case had the closure motion been drafted in advance,[8] and that if McDermott had not been fired on September 13, 2005, it would have resigned, because it was apparent to McDermott's supervising partner on the case that McDermott's effectiveness and

---

[4]  A1087, 89:6-20; A0908, ¶ 56.

[5]  A1170, 180:4-6; A0908 ¶ 61.

[6]  A1173, 182:19-23.

[7]  A1069, 69:25-70:5.

[8]  A1077, 78:22-25.

ability to help St. Vincents were at an end.[9]   These admitted facts, as well as other record evidence discussed herein, demonstrate that the Bankruptcy Court's findings of fact were completely supported by the trial record and thus not clearly erroneous.

The Bankruptcy Court's Decision and Order also comported with applicable legal standards.  McDermott accuses the Bankruptcy Court of improperly utilizing "20-20 hindsight" to analyze McDermott's conduct.  McDermott relies on a single, cherry-picked passage from the Decision to support this argument, but it is clear from the entirety of the Decision that the Bankruptcy Court did not use "hindsight" analysis, but rather based its factual findings on the relevant circumstances existing at the time McDermott rendered the services for which its fees were denied.

McDermott also claims that the Bankruptcy Court erred in considering evidence pertaining to facts outside the time period that is the subject of its fee application, but it cites no authority that analysis of a fee application under Section 330 of the Bankruptcy Code must ignore such information.  Section 330(a)(3) clearly requires a bankruptcy court to consider "all relevant factors" when determining the appropriate amount of compensation for bankruptcy professionals.  McDermott's knowledge and conduct during the months leading up to the Petition Date were relevant to the Bankruptcy Court's assessment of the quality of the services McDermott provided during the fee period, the lack of results achieved during its ten-week tenure, and the harm caused to the bankruptcy estate as a result of the services provided.

The Bankruptcy Court thus did not err in applying the relevant law or making findings of facts, and the Decision and Order should be affirmed to the extent of the issues that are the subject of McDermott's appeal.

---

[9]   A1192, 203:24-204:2.

## APPLICABLE STANDARD OF APPELLATE REVIEW

"District courts function as tribunals of appellate jurisdiction when reviewing the determination of bankruptcy courts and, therefore, apply the identical standards as those tribunals governing appellate review in other cases." MacElvain v. IRS, 180 B.R. 670, 672-73 (M.D. Ala. 1995). A district court's review of a bankruptcy court's award of professional fees is governed by the abuse of discretion standard. In re Bayshore Wire Prods., 209 F.3d 100, 103 (2d Cir. 2000); In re JLM, Inc., 210 B.R. 19, 23 (B.A.P. 2d Cir. 1997). As Appellants have acknowledged, a bankruptcy court abuses its discretion where it misapplies the law or makes a clearly erroneous factual finding. Brief of Appellant McDermott Will & Emery LLP ("McDermott Brief") at 4-5. As to the former, a district court reviews a bankruptcy court's conclusions of law de novo. In re Healthco Int'l, Inc., 132 F.3d 104, 107 (1st Cir. 1997); In re Lazar, 83 F.3d 306, 308 (9th Cir. 1996). Findings of fact are reviewed under the clearly erroneous standard. Fed. R. Bankr. P. 8013; In re Manville Forest Prods. Corp., 896 F.2d 1384, 1388 (2d Cir. 1990).

McDermott's appeal focuses on the Bankruptcy Court's findings of fact. The clearly erroneous standard applicable to a bankruptcy court's factual findings is very deferential. "A district court must accept the findings of fact of a bankruptcy court unless the party contesting the findings of fact carries the burden of establishing that the findings are clearly erroneous and that no reasonable person could agree with them." BT/SAP Pool Assocs., L.P. v. Coltex Loop Central Three Partners, L.P., 203 B.R. 527, 531 (S.D.N.Y. 1996), aff'd., 138 F.3d 39 (2d Cir. 1998). A factual finding is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Zervos v. Verizon New York, Inc., 252 F.3d 163, 169 (2d Cir. 2001) (quoting United States v. United

States Gypsum Co., 333 U.S. 364, 395 (1948)).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Anderson v. City of Bessemer, 470 U.S. 564, 573-74 (1985).  The deference accorded to the bankruptcy court's factual findings applies to determinations regarding the reasonableness of requested fees, where the bankruptcy court "enjoys particularly great leeway."  In re Pontarelli, No. Civ. A. 98-116T, 93-11484 – ANV, 2000 WL 34019283, at *2 (D.R.I. Mar. 6, 2000) (quoting In re I Don't Trust, 143 F.3d 1, 3 (1st Cir. 1998)).

As shown below, the Bankruptcy Court's findings of fact were not clearly erroneous, and it did not abuse its discretion in reducing the award of fees by the amounts now challenged by the Appellants.

## STATEMENT OF FACTS

**I.  SPELTZ & WEIS/HURON RETENTION ISSUES**

**A.  McDermott's Failure to Disclose and to Adequately Address the Conflicts Associated with Huron's Acquisition of SWLLC**

In April 2004, the Debtors' board of directors (the "Board") engaged SWLLC, a management consulting firm, to provide management and advisory services to St. Vincents pursuant to the terms of a management agreement ("Management Agreement"). A0903, ¶ 12. The principals of SWLLC, David Speltz ("Speltz") and Tim Weis ("Weis"), were named as Chief Executive Officer and Chief Financial Officer of St. Vincents, respectively. A0903, ¶¶ 13-14. In May 2005, two months before the Debtors filed a petition for relief under chapter 11 of the bankruptcy code ("Petition Date"), SWLLC was acquired by Huron pursuant to a Membership Interest Purchase and Sale Agreement dated May 5, 2005 (the "Acquisition Agreement"). A0069; A0906, ¶ 37.  At that time, dozens of SWLLC employees were working for St. Vincents, as were a number of employees of Huron.  A0828, ¶ 3.

Under the terms of the Acquisition Agreement, Messrs. Speltz and Weis were to receive consideration from Huron in the form of an "earn-out" to be based upon SWLLC-generated revenues, including revenues earned from St. Vincents. A0069; A0829, ¶ 8.    The remuneration paid by Huron to Speltz and Weis also included a payment derived from future billings of Huron and its affiliates that were attributable to the work referred by Speltz and Weis. A0069.   The parties to the Acquisition Agreement contemplated that Speltz and Weis would be entitled to these referral payments in connection with Huron billing for St. Vincents-related work. Id.  After the acquisition of SWLLC by Huron, SWLLC utilized the services of certain Huron employees, on a subcontracting basis, and billed St. Vincents for those employees' services at a higher rate than it paid Huron.  Id.

McDermott, through its lead partner on the case, William P. Smith ("Smith"), knew about the discussions regarding Huron's acquisition of SWLLC as early as February 2005, and Smith admitted that he was aware that a deal was imminent no later than mid-April 2005. A0904, ¶ 25; A0905, ¶ 28.  After learning that discussions of a Huron acquisition of SWLLC were becoming serious, Smith commissioned a research memorandum regarding the issues that could arise from such an acquisition in the event of a St. Vincents bankruptcy filing. A0905, ¶ 29.  In April 2005, Weis, Speltz and Smith also discussed whether Huron's potential acquisition of SWLLC would have any implications in the event St. Vincents filed for bankruptcy and sought to retain SWLLC and Huron on a post-petition basis. A0906, ¶ 34.  During that conversation, Smith acknowledged that continuing to retain the services of SWLLC and Huron employees after the two entities combined could create certain troublesome "issues" in bankruptcy, including "disinterestedness, the Jay Alix Protocol and conflicts." A0906, ¶ 35.[10]

---

[10] The J. Alix Protocol was and is a policy of the United States Trustee's Office for Region 2 that prohibits outside consultants from being retained as both management and financial advisors for a chapter 11 debtor, is followed in

Despite having knowledge of the pending acquisition and awareness of potential issues that would result therefrom if St. Vincents filed for bankruptcy, McDermott did not disclose this information to the Board prior to May 5, 2005, the date on which SWLLC and Huron signed their agreement. A0905 – A906, ¶ 26, 35, 42. In fact, the Board first learned about the transaction on the evening of May 6, 2005, when Speltz, not McDermott, called to inform Richard Boyle ("Boyle"), the Debtors' Chairman of the Board. A0828, ¶ 4. The SWLLC/Huron transaction was publicly announced on the following business day, Monday, May 9, 2005. A0906, ¶ 38.

Upon learning of Huron's acquisition of SWLLC, the Board retained, at the urging of St. Vincents' in-house General Counsel, Leo Crowley, Esq. ("Crowley") of the Pillsbury Winthrop firm, in mid-May 2005, to investigate and report on whether the Huron acquisition violated St. Vincents' conflict of interest policy or other legal obligations that Messrs. Speltz and Weis owed to St. Vincents. A0907, ¶ 44; A0829, ¶ 6. Notably, Crowley was <u>not</u> engaged to advise the Board concerning the bankruptcy ramifications and issues raised by the SWLLC/Huron transaction; this responsibility, as Smith conceded, was solely McDermott's. A1220, 234:15-18.

As a result of this investigation, Crowley concluded that Speltz and Weis violated the St. Vincents conflict of interest policy, breached their fiduciary duties to St. Vincents, and breached the SWLLC management agreement with St. Vincents. A1403 – A1404, 114:13-115:5. Crowley advised Smith on June 23, 2005 that McDermott should read Huron's recent SEC 8-K filing as it reports that both David Speltz and Tim Weis have personal services contracts with Huron and they both were entitled to additional consideration for their sale of SWLLC to Huron

---

bankruptcy cases in the Southern District of New York, and is posted on the Untied States Trustee's website. A0640, 20:4-14; A0908, ¶ 63.

by means of an earn-out provision. A1801 – A1802; A1820 – A1822.  Crowley suggested that at a minimum these would be disclosure items for any retention applications concerning SWLLC and Huron. Id.  The substance of the Smith-Crowley call was memorialized in Smith's personal notes and in an email to his partner David Cleary, dated June 23, 2005, in which Smith commented "… it certainly smells like David [Speltz] and Tim [Weis] have a personal financial interest in pumping up the Huron revenues." Id.   Thereafter, in an email from Cleary to Smith dated June 27, 2005, Cleary stated that he reviewed the Huron 8-K and recognized that the "earn-out provision raises a sharing of compensation/additional payment issues we have to address." A1841.

Despite these concerns, raised both internally and externally, McDermott's motion to approve the SWLLC management agreement (the "SWLLC Retention Motion"), filed on the same day as St. Vincents' bankruptcy petition (July 5, 2005), and its subsequent motion seeking approval of Huron as St. Vincents' financial advisors did not disclose the details of Huron's acquisition of SWLLC, the Speltz and Weis employment agreements with Huron, or the earn-out provisions. A0226 – A0300; A0807, ¶ 50-51.  Indeed, Smith testified that the SWLLC Retention Motion was "pretty careless, pretty incomplete and inappropriate."  A1170, 180:4-6.   The SWLLC Retention Motion was promptly withdrawn by McDermott, and McDermott then began an ultimately ineffective campaign to garner the support of the United States Trustee and the Committee and win Bankruptcy Court approval of the dual retention of SWLLC and Huron.

The United States Trustee, Deirdre Martini ("Martini"), did not learn about the Huron acquisition until after the Petition Date, even though McDermott had been in communication with her prior to the filing of the Petition. A0909, ¶ 66.  Upon learning of the acquisition, Martini expressed concern about the conflicts created by Huron's acquisition of SWLLC and objected to

the Debtors' attempt to retain both SWLLC and Huron. A0909, ¶ 67.  Specifically, the United

States Trustee testified that she advised McDermott that the retention of both SWLLC and Huron

violated the J. Alix Protocol. A0646, 43:23-44:9.

The General Counsel for St. Vincents, Elizabeth St. Clair ("St. Clair"), testified that

McDermott did not advise the Board of the conflicts created by the acquisition or the concerns

raised by the United States Trustee until late August 2005. A0698 – A0699, ¶ 12.  These

sentiments were echoed by the Board.  Boyle testified at trial that neither he nor the Board were

aware of the substantial issues related to the retention until mid-August 2005. A0830, ¶ 11.

Boyle's testimony that he was not advised of the gravity of the Huron and SWLLC retention

issues or the United States Trustee's position relating thereto was confirmed in the United States

Trustee's testimony.  According to Martini, "Dick Boyle had no idea about … the level of my

concern in the case." A0655, 78:10-11.  Martini further testified, without objection, that as a

result of conversations that she had with St. Clair, Boyle, Sister Jane Iannucelli (another Board

member) and Mark Ackermann (an employee of St. Vincents), she concluded that McDermott

had not adequately advised or informed the Debtors of the various positions taken by the United

States Trustee's office regarding the SWLLC and Huron retention issues.  A0655, 81:7-15.

Even as it failed to provide St. Vincents' Board and General Counsel the information

they needed to assess and respond to the crisis involving the SWLLC and Huron retention

applications, McDermott aggravated the situation by waging a doomed campaign to protect the

jobs of Speltz and Weis.  McDermott admitted that, by no later than the second week of August,

it was well aware that Boyle had lost confidence in Messrs. Speltz and Weis and recognized the

need to transition to new management. A1205, 218: 12-18.  Yet when counsel for the Committee

subsequently proposed that St. Vincents replace Speltz and Weis with a Chief Restructuring

Officer ("CRO"), but be permitted to continue to employ SWLLC employees for at least another two months (and longer if the new CRO so chose), Smith unilaterally rejected the Committee's proposal without consulting his client. A1861. Significantly, Smith relayed the Committee's proposal and boasted of his decision to reject it in an e-mail sent to Speltz and Weis (whose jobs he had just defended), but <u>not</u> to Boyle or St. Clair. <u>Id</u>.

Likewise, when the United States Trustee presented Smith with a formal, written proposal to replace Messrs. Speltz and Weis with a CRO (A0512 – A0518), Smith promptly responded with an angry letter to the United States Trustee and counsel for the Committee, informing them that he believed the United States Trustee and Committee should "back off." A1826 –A1830.

**B.    McDermott's Actions Resulted in a "Poisoned Well" Atmosphere That Caused Harm to the Debtors' Estates**

McDermott's failure to make prompt disclosure of the Huron-SWLLC transaction, mishandling of the SWLLC and Huron retention motions and subsequent discussions (or lack thereof) with the United States Trustee and Committee resulted in a breakdown of the relationship between St. Vincents, on the one hand, and the United States Trustee and Committee, as well as the Bankruptcy Judge, on the other hand. <u>See</u> A0698 – A0699, ¶¶ 13-14; <u>see also</u> A0642 – A0643, 29:22-30:2; A0649, 57:12-16; A0654, 75:12-16; A0666, 123:4-124:2.[11]

In fact, from the beginning of the bankruptcy case, there was a lack of transparency in McDermott's dealings with the United States Trustee. Martini testified that her office did not receive full, complete and accurate disclosure from McDermott. A0653, 70:5-8. Martini testified that, by the end of McDermott's tenure, she had lost confidence in St. Vincents'

---

[11] For example, McDermott did not even meet with the United States Trustee until July 21, 2005, over two weeks after the commencement of the bankruptcy case. A1182, 193:21-22.

professionals, including McDermott, and that McDermott was not able to effectively address the issues facing St. Vincents in the bankruptcy case. As Martini testified, "they [McDermott] didn't squelch the crisis. They didn't contain it. They didn't deal with it and they didn't fix it. And that's what restructuring professionals do." A0666, 123:22-124:2.

The deterioration of the relationship between St. Vincents and the Committee, brought about by McDermott's antagonistic strategy towards the Committee, is best epitomized by the "Radio Silence Instruction." On August 11, 2005, the Committee informed Smith that it intended to object to the St. Vincents' application to retain SWLLC. A0931, ¶ 261. On that same day, Bill Smith unilaterally sent an email to St. Vincents' management directing it to cease all communications and information transmittal to the Committee, cancel all meetings with the Committee's representatives, and "maintain radio silence." A0600L; A0931, ¶ 262. Smith did not discuss with the Board or St. Clair his plan to cease communication with the Committee prior to issuing his directive. A0931, ¶ 263.

Acting on the Radio Silence Instruction, the Debtors' management thereafter ceased providing any information about the Debtors' business and operations to the Committee and its professionals. Id. at ¶ 264. The Committee objected to McDermott's course of conduct, and the Radio Silence Instruction severely strained the Debtors' relationship with the Committee. A1859 – A1866; A0931, ¶ 265.

After giving the Radio Silence Instruction, Smith instructed McDermott attorneys to undertake an investigation of a rumor that the Committee had begun to interview candidates to replace the Debtors' senior management. This investigation lasted four business days. Id. at ¶ 266. McDermott finally determined that there was no credible evidence of any wrongdoing, upon which, the investigation ceased. Id. at ¶ 269. It was only after McDermott had concluded the

fruitless investigation that Smith instructed Debtors' management to reopen communications with the Committee. Id. at ¶ 270.

With the break-down in the relationship among St. Vincents, the United States Trustee and the Committee, McDermott was unable to secure approval of the retention of Huron and SWLLC or reach a compromise satisfactory to its client, prior to McDermott's termination. A resolution supported by St. Vincents, the Committee and the United States Trustee was achieved shortly after replacement counsel, Weil Gotshal & Manges LLP ("Weil"), was engaged on or about September 8, 2005. Id. at 124:7-124:9.

## II. MCDERMOTT'S FAILED EFFORTS TO CLOSE ST. MARY'S HOSPITAL

On June 1, 2005, prior to the Petition Date, the Board resolved to close St. Mary's Hospital. A0913, ¶ 105. St. Mary's was losing in excess of $78,000 per month, and thus its continued operation was creating a material adverse impact on St. Vincents as a whole. A1506, ¶ 47. Smith was present during the Board meeting wherein the Board clearly instructed management and counsel, including McDermott, to take the necessary and appropriate action for the closure of St. Mary's Hospital. Id. at ¶ 106-107. Thus, there is no doubt that McDermott knew, even prior to the Petition Date that the Debtors wanted to close St. Mary's as soon as possible. Id. at ¶ 108.

There is no dispute that primary responsibility for obtaining Bankruptcy Court approval of the closure of St. Mary's Hospital lay with McDermott, while the Debtors' internal management was primarily responsible for the steps required to obtain canonical and regulatory approval of the closure. Id. at ¶ 110. In late June 2005, within a month of the Board meeting resolving to close St. Mary's Hospital, the Debtors had already obtained canonical authority to close the Hospital. Id. at ¶ 111. The Debtors also made the application to the Department of Health ("DoH") to close St. Mary's Hospital in June 2005. Id. at ¶ 113. On June 17, the Executive

13

Committee met, with Smith in attendance, and set September 1, 2005, as the target date for the closure of St. Mary's Hospital.  A0914, ¶ 116.

McDermott caused a series of motions to be filed on behalf of the Debtors on the Petition Date (the "First Day Motions").  Id. at ¶ 119.  However, despite the Board's clearly communicated intent to close St. Mary's Hospital, McDermott did not file a motion seeking permission to close St. Mary's Hospital with the First Day Motions, Id. at ¶ 120, nor within the first six weeks of the case.  McDermott acknowledged that by July 22, it was understood from St. Clair that DoH approval was "imminent." A1070, 71:16-18.  Yet, between the Petition Date and July 22, 2005, McDermott took no steps to seek Bankruptcy Court approval to close St. Mary's Hospital and staunch the significant cash losses.  A0915, ¶ 123.

On July 22, 2005, Harriett McCloud, a former patient of St. Mary's Hospital, obtained an ex parte temporary restraining order in the Supreme Court for the State of New York, Kings County, restraining the DoH from approving a closure plan for St. Mary's Hospital (the "State Court Litigation").  A0915, ¶ 124.  In response, McDermott filed a complaint with the Bankruptcy Court on July 29, 2005, seeking a preliminary and permanent injunction to enjoin McCloud from prosecuting the State Court Litigation.  Id., ¶ 125.

On August 4 and August 5, Stephen Selbst ("Selbst") appeared on behalf of the Debtors at hearings in the Bankruptcy Court on the Debtors' application for a preliminary and permanent injunction.  A0915, ¶ 126.  The Bankruptcy Court expressed concern at the August 4 and August 5 hearings regarding the lack of information provided to members of the community concerning the anticipated closing of St. Mary's Hospital. A1060, 59:25-60:3.  In addition, the Bankruptcy Court criticized McDermott for failing to disclose adequate information about the financial condition of St. Mary's Hospital. Id. at 60:4-6.  In his testimony, Selbst acknowledged

that the Bankruptcy Court was "sharply critical" of his performance on August 4. A1066, 66:14-23.[12]

At the August 5, 2005 hearing, the Bankruptcy Court once again expressed concern that adequate disclosure had not been made as to the financial condition of St. Mary's Hospital. A1067, 67:13-22. In response to the concerns expressed by the Bankruptcy Court at the August 5, 2005 hearing, Selbst acknowledged that, "I am ashamed that I have dishonored myself and my client in this way." A0598, 22:18-20.

Even though St. Mary's Hospital was squarely on the Bankruptcy Court's radar screen at the hearings in early August, McDermott still had not filed any motion seeking the Court's approval of the hospital's closure. McDermott conceded that the State Court Litigation was the precipitating event that caused it finally to focus on a motion to close St. Mary's Hospital. A1069, 69:25-70:12. McDermott also admitted that it could have filed a motion seeking permission to close St. Mary's Hospital on August 5, 2005, had the closure motion been drafted in advance. A1077, 78:22-25. However, drafting only began on August 3, 2005, and the motion was not filed for another two weeks after that, on August 18, 2005 (the "Motion to Close"), A1076, 77:15-16; A0915, ¶ 129. Had McDermott not been "spurred" to action by the State Court Litigation (id.), one can only speculate as to when it would have begun work on the Motion to Close.

The Motion to Close was not supported by one single affidavit or declaration. A1486-A1627; McDermott Brief at p. 45. In fact, the Honorable Prudence C. Beatty[13] left a voicemail for Selbst on September 3rd (after the Motion to Close was filed), stating that she was not satisfied with the

---

[12] In fact, as a result of the Bankruptcy Court's criticism, both Selbst and St. Clair expressed to Smith their hesitation at having Selbst appearing before the Bankruptcy Court at the continuation of the hearing the following day, August 5, 2005. A0915, ¶ 127; A1066, 66:21-25. Despite these concerns, Smith instructed Selbst to appear on behalf Debtors, both at the August 5, 2005 continued hearing and at a subsequent hearing on St. Mary's Hospital on September 7, 2005. Id.

[13] This case was transferred to Judge Hardin after Judge Beatty went on medical leave in January 2006.

15

financial information that McDermott had provided and requesting additional information. A1851; A1081, 82:22-84:7.    Despite this request, McDermott did not submit additional information in support of the Motion to Close and offered no testimony from any witnesses (nor did McDermott even prepare witnesses to testify) at the hearing on the Motion to Close held thereafter on September 7th. A0916, ¶ 140.    Indeed, Selbst admitted that he does not know whether McDermott ever provided Judge Beatty with the information she requested. A1082, 84:5-7; 264:7-18.

On August 31, 2005, the DoH approved the closure of St. Mary's Hospital, and the only obstacle to closing the hospital was obtaining Bankruptcy Court approval. A0916, ¶ 131. The Bankruptcy Court held a hearing on the Motion to Close on September 7, 2005. Id. at ¶ 138. Selbst represented the Debtors at the hearing. Id. at ¶ 139.    There was no testimony from any witnesses offered by McDermott. Id. at ¶ 140.    At the September 7, 2005 hearing, the Bankruptcy Court stated:

- "I do not appreciate in any way the level of secretiveness that has been going on here." A0614, 43:15-17.

- "...I consider, as I say, the closure of St. Mary's to have been handled as about as poorly as you can handle such a thing in terms of dealing with the personal issues, you know, how people feel about it..." A0622, 69:11-16.

- "...I really think what's happened since I've been here with St. Mary's since I've been on the case, has not been what I think should have been done." A0617, 49:22-25.

In response to the concerns expressed by the Bankruptcy Court at the September 7, 2005 hearing, Selbst stated:

- "...we have heard a lot of criticism about secrecy and openness. We seriously regret that there was a perception that we have not acted with fairness and transparency." A0632, 120:23 – 121:3.

16

- "We have made mistakes and we are trying to sincerely learn from them..." Id., 121:5-6.

The Bankruptcy Court did not grant the Motion to Close St. Mary's Hospital on September 7, 2005, and the hearing was adjourned. A0917, ¶ 142. Concerning McDermott's handling of the closure of St. Mary's Hospital, Martini testified that she was "just trying to understand … why is it taking so long, why hasn't this been addressed earlier." A0656, 82:5-13.

On September 13, 2005, McDermott was replaced by Weil. Within ten days of its retention as substitute counsel, Weil filed a comprehensive set of declarations in support of the Debtors' motion to close St. Mary's Hospital, appeared at a second hearing before the Bankruptcy Court on September 20, 2005, and obtained entry of that order, twenty days after the DoH had authorized its closure. A0917, ¶ 147.

### III.  ST. VINCENTS HAD NO CHOICE BUT TO TERMINATE MCDERMOTT

On September 13, 2005, merely ten weeks into the Debtors' chapter 11 case, St. Vincents fired McDermott as bankruptcy counsel and replaced it with Weil. A0903, ¶ 11. Richard Boyle, then Chairman of the Board and Interim CEO, explained the decision as follows:

> It became readily apparent to me that the restructuring of St. Vincents was in a quagmire, and that the bankruptcy process could not go forward with MWE continuing as counsel to St. Vincents, given the frayed relationships between McDermott, on the one hand, and the U.S. Trustee and Committee, on the other. I believed that an immediate change was necessary. I could not replace the Judge, I could not replace the U.S. Trustee, and I could not replace the Committee or its counsel. Because progress was not being made in terms of turning St. Vincents around, and because the Board had lost confidence in MWE's ability to guide St. Vincents through the bankruptcy process, we needed to replace MWE as counsel to the Debtors.

A0830-31. Indeed, Smith acknowledged in his testimony that if McDermott had not been terminated as counsel, the firm would have resigned because the firm's effectiveness was at an

17

end.  In re Saint Vincents Catholic Medical Centers of New York, No. 05 B 14945 (ASH), 2007

WL 2492787, at *12 (Bankr. S.D.N.Y., Aug. 29, 2007) (the "Decision").

## IV.  THE FEE APPLICATION DISPUTE

On January 31, 2006, McDermott filed an application (the "Application") for

compensation and for reimbursement of expenses for the period from July 5, 2005 through

September 30, 2005.  The Creditors' Committee objected to the Application on March 3, 2006,

the United States Trustee objected to the Application on March 7, 2006 and the Debtors

objected to the Application on July 31, 2006.

The matter was heard on October 23 - October 25, 2005, before the Honorable Adlai S.

Hardin in the Bankruptcy Court for the Southern District of New York.  After hearing the

testimony of six witnesses over two and one-half days of trial, reviewing the affidavit and

deposition testimony of another six witnesses,[14] and reviewing a comprehensive joint pre-trial

statement (containing 278 stipulated facts), the Bankruptcy Court concluded the hearing by

noting, inter alia, that "I have problems with McDermott Will & Emery's stewardship with

regard to these two issues, this Speltz and Weis consulting and Huron [C]onsulting retention

and the closing of St. Mary's [H]ospital." A2057, 41:11-14.  The Bankruptcy Court offered

McDermott the opportunity to make a post-trial submission to point out any evidence in the

record "that would explain and justify and exonerate" the actions that McDermott took during

its tenure as counsel to the Debtors.   A2059 at 13-14.   McDermott filed its post-trial

submission on November 10, 2006; the Debtors, the Committee and United States Trustee filed

their joint reply to McDermott's submission on November 22, 2006.

---

[14] Stephen Selbst, James Sullivan, William Smith, Elizabeth St. Clair, Richard Boyle and Leo Crowley testified at trial.  David Cleary, Thomas Allison, David Speltz, Timothy Weis, Michael Solow, Sr. Jane Iannucelli and Deirdre Martini's testimony was offered through deposition and affidavit.

The Bankruptcy Court rendered the Decision on August 29, 2007 and a final Order was issued on September 21, 2007.

## ARGUMENT

### I. THE BANKRUPTCY COURT DID NOT ERR IN DENYING MCDERMOTT'S FEES ON MATTERS PERTAINING TO THE FAILED CAMPAIGN TO SECURE APPROVAL OF THE RETENTION OF SWLLC AND HURON

#### A. MCDERMOTT IS NOT ENTITLED TO $98,382 IN FEES BECAUSE ITS SERVICES IN CONNECTION WITH THE RETENTION OF SWLLC AND HURON DID NOT BENEFIT ST. VINCENTS

##### 1. The Bankruptcy Court Based Its Decision To Deny McDermott Fees on Several Key Findings of Fact That Are Amply Supported By the Record.

The Bankruptcy Court concluded that "the McDermott services relating to retention of professionals, at the time at which those services were rendered, were not only not beneficial to the debtors' estates and not reasonably likely to benefit the debtors' estates – they were affirmatively detrimental to the debtors' estates." Decision, 2007 WL 2492787, at *23 (emphasis added). Accordingly, the Bankruptcy Court determined that McDermott should receive no compensation for these services. Id.

The Bankruptcy Court's decision to deny the portion of McDermott's fees reflecting its work on the dual retention is based on more than just "one key finding" as McDermott contends. As set forth below, the Bankruptcy Court made multiple key factual findings with respect to this issue, all of which are supported by the record. For example, the Bankruptcy Court found:

- "McDermott attorneys responsible for the SVCMC bankruptcy case had studied the Acquisition Agreement and the Speltz and Weis employment contracts with Huron and were therefore aware of the multiple conflicts and breaches of fiduciary duty on the part of Speltz and Weis." Decision, 2007 WL 2492787 at *6.

- "McDermott never made full and candid disclosure respecting the Huron acquisition of SW and the consequent conflicts and breaches of fiduciary duty by Speltz and Weis." Id.

- "As counsel to SVCMC and ultimately its Board of Directors (not Speltz and Weis), Smith should have disclosed his knowledge of the Huron Group/SW negotiations to Boyle, as Chairman of the Board, and advised Boyle of the potential issues which he advised the conflicted Messrs. Speltz and Weis, namely, 'disinterestedness, the Jay Alix Protocol and conflicts.' Smith's reason for not disclosing his knowledge to the Board – that Speltz told him he had already informed Boyle (denied by Speltz and concededly not true) – is no reason at all." Id. at *13.

These factual findings are all supported by the record. It was undisputed that McDermott (1) knew of the anticipated transaction between SWLLC and Huron as early as February 2005 (A0904-A0905, ¶¶ 25-26, 28); (2) never disclosed to the Debtors the existence of the negotiations between SWLLC and Huron until after the execution of the Acquisition Agreement (A0906, ¶¶ 36, 42), and (3) reviewed the Acquisition Agreement and employment contracts in advance of filing the retention applications on the Petition Date (A0010, ¶ 69). It was further undisputed that the initial application to retain SWLLC did not adequately disclose to the Bankruptcy Court the complicated set of conflicts posed by the SWLLC-Huron transaction and the proposed bankruptcy retention of both entities. Indeed, Smith himself admitted the filing was "pretty careless, pretty incomplete, and inappropriate." A1170, 180:4-6; A0908, ¶¶ 56, 61. There is also ample evidence that McDermott did not adequately apprise the Debtors of the impact of the conflict presented by the dual retention. A0830, ¶ 11; A0698, ¶ 12.

The record evidence also supported the conclusion that McDermott's services in connection with the SWLLC/Huron retention applications caused affirmative harm to the Debtors' estates. The testimony of the United States Trustee, summarized above at 11, and the evidence of the Radio Silence Instruction clearly demonstrated that McDermott's handling of these issues engendered a "poisoned well" atmosphere that infected the early bankruptcy period, undermining St. Vincents' ability to make progress in its reorganization efforts.

The evidence adduced at the trial of this matter thus amply supported the Bankruptcy Court's denial of the $98,382 in fees incurred by McDermott in connection with the retention applications.

### 2. McDermott Provided Its Client Inadequate Information and Advice on the Dual Retention Issue.

McDermott argues that the decision to move forward with the dual retention of both SWLLC and Huron was "reasonable at the time, given that these individuals [SWLLC and Huron employees] were performing crucial work for the Debtors." McDermott Brief at 36. The reasonableness of McDermott's advice, however, must take account of the entirety of its own conduct and advice, which left St. Vincents on the Petition Date in the untenable position of pursuing a risky dual retention strategy or losing the services of a number of key employees at a very critical point in time. Had McDermott heeded its fiduciary obligation to disclose to St. Vincents that a combination of SWLLC and Huron was under discussion in February (when McDermott first learned of the negotiations) or even April 2005 (when McDermott learned that a deal was imminent) and advised St. Vincents that a combination could make it very difficult to continue to retain the services of key employees from SWLLC and Huron in bankruptcy, the Debtors could have considered all options well in advance of the Petition Date, which could well have obviated the need to pursue the doomed dual retention strategy.[15] As aptly stated by the Bankruptcy Court "[p]recisely because Speltz and Weis were conflicted in pursuing the dual Huron/SW retentions for public relations purposes, McDermott had no alternative but to take the matter to the St. Vincents Board at the earliest stage possible, preferably even before the July 5, 2005 filing date, to preclude the ultimately disastrous confrontation with the Creditors'

---

[15] For example, had McDermott disclosed the SWLLC/Huron negotiations to the St. Vincents' Board in March or April 2007, St. Vincents would have had two months in which to consider hiring the SWLLC employees directly (rather than through SWLLC) or retaining another professional services vendor to provide such personnel.

Committee and the U.S. Trustee's office. That was not done." Decision, 2007 WL 2492787, at *20. McDermott cannot engage in revisionist history by trying to isolate the decision to pursue the dual retention strategy from the conduct and advice that provides the immediate context for that decision.

In a brazen attempt to shift blame to the Debtors for its own failure to adequately handle the dual retention, McDermott claims that the Bankruptcy Court erred in denying McDermott's fees because "the Debtors themselves believed that pursuing the retention of S&W and Huron, despite the risks, was beneficial." McDermott Brief at p. 29. The record evidence, however, does not support McDermott's claim that its client had been adequately apprised of the "risks," nor does its client's approval of the overall strategy of pursuing the dual retention applications justify McDermott's failure to execute that strategy in a competent manner, which could only have been done with full disclosure to the Debtors.

The record evidence considered by the Bankruptcy Court made clear that the Board and St. Clair, who were not bankruptcy experts, were wholly relying on McDermott as bankruptcy counsel with respect to the retention issues. A1334, 39:23-40:3 (St. Clair relied exclusively on the advice that McDermott was providing.); id. at 54:3-6 (St. Clair also relied on McDermott to do whatever needed to be done as bankruptcy and restructuring counsel to properly file the chapter 11 case on July 5.). It is therefore irrelevant that members of St. Vincents' Board and management reviewed the Crowley Report or participated in certain discussions regarding SWLLC and Huron (as McDermott claims) because McDermott failed to make clear the seriousness of the issues and the United States Trustee's objections until very late in the process. A1342, 48:23-25; A1343, 48:24-49:4 (St. Clair testified that neither Smith nor anyone else from McDermott at any time told her that the United States Trustee's concerns were extremely serious

or that the United States Trustee's concerns could lead to a crisis in management.); A0830, ¶ 11 (Boyle testified that McDermott never adequately explained to him the nature or severity of the United States Trustee's concerns.)  Given McDermott's failure to adequately apprise the Debtors of the risks associated with pursuing the dual retention, the Debtors were clearly not in a position to make an informed decision and/or consider alternative approaches.[16]

In any event, the fact that St. Vincents' Board and management might have approved of a dual retention strategy does not relieve McDermott of its obligation to candidly advise the Debtors of the issues and risks that arise in a bankruptcy case by pursuing such a strategy.  Not surprisingly, there was no evidence adduced at trial to suggest that the Board or management approved of McDermott's decision to withhold from the Bankruptcy Court or the United States Trustee information about the SWLLC-Huron transaction and the conflicts of interest it presented. The critical errors made by McDermott thus cannot be foisted off on the client that was relying on it for effective representation.

### 3. The United States Trustee Did Not Support the Dual Retention.

McDermott attempts to justify its failure to properly handle the dual retention of SWLLC and Huron by claiming that independent corporate counsel to the Debtors, Leo Crowley, and the United States Trustee supported the retention of SWLLC and Huron.  As for Mr. Crowley, his position on the dual retention is irrelevant because (as McDermott itself acknowledged), it was McDermott, not Crowley or the United States Trustee, that served as bankruptcy counsel to the

---

[16] The fact that the Debtors might have been willing to waive the conflicts associated with the dual retention was completely irrelevant, because it was clear that no waiver could be expected from the Creditors' Committee or the United States Trustee's Office, or approved by the Bankruptcy Court. see, e.g., A0646, 44:10-11; A0647, 46:20-47:9; A0911, ¶ 89.  Nor does the Debtors' willingness to proceed in this fashion obviate the need for full disclosure in filings with the Bankruptcy Court.

Debtors, and it was thus McDermott's responsibility to provide competent advice and services on bankruptcy issues. A1220, 234:15-18.

As for the United States Trustee, the record evidence flatly contradicts McDermott's contention that the United States Trustee supported the dual retention "for a significant period of time." McDermott Brief at 31. While McDermott attempts to paint the picture that the United States Trustee's support for the bankruptcy retention of SWLLC did not waver until mid-August 2005 (see McDermott Brief at 32), the United States Trustee in fact testified that she was always deeply troubled by the prospect of SWLLC's retention (see, e.g., A0646, 44:10-11 ("Under no circumstances did I ever tell [Smith] that I was comfortable with this.")). In fact, Martini testified "I told him [Bill Smith] repeatedly that he could file whatever he wanted with the Court, as many times as he wanted, but that there was a consistent objection, standing objection, to the retention of Speltz & Weis and Huron." A0646, 44:13-17. While McDermott touts the United States Trustee's statement that Smith was "compliant" (McDermott Brief at p. 13), it completely ignores her conclusion that Smith made many promises that he never delivered on. A0662, 107:2-25; A0670, 141:7-21. Most tellingly, Martini testified that Smith never delivered a proposal for the retention of SWLLC that was acceptable to the United States Trustee or the Committee. A0660, 100:7-14.

### 4. The Bankruptcy Court Properly Considered All Material Evidence in the Record and Did Not Evaluate McDermott's Services Using "20-20 Hindsight."

McDermott baselessly argues that the Bankruptcy Court erred by failing to consider "all facts relevant to the S&W/Huron retention efforts." McDermott Brief at 33. The only fact that McDermott claims was overlooked is that SWLLC's retention was eventually secured by successor counsel. However, it does not follow, as McDermott suggests, that because the Debtors' new counsel succeeded in securing approval of the dual retention, McDermott's efforts

and services rendered in connection with the dual retention were beneficial to St. Vincents.  In fact, the record evidence amply supports the conclusion that successor counsel succeeded where McDermott failed because it took a decidedly more open and collaborative approach with respect to the Court and the interested constituents. A1856, 100:11-19 (During the September 7 hearing on the Motion to Close St. Mary's Hospital, Judge Beatty stated "I don't really want to argue with you about that, but the fact is I have new attorneys in. They [Weil] handle things differently than the others attorneys [McDermott] did…"); A0652, 67:21-68:3 (The United States Trustee described her reaction to the eventual news that St. Vincents had fired McDermott as one of "relief."); A0652, 67:21-68:9 (The United States Trustee testified that the firing of McDermott as counsel to St. Vincents was "a good thing" and a "positive development."); A1351 – A1352, 58:3-24 (St. Clair testified that after Weil replaced McDermott as counsel the Debtor's relationship with the Creditors' Committee, the United States Trustee and Judge Beatty improved; "things very rapidly got much, much better.").

As the fact-finder, the Bankruptcy Court was entitled to assess and weigh the many pieces of evidence adduced at trial.  As the Supreme Court has held, "[w]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 574 (1985).  Furthermore, "a reviewing court must defer to that choice so long as the deductions are not 'illogical or implausible.'" Siewe v. Gonzales, 480 F.3d 160, 168 (2d Cir. 2007), quoting Anderson 470 U.S. at 577; Healey v. Chelsea Res., Ltd., 947 F.2d 611, 618 (2d Cir. 1991) ("[W]here the evidence would support either of competing inferences, the fact that this Court might have drawn one inference does not entitle it to overturn the trial court's choice of the other.").  McDermott cannot seek reversal on the basis that the Bankruptcy Court did not adopt the interpretation of the evidence McDermott

prefers, because the conclusions the Bankruptcy Court reached were well-supported by the evidence.  See Joseph v. New York City Bd. of Educ., 171 F.3d 87, 93 (2d Cir. 1999) ("The weight of the evidence is an argument to be made to the factfinder at trial, not a ground for reversal on appeal.").

McDermott also argues that the Bankruptcy Court improperly evaluated McDermott's services using "20-20 hindsight." McDermott Brief at 34.  Nothing in the Bankruptcy Court's Decision suggests that McDermott's conduct was evaluated with "20-20 hindsight."  Instead, it is abundantly clear from the Decision that the Bankruptcy Court analyzed the quality of the services rendered and results achieved by McDermott from a contemporaneous perspective.  The Bankruptcy Court was explicit in holding that, "the McDermott services relating to retention of professionals, at the time at which those services were rendered, were not only not beneficial to the debtors' estates and not reasonably likely to benefit the debtor's estates – they were affirmatively detrimental to the debtors' estates" (emphasis added). Decision, 2007 WL 2492787, at *23.[17]

The single passage from the Decision on which McDermott exclusively relies does not support the conclusion that the Bankruptcy Court conducted its entire analysis without regard to the circumstances that existed at the time the services were rendered.  In that passage, the Bankruptcy Court simply recognized the reality that a court's assessment of facts is necessarily conducted from a retrospective viewpoint and also that legal professionals must be charged with responsibility for reasonably anticipating the results that can be expected from their actions.  See e.g., In re Wonder Corp. of America, 82 B.R. 186, 190-191 (D. Conn. 1988) (while recognizing

---

[17] Likewise, in reducing McDermott's fees related to the closing of St. Mary's Hospital, the Bankruptcy Court again explicitly held that "McDermott's delay in rendering those services was not 'beneficial at the time at which the service was rendered.'"  Id. at *24.  The Bankruptcy Court thus indisputably applied the correct legal standard under § 330(a)(3) of the Bankruptcy Code.

that, in the context of fee awards under section 506(b), the reasonableness of fees is to be determined prospectively, "the determination of reasonable fees is by necessity to some degree done with hindsight because the application for fees is made at the completion of the case"); see also Houlihan Lokey Howard & Zukin Capital v. High River Ltd. P'ship, 369 B.R. 111, 118 (S.D.N.Y. 2007) ("[A] bankruptcy court may consider the fact that a professional's services were unsuccessful when calculating a fee award."); In re Angelika Films 57th, Inc., 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998), aff'd, 246 B.R. 176 (S.D.N.Y. 2000) (same).  Importantly, the Court did not in any way suggest that the Bankruptcy Court's analysis took account of facts that were not available to McDermott at the time it rendered its services because they had not yet occurred.[18] In fact, in the paragraph directly preceding the quoted passage in McDermott's Brief, the Bankruptcy Court correctly recognized that, "[Section 330 of the Bankruptcy Code] requires this Court to make a retrospective review of the services rendered by counsel to determine whether the services were 'necessary … or beneficial at the time at which the service was rendered.'" Decision, 2007 WL 2492787, at *12 (emphasis added).

It is clear from the record evidence that the Bankruptcy Court's critical findings did not require that it use hindsight.  For example, hindsight was not needed to conclude that McDermott breached its duties of candor and care in failing to promptly disclose to its client the pending negotiations between SWLLC and Huron in the Spring of 2005.  Likewise, McDermott had all the facts it needed to make a full disclosure of the Huron/SWLLC transaction in the retention applications presented to the United States Trustee and the Bankruptcy Court and anticipate the thorny conflict issues they presented, yet by its own admission, the SWLLC retention application

---

[18] McDermott cites the following passage from the Decision: "It is an inevitable fact of life that events and conduct are judged after the fact, with the proverbial benefit of 20-20 hindsight…Counsel charge and are paid high compensation in a fair expectation that their foresight and judgment will assess today's facts as the facts would be perceived and judged tomorrow under the searching gaze of 20-20 hindsight."  McDermott Brief at 34.

was "pretty careless, pretty incomplete and inappropriate" (A1170, 180:4-6) when it was filed on the Petition Date.  The sharp letters sent by the United States Trustee (A1812 – A1817; A0501 – A0502) were contemporaneous evidence available to Smith and his colleagues that their dual retention strategy was failing, yet they refused to consider, or even present to their client, compromises that both the United States Trustee and the Committee put on the table.

Lastly, it is clear from the record that McDermott's services provided in connection with the dual retention and the closing of St. Mary's Hospital were not beneficial and therefore were not "necessary" within the meaning of §330(a)(1).  In order for services to be "necessary," and thereby compensable, they must have been beneficial to the bankruptcy estate at the time they were rendered.  In re Ames Dep't Stores, 76 F.3d 66, 71 (2d Cir. 1996), overruled in part on other grounds by, Lamie v. United States, 540 U.S. 526 (2004).  Furthermore, whether the services rendered were successful is a proper factor in determining fee awards.  Houlihan Lokey, 369 B.R. at 118; Angelika Films, 227 B.R. at 42 ("The fact that [a professional's] services are unsuccessful is not a per se reason for denying compensation, although that fact may be taken into consideration in ascertaining the value of [the] services to the estate.").  Moreover, a professional's fees should be denied for services that are futile and where there is no reasonable prospect of success.  In re Lederman Enters., 997 F.2d 1321, 1324 (10th Cir. 1993) (holding that the bankruptcy court did not abuse its discretion in denying debtor's counsel fees in preparing a plan because "the debtor's inability to successfully develop and complete a plan should have been apparent to counsel from commencement of the case"); In re Casco Fashions, Inc., 490 F.2d 1197, 1204 (2d Cir. 1973) (fees will not be awarded "if a court finds that [the] proceeding was filed without any reasonable prospect of success"); In re Office Prods. of Am., Inc., 136 B.R. 983, 990-91 (Bankr. W.D. Tex. 1992) (if it is clear that debtor and its counsel knew or should

have known from the outset that plan could not satisfy requisites of 11 U.S.C. § 1129(a), counsel cannot expect to be compensated for "actual, necessary" services under § 330(a)); In re Muir Training Technologies, Inc., 120 B.R. 154, 162-63 (Bankr. S.D. Cal. 1990) (fees disallowed for time expended after it became clear there was no reasonable prospect of reorganization).

In light of these authorities, the Bankruptcy Court properly considered the following factors, among others, in concluding that McDermott's services in connection with the dual retention applications and closure of St. Mary's Hospital were not necessary, beneficial and/or successful to the Debtors' estates: (1) McDermott's efforts to retain SWLLC and Huron failed Decision (2007 WL 2492787, at *7-8); (2) McDermott's unyielding efforts to push through the dual retention applications and refusal to consider compromise proposals undermined St. Vincents' and McDermott's credibility and relationship with the Creditors' Committee and the United States Trustee's office (id. at *11); (3) the dual retention applications were doomed from the start due to conflicts associated with the J. Alix Protocol (id. at *10); (4) the disclosure in the retention applications were "grossly and concededly inadequate" (id. at *15); (5) McDermott's services in connection with the closure of St. Mary's Hospital "were grossly tardy and the work product was plainly inadequate" (id. at *24); (6) McDermott did not obtain Bankruptcy Court approval for the closure of St. Mary's Hospital during its tenure (id. at *23); and (7) "McDermott's failure to get the job done in accordance with its instructions from the client resulted in a twenty-day delay in closure of [St. Mary's] Hospital." Id.

**B. THE BANKRUPTCY COURT DID NOT ERR IN CONSIDERING PRE-PETITION FACTS REGARDING MCDERMOTT'S FAILURE TO DISCLOSE HURON'S ACQUISITION OF SWLLC TO THE DEBTORS AND THE CONFLICTS OF INTEREST PRESENTED BY SAID ACQUISITION**

McDermott contends that the Bankruptcy Court erred in considering facts that occurred prior to the period covered by McDermott's fee petition (July 5 to September 13, 2005).

29

McDermott Brief at 36.   McDermott attempts to artificially limit the Bankruptcy Court's perspective on its services by urging the Court to view its fee application in a vacuum and to not consider facts occurring outside of that time frame. McDermott Brief at 37-38.  Yet McDermott cites no authority for the proposition that pre-petition facts cannot be considered in the adjudication of a fee application.  The authorities that McDermott does cite stand only for the proposition that, in determining compensation awards, the "necessity" of the services must be reviewed in light of the circumstances at the time they were rendered.  "[W]hether the services were necessary … or beneficial at the time at which the service was rendered," is only <u>one</u> of the relevant factors that a bankruptcy court must consider.  11 U.S.C. § 330(a)(3).  Section 330(a)(3) requires a bankruptcy court to consider "all relevant factors" when determining compensation for professionals, not just necessity/benefit.  Section 330(a)(3), on its face, does not constrain the Bankruptcy Court to consideration of facts from the period when the services at issue were rendered.

Whether facts outside of the fee period may be considered is a question of relevance. A trial court's "determination of relevance will not be disturbed unless it evidences an abuse of discretion."  <u>George v. Celotex Corp.</u>, 914 F.2d 26, 28 (2d Cir. 1990); <u>see also</u> <u>In re Martin-Trigona</u>, 760 F.2d 1334, 1344 (2d Cir. 1985) (evidentiary rulings should not be disturbed but for manifest error).  Furthermore, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; <u>see also</u> <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 587 (1993) ("The Rules' basic standard of relevance thus is a liberal one.").  The pre-petition facts cited by the Bankruptcy Court are clearly "relevant factors" in determining the compensation to be awarded to McDermott.

In order to fully evaluate McDermott's services in connection with the retention of SWLLC and Huron, the Bankruptcy Court had a duty to consider the entirety of McDermott's knowledge and conduct with respect to this issue regardless of whether it acquired such knowledge and/or such conduct occurred before or after the Petition Date.  For example, the unreasonableness of McDermott's application to retain SWLLC, filed on the first day of the relevant period, can only be appreciated in the context of the following pre-Petition facts: (1) McDermott had access to, and reviewed, the terms of the Huron-SWLLC Acquisition Agreement, (2) McDermott was aware of the strictures imposed on the retention of professionals by the J. Alix Protocol, (3) McDermott knew that the benefits Messrs. Speltz and Weis were to derive from the SWLLC-Huron transaction created the impression that they were seeking to profiteer from the St. Vincents bankruptcy, and (4) Smith had instructed his colleagues to make full disclosure of the SWLLC-Huron relationship in the retention motion.  Indeed, Smith himself necessarily took all of these pre-Petition facts into account when he admitted at trial that the retention motion was patently deficient when filed.  A0908, ¶ 61.

Consideration of pre-Petition facts is also required to assess the deficiency of the SWLLC Retention Motion (filed on the Petition Date) in light of the disclosure requirements imposed by Bankruptcy Rule 2014.  Rule 2014 requires professionals to disclose, among other things, "any proposed arrangement for compensation, and to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest …" Id.

The scope of disclosure is much broader than the question of disqualification and the professional must disclose all connections and not merely those that rise to the level of conflicts. In re Granite Partners L.P., 219 B.R. 22 (Bankr. S.D.N.Y. 1998); see also In re Matco Elec. Group, Inc., 383 B.R. 848, 852 (Bankr. N.D.N.Y. 2008) (holding that knowledge of a conflict of

31

interest prepetition that was not disclosed with the affidavit was a breach of the disclosure requirement of 2014.).

McDermott's pre-Petition knowledge and conduct demonstrated that it did not appreciate, or worse, it disregarded, the gravity of the conflicts presented by the dual retention and the lack of full disclosure. Its misjudgment carried into the post-petition period, when McDermott (1) inaccurately assured its clients that it could get around the J. Alix Protocol, (2) bungled the retention papers by failing to adequately disclose the conflict presented by the dual retention, (3) failed to appreciate and address the United States Trustee's concerns, and (4) lost all sight of who its real clients were in a misguided campaign to assure the continued employment of Speltz and Weis. The dual retention applications could probably have been avoided altogether had McDermott promptly disclosed to the Board or St. Clair when it learned of the negotiations between its two vendors. Even without that disclosure, the dual retentions might have been accomplished had the SWLLC Retention Motion, and the subsequent motion to retain Huron, properly incorporated information acquired about the Huron/SWLLC relationship and legal analysis performed in the pre-Petition period. McDermott's pre-Petition knowledge thus bore directly on the Bankruptcy Court's assessment of post-Petition services that brought the Debtors no benefit and that would have been unnecessary had McDermott acted appropriately in light of the information it had.[19]

---

[19] Ironically, McDermott itself relies on events occurring prior to the Petition Date in support of its position that the Debtors "waived" the conflicts associated with the Huron acquisition of SWLLC. McDermott Brief at 37. McDermott cannot have it both ways – it cannot claim that reversal is required because the Bankruptcy Court improperly considered facts outside the relevant period and simultaneously insist that reversal is appropriate because the Court failed to take account of certain other facts outside the relevant period.

**C. THE BANKRUPTCY COURT DID NOT ERR IN DISALLOWING $74,180 IN FEES TO McDERMOTT AS A RESULT OF THE POST-SWLLC CHANGE IN MANAGEMENT AND APPOINTMENT OF A CRO**

The Bankruptcy Court's decision to deny McDermott's fees in connection with the change in management and the retention of a chief restructuring officer is entitled to significant deference. In re Angelika Films 57th, Inc., 246 B.R. 176, 178 (S.D.N.Y. 2000). As discussed above, a bankruptcy court must consider all relevant factors in determining the "nature, the extent, and the value" of services rendered by professionals seeking compensation from the bankruptcy estate under Section 330 of the Bankruptcy Code. "The bankruptcy judge is on the front line, in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails." Id. (quoting In re Martin, 817 F.2d 175, 182 (1st Cir. 1987)). In this case, the Bankruptcy Court clearly did not abuse its discretion in denying McDermott's fees because the services provided were not "necessary" under Section 330(a) of the Bankruptcy Code.

Here, the Bankruptcy Court observed that "[t]hese matters [the change in management and CRO retention] are inextricably related to the disastrous SW and Huron retention proceedings and events described at length in this Decision." Decision, 2007 WL 2492787, at *23. This conclusion was amply supported by the record. As a direct result of McDermott's mishandling of the dual retention motions and subsequent negotiations with the United States Trustee and the Committee, the Debtors were required to include the United States Trustee and the Committee as integral participants in the search for and selection of interim CRO and CFO. Although debtors commonly consult with the United States Trustee and creditors when selecting post-petition management, in this case counsel for the Committee, Committee members and representatives of the United States Trustee had no choice but to insist upon a much higher level of involvement, working side-by-side with the Debtors' Board to negotiate the CRO proposal

and then identify candidates, interview them and select the individuals to serve as CRO and CFO. Had McDermott not mishandled the retention motions and negotiations, the process to select these officers would have been significantly less cumbersome and less expensive. A0652, 67:21 – 69:2; A0656, 85:12-23. The Bankruptcy Court therefore did not abuse its discretion in deducting this amount from the award of compensation.[20]

### D. THE BANKRUPTCY COURT DID NOT ERR IN DISALLOWING $44,523 IN FEES TO MCDERMOTT DUE TO THE HARM CAUSED BY MCDERMOTT'S RADIO SILENCE INSTRUCTION

McDermott attempts to avoid any culpability associated with the Radio Silence Instruction by arguing that it was merely following the Debtors' instruction to conduct an investigation into the Creditors' Committee's alleged solicitations of its managerial employees. McDermott Brief at 40. The investigation, however, is little more than a red herring. Instead, it was McDermott's unilateral instruction to the Debtors' management directing it to cease all communications and information transmittal to the Committee, cancel all meetings with the Committee's representatives, and "maintain radio silence" that resulted in the harm to St. Vincents. A0931, ¶ 262. As noted by the Bankruptcy Court, "[t]he 'radio silence' incident reflects fundamental misconceptions concerning the stewardship of a Chapter 11 case as debtors' counsel ... [I]f the Committee had, in fact, begun to interview candidates to replace Speltz and Weis, there was nothing improper in the Committee doing so. McDermott's imposition of 'radio silence' on the debtors' management while the firm undertook an investigation of whether the Committee had begun to interview candidates was emblematic of McDermott's adversarial and counterproductive representation of the debtors." Decision, 2007 WL 2492787, at *17. The

---

[20] McDermott does not argue, nor could it that the Bankruptcy Court did not have the legal authority to deduct from the award of compensation an amount representing expenses that St. Vincents incurred as a direct result of the McDermott services. In re Cenargo International, Plc., 294 B.R. 571, 604-6 (Bankr. S.D.N.Y. 2003) (reducing debtor's counsel's fee award to account for its flawed decision to file for bankruptcy protection only in the United

Bankruptcy Court's finding is supported by the record evidence.  See, e.g., A1859 – A1866 (the Radio Silence Instruction disrupted the Debtors' relationship with the Committee at a critical time in the bankruptcy); A0931, ¶ 263 (McDermott failed to even discuss with the Board or the Debtors' Chief Legal Officer its plan to direct St. Vincents to cease communication with the Committee prior to issuing the directive).

McDermott argues that the Bankruptcy Court erred in disallowing fees on the Radio Silence Instruction because the Bankruptcy Court "issued no factual findings regarding this episode other than to say, in conclusory fashion, that 'there was nothing improper' in the Committee's solicitation." McDermott Brief at 40.  McDermott is wrong.  The Bankruptcy Court actually made several factual findings with respect to this issue:

- "On August 11, 2005 the Creditors' Committee informed Smith that it intended to object to the debtors' motion to retain SW." Decision, 2007 WL 2492787, at *16.

- "The same day Smith sent an email to the debtors' management directing that it cease all communications and information transmittal to the Creditors' Committee, cancel all meetings with the Committee's representatives and 'maintain radio silence.'" Id.

- "Acting on the McDermott 'radio silence' instruction, the debtors' management thereafter ceased to provide any information about the debtors' business and operations to the Committee and its professionals." Id.

- "At the same time Smith instructed McDermott attorneys to undertake an investigation of a rumor that the Creditors' Committee had begun to interview candidates to replace the debtors' senior management." Id.

- "The investigation lasted four days, after which McDermott determined that there was insufficient credible evidence of any 'wrongdoing.' Only then did Smith instruct the debtors' management to reopen communications with the Creditors' Committee." Id.

---

States and failure to make preparations for a rapid protective filing in England).

These factual findings support the Bankruptcy Court's decision to deny McDermott's fees associated with the Radio Silence Instruction, and they are indisputably supported by the record as McDermott stipulated to the underlying facts in the parties' Joint Pretrial Statement. See A0931, ¶¶ 261-70.

## II. THE BANKRUPTCY COURT DID NOT ERR IN DENYING CERTAIN FEES ON MATTERS PERTAINING TO THE CLOSURE OF ST. MARY'S HOSPITAL

In connection with the closure of St. Mary's Hospital, the Bankruptcy Court found that the Debtors suffered a large loss as a direct consequence of McDermott's delay in filing the Motion to Close St. Mary's Hospital, and rejected McDermott's contention that there was no proof linking these losses to McDermott's services. Decision, 2007 WL 2492787, at *21-22, 24. The Bankruptcy Court further found that McDermott's services "were grossly tardy and the work product was plainly inadequate," id., and that the services in connection with the closure of the hospital "were not 'performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed' within the meaning of Section 330(a)(3)(D) [of the Bankruptcy Code] and that McDermott's delay in rendering those services was not 'beneficial at the time at which the service was rendered' within the meaning of Section 330(a)(3)(C)." Id.

McDermott contends that the Bankruptcy Court erred because it supposedly rested its decision on two major premises that are not supported by the record: (1) St. Vincents established September 1, 2005 as a "drop-dead" date by which bankruptcy court approval had to be obtained, and (2) McDermott's failure to provide appropriate documentation to the Bankruptcy Court was the reason approval was not obtained until September 20, 2005. McDermott Brief at 41. As set forth below, these findings are amply supported by the record, and in any event, the Bankruptcy Court's decision rested on more than just these findings. Thus, it did not err in

denying McDermott a portion of its fees in connection with its handling of the closure of St. Mary's Hospital.[21]

### A. McDermott's Services Were Grossly Tardy and Plainly Inadequate in Connection with the Closure of St. Mary's Hospital

According to McDermott, the September 1st "deadline" was a fiction created by the Bankruptcy Court, and "[t]he lower court seems to be the only one concerned about the St. Mary's closure being approved by the 1st of September rather than the 20th."  McDermott Brief at 42.  McDermott further argues that the Debtors were "certainly" not concerned with closing St. Mary's Hospital by September 1, 2005.  Id.  McDermott's position mischaracterizes both the Decision and the evidence in the record.  In fact, the Bankruptcy Court concluded that McDermott's services were deficient because it failed to act in an expeditious fashion, and the firm's failure to adhere to the long-established September 1 target date for the closing of St. Mary's Hospital was simply a factual finding supporting that conclusion. Decision, 2007 WL 2492787, at *22 ("McDermott's delay in preparing and filing the motion was not the consequence of strategy, but inattention."), *21 ("In order to meet the September 1 deadline set by the Board, it was absolutely essential for McDermott to prepare and file with the Bankruptcy Court a comprehensive, well-supported motion by the second or third week in July at the very latest to have any chance of holding a hearing in August and getting a favorable ruling by September 1 deadline set by the Board …. McDermott simply did not get the job done.") Moreover, the record evidence amply supports the finding that September 1, 2005, whether characterized as a "deadline" or otherwise, was a date of critical importance to St. Vincents, as

---

[21] The Debtors and Committee do not concede that the Bankruptcy Court should only have reduced McDermott's fees for St. Mary's by the amount it did.  As argued in their opening brief on the cross-appeal, the Bankruptcy Court erred by awarding McDermott any fees at all for this work.

reflected in the undisputed evidence that the Board set that date as the target for the closing of the hospital.

It was undisputed at trial that on June 1, 2005, the Board of Directors instructed McDermott to work with management to close St. Mary's Hospital <u>as soon as possible</u>. A0913, ¶ 107.  Moreover, as of June 17, 2005, McDermott knew that St. Vincents' Board had set September 1, 2005 as the target for closure of St. Mary's Hospital.  A0914, ¶ 115.  In support of its defense, McDermott makes much of the fact that the Debtors used the word "target" and not "deadline" when referring to the September 1st date.[22]  Whatever terminology was used when referring to the closure of St. Mary's Hospital, it is undisputed that McDermott was aware that its clients wanted to close St. Mary's as promptly as applicable regulatory approvals could be obtained. A0913, ¶ 108.  Semantic word games cannot excuse McDermott's failure to execute the directive clearly articulated by its client.

The trial record contains ample evidence supporting the Bankruptcy Court's conclusion that, in the face of the Board's June 1 and June 17, 2005 marching orders, McDermott delayed unreasonably in seeking court approval to close St. Mary's Hospital: (1) between the Petition Date and July 22, 2005, McDermott took no steps to seek Bankruptcy Court permission to close St. Mary's Hospital (A0915, ¶ 123); (2) McDermott did not begin work on a motion seeking permission from the Bankruptcy Court to close St. Mary's Hospital until August 5, 2005 (A0915, ¶ 128); and (3) despite the fact that the Debtors had already obtained canonical authority to close St. Mary's Hospital in late June 2005 (A0913, ¶ 111) and McDermott understood DoH approval was imminent as of mid-July (A1070, 71:16-18), McDermott did not file the motion to close St. Mary's Hospital until August 18, 2005 (A0915, ¶ 129).  It was also undisputed that DoH

---

[22] Following McDermott's logic, if it was only a target date and not a deadline, there was no need to take any steps to hit the target date.

approval was secured on August 31, 2005 (A0916, ¶131), but that Bankruptcy Court approval did not come until after McDermott's termination, on September 20, 2005 (A0917, ¶ 147). Based on these stipulated facts, the Bankruptcy Court properly concluded that the twenty-day delay in closing St. Mary's Hospital was solely attributable to McDermott's failure to get the job done. Decision, 2007 WL 2492787, at *23 ("Since canonical authority for the closure had been obtained in late June, and Department of Health approval of the closure was obtained on August 31, McDermott's failure to get the job done in accordance with its instructions from the client resulted in a twenty-day delay in closure of the Hospital.").

McDermott claims that, notwithstanding the Board's clear directive, September 1, 2005 was not a "real" deadline because both Weis and Bernadette Kingham-Bez ("Kingham-Bez") (Senior Vice-President of St. Vincents) made statements that suggest that they expected closure to occur later than the September 1st date. McDermott Brief at 42. The fact that certain St. Vincents officers expressed concerns that unforeseen events could delay the closure of St. Mary's Hospital does not somehow exculpate McDermott with respect to its unreasonable delay in executing its role in the process. There is no evidence in the record that Weis or Kingham-Bez ever contemplated that the closure would be delayed for the sole reason that St. Vincents' counsel would allow over six weeks to pass after the Petition Date before filing the closure motion.

McDermott's attempt to justify its actions (or inaction) by citing the difficulties associated with closing the Hospital also fails. McDermott Brief at 42-43. Indeed, the Bankruptcy Court properly considered and rejected each of McDermott's excuses based on the evidence presented at trial:

- "I reject McDermott's contention that it did not file the St. Mary's Hospital closure motion on July 5, or on July 22 'because the Debtors . . . were not far along enough in the process of obtaining regulatory approval from the Department of Health.' No witness at

the trial (other than McDermott) supported such a rationale. Nor do the facts and circumstances." Decision, 2007 WL 2492787, at *21.

- "The Selbst trial affidavit to the effect that St. Clair told him to delay the motion because the Department of Health had a strong preference for keeping details relating to the closure confidential until it had finally approved the closure is unsupported by any document, or by St. Clair, or by any witness from the Department of Health. The argument makes no sense, because by mid-July it was widely known public knowledge that SVCMC was seeking to close St. Mary's Hospital. In response to a question by the Bankruptcy Court, St. Clair denied ever having a conversation with any lawyer from McDermott in which she asked McDermott, in words or substance, to hold up or refrain from filing a motion in the Bankruptcy Court." Id.

- "Nor was Selbst convincing in asserting that the Bankruptcy Court closure motion could not have been completed and filed before August 18 because McDermott 'struggled mightily with the client to verify these . . . numbers . . . the losses, to figure out which contract[s] [would have] to be rejected and to try to address some of the concerns that Judge Beatty had expressed.'" Id.

The Bankruptcy Court's conclusion that McDermott delayed unreasonably in taking the steps necessary to secure Bankruptcy Court approval to close St. Mary's Hospital was thus amply supported by the record, and the denial of fees incurred in connection with that task was not clearly erroneous.

## B. McDermott Bungled the Motion to Close St. Mary's Hospital

McDermott argues that the Bankruptcy Court also erred in finding that McDermott did not provide the Court with sufficient information to support an order authorizing the closure of St. Mary's Hospital. McDermott Brief at 44. McDermott claims that there is nothing in the record suggesting that the St. Mary's Hospital closure was delayed by deficiencies in McDermott's submission to the Court. Id. at 44-45.

In fact, the record is clear that the Bankruptcy Court could not enter the necessary order until September 20, 2005, because prior to that date McDermott had failed to provide it with

40

critical information it needed.   By its own admission, McDermott filed <u>no</u> affidavits or declarations in support of the Motion to Close St. Mary's Hospital. A0054, ¶ 53.  At trial and on appeal, McDermott has argued that the Bankruptcy Court had factual evidence on which it could have relied when it considered the Motion to Close, because a declaration executed by Kingham-Bez containing certain relevant information had previously been filed in the case.   It was undisputed, however, that the Kingham-Bez declaration was not filed in support of the Motion to Close, but had been filed weeks earlier in support of the application to stay the State Court Litigation. A0390-A0500; A0915, ¶ 124.   Moreover, the August 18, 2005 Motion to Close did not even refer the Court to the Kingham-Bez declaration. A1486 – A1627; A1078:79:16-18. Without question, the Bankruptcy Court rightly concluded that the Motion to Close St. Mary's Hospital was <u>not</u> supported by a single piece of evidence.

In fact, at the time it was considering the Motion to Close, the Bankruptcy Court voiced its concern that McDermott had not provided it with adequate information about the financial condition of St. Mary's Hospital.  It is undisputed that Judge Beatty left a voicemail for Selbst on September 3rd (after the Motion to Close was filed but prior to the September 7th hearing), wherein Judge Beatty stated that she was not satisfied with the financial information that McDermott had provided and requested additional information. A1851; A1081, 82:22-84:7. Despite Judge Beatty's request, McDermott offered no testimony from any witnesses at the hearing on the Motion to Close on September 7th. A0916, ¶ 140.   Not surprisingly, and as a direct result of McDermott's failure to provide the Bankruptcy Court with sufficient information, the Bankruptcy Court did not grant the Motion to Close St. Mary's Hospital at the September 7th hearing. A0917, ¶ 142.

McDermott claims that an August 30, 2005 ex parte communication with Judge Beatty, recounted by Smith, somehow refutes the conclusion that McDermott's failure to provide any evidence in support of the Motion to Close played a role in the Bankruptcy Court's failure to grant the Motion to Close at the September 7th hearing. McDermott Brief at 46. It does not. The Bankruptcy Court was clearly entitled to discount Smith's self-serving hearsay account of the supposed conversation with Judge Beatty in light of (1) Judge Beatty's September 3rd voicemail to Selbst (which was corroborated by an e-mail from Selbst to other lawyers at McDermott) (A1851), and (2) the Court's statements on the record at the September 7th hearing. A0614, 43:15-17; A0622, 69:11-16; A0617, 49:22-23. In fact, Selbst acknowledged that the Bankruptcy Court expressed concern about inadequate disclosure at the September 7th hearing and concluded that McDermott had still not made sufficient financial information available. A1086, 88:12-19. Perhaps most tellingly, the Motion to Close was finally granted on September 20, 2005, after successor counsel filed a comprehensive set of declarations to support the application. A0917, ¶ 143, 147.[23]

The record evidence amply supports the Bankruptcy Court's conclusion that the Motion to Close prepared by McDermott was untimely and deficient, and the Court's refusal to award McDermott a portion of the fees associated with the closure of St. Mary's Hospital was not clearly erroneous. See supra, p. 36 n. 21.

## III. MCDERMOTT SHOULD BEAR THE COST OF TRANSITION TO SUCCESSOR COUNSEL BECAUSE IT WAS DISMISSED FOR POOR PERFORMANCE

The Bankruptcy Court properly determined that McDermott should bear certain expenses associated with transferring the case to new counsel. Section 330(a)(4)(A)(i) of the Bankruptcy

---

[23] At the September 20th hearing, the Bankruptcy Court made clear that successor counsel had presented information that McDermott had failed to disclose and that allowed the Bankruptcy Court finally to grant the Motion to Close. A1856, 100:13-19.

Code provides that no compensation can be awarded for "unnecessary duplication of services." 11 U.S.C. § 330(a)(4)(A)(i). The reduction of the fee award by the amount associated with costs incurred in bringing successor counsel on board was appropriate because the transition necessarily entitled a high degree of duplication of efforts and because McDermott's mishandling of the St. Vincents representation necessitated the hiring of its replacement.

McDermott claims that this reduction was erroneous because it was not dismissed for poor performance. McDermott Brief at 48. But that is precisely why the firm was fired. The record amply supports the Bankruptcy Court's conclusion that McDermott's poor performance necessitated the hiring of successor counsel. As demonstrated by the facts in evidence, the "poisoned well" atmosphere that began on July 5, 2005 with the inadequate, incomplete and thoroughly deficient motion to approve the SWLLC management agreement so completely permeated McDermott's ten-week tenure that Smith was forced to concede at trial that, had McDermott not been fired on September 13, 2005, it would have resigned because its effectiveness and ability to help its client was at an end. A1192, 203:20-204:2.

The record evidence makes clear that, at the time of the termination, St. Vincents concurred in Smith's assessment. The chairman of St. Vincents' Board, Boyle, testified that it was clear that McDermott could not continue as counsel to St. Vincents given McDermott's strained relationship with the United States Trustee and the Committee. A0830 – A0831, ¶ 12. Boyle further testified that the Bankruptcy Court, the United States Trustee and the Committee all had lost confidence in the Debtors and McDermott. A1389, 99:8-21. The Debtors' General Counsel voiced similar sentiments. St. Clair testified that "MWE's decision to take a strong adversarial position against the U.S. Trustee and the Creditors' Committee did not benefit SVCMC, and resulted in delaying SVCMC's restructuring process." A0698 – A0699, ¶ 14.

43

The testimony cherry-picked by McDermott in its brief is not inconsistent with the conclusion that St. Vincents terminated McDermott for poor performance. Boyle testified that he "sacrificed" McDermott, but he also recognized that such action was compelled by McDermott's ineffectiveness in handling the bankruptcy case and the "quagmire" McDermott's actions had created. A0830 – A0831, ¶ 12 ("Because progress was not being made in terms of turning SVCMC around, and because the Board had lost confidence in MWE's ability to guide SVCMC through the bankruptcy process, we needed to replace MWE as counsel to the Debtors.") McDermott makes much of the fact that Boyle, on an individual basis and from a business (not bankruptcy) perspective, agreed that McDermott should be compensated for its services, but it conveniently ignores his testimony that he did not have an opinion as the amount that should be paid. A0831, ¶ 13. ("While I personally believe that MWE should be compensated for services rendered to SVCMC, I have no opinion as to whether MWE is entitled to full compensation from a legal perspective.") Similarly, McDermott's focus on conciliatory remarks made contemporaneously by St. Clair ignore her testimony that her lack of bankruptcy experience and her reliance on McDermott prevented her from fully appreciating the degree to which McDermott had failed in performing its duties. A0698, ¶ 11 ("I did not at that time [Huron's acquisition of SWLLC], nor at the time of the bankruptcy filing, have any understanding regarding the scrutiny and approval process related to professionals for a chapter 11 debtor, nor was I familiar with the standards for doing so. I at all times assumed that MWE would be responsible for raising and handling any bankruptcy related issues regarding Huron's acquisition of Speltz & Weis.").

Ultimately, the best evidence of McDermott's poor performance is the fact that St. Vincents was forced to replace it at all, and that evidence, standing alone, makes clear that the

Bankruptcy Court's reduction of the fee award by the amount of transition expenses was not clearly erroneous.

## IV.  <u>REMAND IS REQUIRED IF THE DISTRICT COURT REVERSES</u>

In reviewing a bankruptcy court order, a district court may not make its own findings of fact.  <u>In re Britt</u>, 355 B.R. 427, 432 (S.D.N.Y. 2006) (citing <u>In re JLJ Inc.</u>, 988 F.2d 1112, 1116 (11th Cir. 1993)).  Thus, when a district court concludes that the Bankruptcy Court's findings of fact were clearly erroneous, remand to the bankruptcy court is required.  <u>Pullman-Standard v. Swint</u>, 456 U.S. 273, 291 (1982) ("When an appellate court discerns that a [lower] court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the [lower] court to make the missing findings."); <u>DeMarco v. United States</u>, 415 U.S. 449, 450 (1974) ("[F]actfinding is the basic responsibility of district courts, rather than appellate courts, and ... the Court of Appeals should not have resolved in the first instance this factual dispute which had not been considered by the District Court.")  The cases on which McDermott relies for its argument that remand would not be necessary if the Bankruptcy Court Decision and Order were reversed are inapposite because they involved technical errors that could easily be corrected by the reviewing courts.  A reversal here would require re-evaluation of a voluminous evidentiary record, a task that must be performed by the original fact-finding court.

45

## CONCLUSION

For the foregoing reasons, the Decision and Order of the Bankruptcy Court should be affirmed as to the issues that are the subject of McDermott's Appeal.

Dated:  New York, New York
        July 7, 2008

TOGUT SEGAL & SEGAL LLP
*Counsel for Appellee Saint Vincents Catholic Medical Centers of New York*

By:  _s/Frank A. Oswald_____
     Frank A. Oswald (FAO-1223)
     Howard P. Magaliff (HPM-2189)
One Penn Plaza
New York NY 10119
(212) 594-5656


ALSTON & BIRD LLP
*Counsel for Appellee Creditors Committee of Saint Vincents Catholic Medical Centers of New York*

By:  _s/Michael E. Johnson_____
     Michael E. Johnson  (MJ-0299)
     Martin G. Bunin (MB-1602)
     Brook A. Clark (BC-1749)
90 Park Avenue
New York, NY  10016
(212) 210-9400

LEGAL02/30820121v5