Michael L. Cook (MC 7887)
David M. Hillman (DH 8666)
SCHULTE ROTH & ZABEL LLP
Counsel for McDermott Will & Emery LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Civ No. 1:07-CV-09818-AKH |
| SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK d/b/a SAINT VINCENT CATHOLIC MEDICAL CENTERS, *et al.*, | Chapter 11 Case No. 05-14945 (ASH) (Jointly Administered) |
| Debtors. | |
| McDERMOTT WILL & EMERY LLP, | |
| Appellant. | |
| v. | |
| SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK, CREDITORS' COMMITTEE OF SAINT VINCENT CATHOLIC MEDICAL CENTERS OF NEW YORK and DIANA G. ADAMS, AS UNITED STATES TRUSTEE FOR REGION 2, | |
| Appellees. | |

**REPLY BRIEF OF APPELLANT MCDERMOTT WILL & EMERY LLP**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

I.    THE LOWER COURT PROPERLY DECLINED TO CALCULATE OR
      AWARD CONSEQUENTIAL DAMAGES IN RESPONSE TO DEBTORS' FEE
      OBJECTIONS................................................................................................ 2

      A.    There Is No Precedent For Calculating or Awarding Consequential
            Damages In Response to an Objection to a Section 330 Fee Application............. 2

      B.    The Lower Court Did Consider the Alleged Harm Caused by McDermott's
            Allegedly Inadequate Services, But Properly Declined to Calculate or
            Award Consequential Damages.......................................................................... 4

II.   McDERMOTT PROPERLY HANDLED THE ST. MARY'S HOSPITAL
      CLOSURE ................................................................................................... 9

      A.    The Debtors' Board Set No Fixed Deadline For The Closure ............................ 10

      B.    McDermott Started Educating Judge Beatty on the St. Mary's Closure In
            Early July 2005 ........................................................................................... 11

      C.    McDermott Provided Judge Beatty With An Ample Factual Basis For
            Closing St. Mary's....................................................................................... 14

      D.    Successor Counsel Added Little To McDermott's Factual Showing
            Supporting Closure Of St. Mary's.................................................................. 17

III.  THE LOWER COURT PROPERLY EXCLUDED SANSONE'S
      DECLARATION ........................................................................................... 21

CONCLUSION.................................................................................................22

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

Beal v. Stern, 184 F.3d 117 (2d Cir. 1999)...................................................................9

Bourjailly v. U.S., 483 U.S. 171 (1971) ...................................................................21

In re Cenargo Int'l, PLC, 294 B.R. 571 (Bankr. S.D.N.Y. 2003) ....................................8

In re Davison, 79 B.R. 859 (Bankr. W.D. Missouri 1987) .............................................8

Folio Impressions, Inc. v. Byer California, 937 F.2d 759 (2d Cir.1991).......................................22

Golladay v. Broach (In re Envirodyne Corp.), 2006 Bankr. LEXIS 1482, (Bankr. N.D.
Cal. July 6, 2006)......................................................................................................5, 8

IMAF, S.P.A. v. J.C. Penney Co., Inc., 1991 WL 66892 (S.D.N.Y. April 24, 1991) ....................6

Jones v. Woody, 139 B.R. 824 (Bankr. S.D. Tex. 1992)...........................................................5, 8

Kassman v. American Univ., 546 F.2d 1029 (D.C.Cir. 1976).........................................................6

Marin v. Midland Loan Servs., 122 Fed. Appx. 527 (2d Cir. 2004) ...............................................9

O'Shea v. Brennan, 2004 U.S. Dist. LEXIS 8919 (S.D.N.Y. May 19, 2004)..................................7

Shaw v. Replogle (In re Shaw), 2000 U.S. Dist. LEXIS 18745 (N.D. Cal. Dec. 22, 2000)........2, 8

In re Source Enterprises, Inc., 2008 Bankr. LEXIS 940 (Bankr. S.D.N.Y. Mar. 27, 2008)............8

United States v. Holmes, 44 F.3d 1150 (2d Cir. 1995)...............................................................21

U.S. v. Tocco, 135 F.3d 116 (2d Cir. 1998) ...........................................................................21

In re Wilde Horse Enterprises, Inc., 136 B.R. 830 (Bankr. C.D. Cal. 1991)..................................2

## FEDERAL STATUTES

11 U.S.C. § 330..........................................................................................................2, 3, 5, 7

Fed. R. Evid. 104(a).......................................................................................................21

Fed. R. Evid. 602 ..........................................................................................................21

## PRELIMINARY STATEMENT

Appellant McDermott Will & Emery LLP ("McDermott") submits this reply brief on its appeal from the lower court's order dated September 21, 2007, denying McDermott fees in the above-captioned chapter 11 reorganization case. A1794-A1797. McDermott will limit this brief to responding to the joint brief ("DC Brief") filed by the Debtors[1] and the Creditors' Committee (jointly the "Debtors") on May 16, 2008, in support of their cross-appeal.

The Debtors argue that the lower court erred in three respects. According to the Debtors, the lower court erred in concluding that "it could not reduce McDermott's fees by any amount that reflected the harm caused to the Debtors by McDermott's deficient services." DC Brief, at 14, 17. The Debtors assert that the lower court, "abused its discretion when...it awarded McDermott $48,704.00 in fees for services rendered in" the closing of St. Mary's Hospital. Id., at 5. Finally, the Debtors argue that the lower court "improperly excluded the trial declaration of Guy Sansone, Debtors' Chief Executive Officer," who was hired after the Debtors terminated the McDermott engagement on September 13, 2005. Id., at 4-5. Because the Debtors' cross-appeal "is confined to three questions of law," they disclaim any challenge to the lower court's "findings of fact." DC Brief, at 6.

As did the lower court, the Debtors ignore material undisputed documentary facts in evidence. By doing so, they distort the record seriously. Nevertheless, the lower court properly declined to calculate and award consequential damages to the Debtors, was fully justified in awarding fees for legal services relating to the closure of St. Mary's Hospital, and properly excluded the Sansone declaration.

---

[1] All capitalized terms have the definitions stated in McDermott's opening brief, dated May 16, 2008.

10682404.4

I.

## THE LOWER COURT PROPERLY DECLINED TO CALCULATE OR AWARD CONSEQUENTIAL DAMAGES IN RESPONSE TO DEBTORS' FEE OBJECTIONS

The Debtors assert that "the Bankruptcy Court erred [ ] in concluding that it could not reduce McDermott's fees by any amount that reflected the harm caused to the Debtors by McDermott's deficient services" and that this supposed finding constitutes a legal error. DC Brief, at 14, 17 - 18. The Debtors are mistaken. In adjudicating a motion for attorney fees pursuant to 11 U.S.C. § 330, bankruptcy courts routinely take into account any harm that the debtor's counsel caused to the debtor, and the lower court properly considered this factor in determining how much to award McDermott in fees. The lower court, however, rejected the Debtors' request that it (i) calculate the precise amount of complex consequential damages that Debtors allegedly suffered, and then (ii) award that amount to the Debtors by way of a fee setoff. This, too, was proper.

### A. There Is No Precedent For Calculating or Awarding Consequential Damages In Response to an Objection to a Section 330 Fee Application.

In determining the amount of fees that an attorney should be awarded pursuant to 11 U.S.C. § 330, the cases hold that, as a general matter, a bankruptcy court may take into account the fact that an attorney committed malpractice and/or breached his fiduciary duty. See, e.g., Shaw v. Replogle (In re Shaw), No. C 00-2820 CRB, 2000 U.S. Dist. LEXIS 18745, at *15 (N.D. Cal. Dec. 22, 2000) ("Courts awarding fees under [11 U.S.C. §§ 329-31] regularly consider the quality of the services rendered by a bankruptcy attorney, including whether the attorney was negligent or committed malpractice."); In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 844 (Bankr. C.D. Cal. 1991) (In ruling on a motion under 11 U.S.C. § 330, "[t]he Court may deny an attorney for a Chapter 11 debtor all fees claimed as due and owing on

account of such attorney's wrongdoing, negligence, or serious breaches of fiduciary obligations.").

In this case, the lower court complied with this case law because it considered the quality of McDermott's representation and the harm allegedly caused the Debtors. First, the lower court considered whether McDermott's legal work was adequate. In fact, fourteen pages of the opinion were devoted to analyzing the adequacy of McDermott's services. A1467 – 1480. The lower court would not have undertaken this analysis if it was irrelevant to its determination as to how much McDermott should be awarded in fees.

Second, the lower court's citation of Section 330 was followed by a clear statement that the harm allegedly suffered by Debtors was a factor to be considered:

> [E]xperienced counsel in major Chapter 11 cases are paid to investigate the facts, to know the applicable principles of law, practice and ethics, to act timely to accomplish their clients' objectives, and to guide their clients with a firm hand to the course of action which is most beneficial to the debtor's estate. Counsel charge and are paid high compensation in the fair expectation that their foresight and judgment will assess today's facts as the facts will be perceived and judged tomorrow under the searching gaze of 20-20 hindsight. McDermott failed in this, *at great cost to the client*. A1467 – 8 (emphasis added).

In addition, the lower court instructed the Debtors to submit a post-trial statement of the economic consequences of MWE's allegedly inadequate services. A1480. The lower court then "carefully considered" (A1481) the Debtors' post-trial submission, ultimately deciding to reduce McDermott's fee award in part because of the harm that the Court believed the Debtors suffered. For example, in response to the Debtors' request that McDermott's fee award reflect the harm allegedly caused by McDermott's work in connection with the Huron and S&W retentions, the lower court granted Debtors' request and awarded McDermott no fees in part based on injury that the lower court believed the Debtors suffered:

- 3 -

> In short, the McDermott services relating to retention of
> professionals, at the time of which those services were rendered
> were not only not beneficial to the debtors' estates and not
> reasonably likely to benefit the debtors' estates—***they were
> affirmatively detrimental to the debtors' estates***.  Compensation of
> $98,382.55 of retention services is denied.  A1481 (emphasis
> added).

Clearly, the lower court concluded that, as a matter of law, it was permitted to

take into account the harm that the Debtors allegedly suffered as a result of McDermott's legal

work.

B.   **The Lower Court Did Consider the Alleged Harm Caused by
McDermott's Allegedly Inadequate Services, But Properly Declined to
Calculate or Award Consequential Damages.**[2]

The lower court properly denied the Debtors' request that it calculate the dollar

amount of consequential damages for which McDermott was allegedly responsible and reduce

the amount of McDermott's fee award by that amount.

First, the lower court correctly recognized that the Debtors failed to plead, brief,

or litigate their consequential damages claims.  The lower court explained that "***in my view*** it is

inappropriate to litigate a tort claim for malpractice in the guise of an objection to legal fees.

The standards for determining the merits of a malpractice claim and the quantum of damages to

be awarded, if any, are not necessarily the same as the standards for determining the

appropriateness of legal fees under the Bankruptcy Code."  A1484 (emphasis added).  In no way

does this statement suggest that the lower court found that it lacked the authority to consider

injury to the Debtors when determining McDermott's fee award, or that it lacked authority to

grant consequential damages in an appropriate case.  Instead, this statement reflects the fact that,

in this case, the Debtors had the opportunity to assert and litigate a claim for affirmative relief

---

[2] Of course, Mc Dermott contends that that the lower court's factual findings are clearly erroneous, as demonstrated
in the brief filed in support of its appeal.

(such as a malpractice claim) that would have justified an award of consequential damages. The cases cited by the Debtors make clear that a debtor may respond to its counsel's 11 U.S.C. § 330 fee application by asserting claims for relief based on malpractice, negligence, and/or breach of fiduciary duty. See, e.g., Golladay v. Broach (In re Envirodyne Corp.), No. 00-40480 TR, 2006 Bankr. LEXIS 1482, at *17-18 (Bankr. N.D. Cal. July 6, 2006) ("Because [debtor's] claims of malfeasance or nonfeasance could have been asserted as an objection to a [trustee's and lawyer's] fee application, subsequent actions against a trustee or professional by a party in interest who received notice of the applications are barred by the doctrine of res judicata."); Jones v. Woody, 139 B.R. 824, 827-28 (Bankr. S.D. Tex. 1992) (debtor's negligence and malpractice claims against its attorney are barred by the doctrine of *res judicata* because debtor could have raised them in opposition to the attorney's fee application before the bankruptcy court). The Debtors, however, opted not to assert or litigate such a claim during the fee proceeding despite having engaged special counsel for the precise purpose of evaluating whether a malpractice claim should be asserted.

Second, the lower court concluded that there was insufficient evidence in the record from which a determination could be made of the amount of any consequential damages arising out of McDermott's allegedly deficient work on the St. Mary's closure: "The precise quantum of loss sustained during this specific twenty-day period may be impossible to quantify with dollar and cents precision *on the trial record*." A1483 (emphasis added). There is no basis for concluding that the lower court abused its discretion in reaching this factual finding. The Debtors do not contend otherwise, having affirmatively stated that they do not take issue with any of the lower court's factual findings.

Third, the factual evidence proffered regarding causation in connection with the St. Mary's closure was insufficient. The Debtors cannot simply assert, without support, that there is a direct correlation between the date the St. Mary's motion was filed (August 18, 2005) and the date of the St. Mary's closure (October 4, 2005). There is nothing in the record to support this syllogism, and, tellingly, the Debtors never contend that this evidence exists. Instead, the undisputed trial record confirmed that the St. Mary's closure turned on many moving parts, among them, the complete discretion of a federal bankruptcy judge to schedule the required hearing(s) and, thereafter, to issue the required order approving the closure. The process of winding down a hospital's operations is a complicated, difficult and uncertain process.[3] There was nothing in the record to show that this process happens on a lock-step timetable pegged to the timing of any one predicate act, so that the process could have been completed before October 4, 2005, regardless of when the various approvals were obtained.

Fourth, the factual evidence proffered regarding causation in connection with the S&W and Huron retentions was likewise insufficient in light of S&W's and Huron's express agreement to reimburse the Debtors' estates for administrative expenses incurred in connection with the S&W/Huron retention. See A2117; "Supplemental Conditions to Huron/SVCMC Engagement Letter," dated as of July 21, 2005 (attached as Exhibit A to the Debtors' October 21, 2005 application to retain Huron ) (Bankruptcy Court Docket Entry No. 527; see also Tab 80, Exhibit J of October 23, 2006 trial exhibits.) The Debtors cannot show causation where another party has already agreed to make the Debtors whole. See IMAF, S.P.A. v. J.C. Penney Co., Inc., 1991 WL 66892, *3 (S.D.N.Y. April 24, 1991) (quoting Kassman v. American Univ., 546 F.2d

---

[3] According to the undisputed testimony of Smith, "[t]he closing of a hospital is a very delicate balance of a lot of different facts and movements and constituencies… There are clinics, there are lines of service, there are employed physicians, there are office leases, there's all kinds of stuff that's involved…" A1241 – 43, Oct. 23, 2006 Tr., 257:11-13, 258:25 – 259:2.

1029, 1033 (D.C.Cir. 1976)) ("[t]he office of compensatory damages is to make the plaintiff whole, but certainly not more than whole... Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which plaintiff pursues.").

Fifth, the Debtors failed to submit the types of expert evidence needed to establish entitlement to consequential damages resulting from the claimed malpractice relating to both the St. Mary's closure and the Huron and S&W retentions. The Debtors did not proffer an expert as to McDermott's duty of care or its breach, despite the fact that such an expert is typically required in a malpractice action. See e.g. Fulfree v. Manchester, 1999 U.S. App. LEXIS 11971, *4 (2d Cir. 1999). Nor did the Debtors submit any expert testimony as to causation and damages, also typically required in a malpractice action. See e.g. O'Shea v. Brennan, No. 02 Civ. 3396 (KNF), 2004 U.S. Dist. LEXIS 8919, at * (S.D.N.Y. May 19, 2004).

Sixth, the lower court's decision to deny consequential damages is consistent with the case law: in the absence of an affirmative claim for malpractice or breach of fiduciary duty, no bankruptcy court has ever calculated or awarded to the debtor, either directly or by way of a fee setoff, the amount of consequential damages caused by an attorney's malpractice. Determining whether an attorney's performance was helpful or harmful is not the same as using a fee application under Section 330 as a basis to calculate or award a debtor the types of complex malpractice consequential damages that the Debtors requested in this case.

None of the cases cited by the Debtors supports their argument that the lower court should have calculated and awarded consequential damages in the absence of some form of affirmative claim. Indeed, the Debtors do not cite a single case — and McDermott has been unable to find any — in which a bankruptcy court determined the amount of fees to which

debtor's counsel was entitled by calculating the amount of consequential damages the attorney's malpractice caused to the debtor and reducing the fee award by the calculated amount.  To the contrary, in each of the cases cited by Debtors, the bankruptcy court either granted the attorney's fee application in its entirety, or denied the application in whole or in part on the basis of the court's overall evaluation of the value of the legal work performed.  See In re Source Enterprises, Inc., No. 06-11707 (AJG), 2008 Bankr. LEXIS 940, at *57-58 (Bankr. S.D.N.Y. Mar. 27, 2008) (denying claim in its entirety because attorney was not qualified under Bankruptcy Code to serve as debtor's counsel and breached legal and ethical duties); Golladay, 2006 Bankr. LEXIS 1482 (analyzing whether doctrine of *res judicata* barred negligence claims against bankruptcy trustee and his counsel because they were or could have been raised in bankruptcy court fee application which was approved); In re Cenargo Int'l, PLC, 294 B.R. 571, 605 (Bankr. S.D.N.Y. 2003) (where administrator asserted that debtor's counsel committed malpractice, the court denied (1) fees charged by the attorneys that were "attributable to that additional confusion and disruption that [the attorneys] should reasonably have foreseen and (2) the amount of fees attributable to drafting a Chapter 11 plan at a particular point in time); Shaw, 2000 U.S. Dist. LEXIS 18745 (analyzing whether malpractice claims were barred as *res judicata* by prior fee judgment granting all requested fees despite debtor's allegation that attorney committed malpractice); Jones, 139 B.R. at 826 (analyzing whether fee judgment in which court "allowed the disputed attorney's fees, less a small amount of duplicative charges" was *res judicata* as to subsequent malpractice action); In re Wilde Horse Enterprises, 136 B.R. at 845-46 (denying fees in their entirety where attorney "admitted violations of her fiduciary, ethical and professional duties", as well as knowingly falsifying a certification submitted to the court); In re Davison, 79 B.R. 859, 861-62, 864-65 (Bankr. W.D. Missouri 1987) (denying fee request in its entirety where attorney

permitted debtor to continue to incur debt post-petition without authorization of the court and without paying the debts as they were incurred and, in doing so, "ma[de] a mockery" of the Chapter 11 cases, holding "none of the services for which compensation has been sought … can be lawfully classified as services rendered 'in aid of administration of the estate[.]'"). The absence of any case law supporting the Debtors' position is telling: no court has ever done what the Debtors asked the lower court to do.

The lower court used the correct legal standard in adjudicating the Debtors' fee objections and requests for consequential damages. Even if this Court were to determine that the lower court utilized the wrong legal standard (which it did not), this Court should still affirm the lower court's decision to deny consequential damages on the basis of the lower court's factual findings and other facts and omissions in the record—including the Debtors' failure to plead, brief, or litigate affirmative malpractice claims. A court reviewing a bankruptcy court judgment "is 'free to affirm an appealed decision on any ground which finds support in the record.'" Marin v. Midland Loan Servs., 122 Fed. Appx. 527, 528 (2d Cir. 2004) (quoting, Beal v. Stern, 184 F.3d 117, 122 (2d Cir. 1999)). The Court's decision to deny the Debtors' request that McDermott's fee award be reduced by the amount of the Debtors' consequential damages should be affirmed for the reasons set forth above.

## II.

## McDERMOTT PROPERLY HANDLED THE ST. MARY'S HOSPITAL CLOSURE

The Debtors argue, to support their flawed damages claim, that McDermott failed to close St. Mary's in a timely manner, (DC Brief, at 18), and that McDermott somehow "botched" the job. DC Brief, at 20. As shown below, not only do the Debtors misstate the facts, but they also ignore material undisputed facts that demolish their baseless assertions. The Board set no fixed deadline for the St. Mary's closure because of practical obstacles over which the

Debtors had no control (e.g., DOH approval). And when DOH approval was eventually received on August 31, 2005, the Debtors asked for and received an extension of time from DOH to October 4, 2005 for the closure. McDermott provided Judge Beatty with an ample factual basis for authorizing the St. Mary's closure, which she did on September 20, two weeks ahead of the Debtors' actual schedule. Finally, successor counsel added little to McDermott's overwhelming factual showing supporting the closure motion, and there is no evidence even remotely suggesting that their last-minute filing had any impact on the substance or timing of the closure order.

### A.    The Debtors' Board Set No Fixed Deadline For The Closure.

According to Debtors, the "Board had directed McDermott on June 1, 2005 to effect closure as soon possible." DC Brief, at 9. In fact, the facts are to the contrary:

- The June 1, 2005 Board resolution contained no deadline for the closure of St. Mary's Hospital. A1538-A1539 (emphasis added).

- The June 1, 2005 Board minutes authorized the Debtors' management to "begin the necessary regulatory steps to close St. Mary's, noting that outpatient facilities will be maintained, in the meantime." A2124 (emphasis added).

- The Board's Executive Committee, on June 17, 2005, set a "target date" of September 1, 2005, noting that despite "enormous political pressure" against closure, work on the closure will continue and "progress will be reported…on a regular basis." A1792.

- The Debtors' Chief Financial Officer, Weis, stated in his July 5, 2005 affidavit, that St. Mary's would be closed "before the end of 2005." A0116, ¶ 14.

- The Debtors' WARN Act notice of July 22, 2005, which was prepared by the Debtors, not by McDermott, (A1054, Oct. 23, 2006 Tr., at 53:25 – 54:2), giving the St. Mary's employees minimum 60 days' notice of closure, contemplated the hospital's closing no earlier than September 20, 2005. A2137; A0027, ¶ 190-191.

- The Debtors' Senior Vice President, Kingham-Bez, in her e-mail of August 17, 2005, told McDermott that September 20, 2005 was the "key" date for the St. Mary's closure. A0507.

- On September 12, 2005, Kingham-Bez "informed the DOH that the contemplated closure date…will be extended [by the Debtors] to October 4, 2005." A0880, ¶ 13 (emphasis added).

- Thomas Barry, in his supplemental declaration of September 19, 2005, stated that October 4, 2005 was "the projected closing date for the hospital." A0860, ¶ 25.

When the DOH finally approved the closure on August 31, 2005, (A0916), the Debtors could not have closed St. Mary's until October 4, 2005. Judge Beatty's September 20, 2005 closure order was thus ahead of the Debtors' actual schedule. McDermott, in fact, got the job done on time.

### B.   McDermott Started Educating Judge Beatty on the St. Mary's Closure In Early July 2005.

The Debtors attempt to support their flawed damages claim by arguing that McDermott failed to begin "work on a motion seeking…to close St. Mary's…no earlier than

August 5, 2005, a full month after the commencement of the bankruptcy case," finally filing a closure motion "on August 18, 2005." DC Brief, at 9-10.  Again, this distorted revisionist history conveniently ignores uncontroverted facts, including:

- The primary responsibility for handling the closure lay with appropriate personnel of the Debtors (St. Clair and Kingham-Bez), not with McDermott.  A0025, ¶¶ 175-177.

- St. Clair, the Debtors' General Counsel, was "quarterbacking…the New York regulatory process for the closure."  A1285, p. 305:11-13.

- Kingham-Bez, Senior Vice President,  handled "the community relations side" while "other employees [of the Debtors] were coordinating other elements."  A1285 - A1286, p. 305:13-16.

- McDermott's role was limited to filing the closure application with Judge Beatty at the appropriate time.  A0025, ¶ 176.

- In his July 5, 2005 affidavit, the Debtors' Weis told Judge Beatty that the Debtors expected St. Mary's to be closed "before the end of 2005."  A0116, ¶ 14.

- According to St. Clair, "DOH asked us to please not circulate to the community…[the proposed closure] plan because they were concerned…[the community] could get out of control and too disorganized….[T]hey didn't want a draft of it floating around in the hospital.  But everybody knew that the…decision had been made that the hospital had to close."  A1355, p. 62:12-20 (emphasis added).

- In response to Judge Beatty's request that the closure plan be circulated to the community, but in an attempt to limit the Debtors' disclosure of details about the proposed closure, St. Clair explained to Judge Beatty in open court on August 4, 2005, that the DOH had rejected the draft of the Debtors' closure plan and still required more work to be done. A1665, p. 38:4-16.

- The Debtors, represented by McDermott, sued a former St. Mary's patient, Harriet McCloud, in the bankruptcy court on July 29, 2005, to enjoin her from further prosecuting a state court action[4] to block the St. Mary's closure. A0028, ¶ 200.

- During emergency injunction hearings before Judge Beatty on August 4 and August 5, 2005, when the St. Mary's closure was mentioned at least 40 times, the court stayed McCloud's attempt at blocking DOH approval of the closure. A0053, ¶ 46.

- During the first month of the reorganization case, the Debtors' senior management directed McDermott to concentrate its efforts toward meeting the most immediate need at the time -- financing and cash: "[F]inance was a number one priority at all times. Improving the [Debtors'] liquidity was a paramount responsibility for McDermott...." A1091 - A1092, p. 94:12-17.

Like the lower court, the Debtors simply ignored these critical facts.

---

[4] McDermott had already prevailed in the State court on the Debtors' behalf, but McCloud was prosecuting an appeal.

C.    **McDermott Provided Judge Beatty With An Ample Factual Basis For Closing St. Mary's.**

To support their argument that McDermott "botched" the St. Mary's initial approval process, the Debtors falsely state that McDermott failed to file supporting affidavits or offer testimony. DC Brief, at 10. They contend that the Weil firm's provision of at least four affidavits immediately prior to the September 20, 2005 hearing, plus the testimony of one witness did the job. This argument is based on the fact that an order was entered approving the closure shortly after the record was so supplemented. DC Brief, at 10.

Again, the Debtors, like the lower court, ignore the indisputable facts, including:

- McDermott's preparation and filing with Judge Beatty of the 9-page August 5, 2005 Kingham-Bez affidavit, attaching the 102-page draft closure plan, provided undisputed — and sufficient — substantive financial information explaining the business rationale for the closure (i.e., losses and underutilization; prior unsuccessful efforts to transfer ownership of the hospital). A0390 - A0500.

- Judge Beatty's warning, upon receipt of the detailed Kingham-Bez affidavit and closure plan, that she would not be able to hear the anticipated closure motion until September 7, 2005. A0054, ¶ ¶ 49-50.

- McDermott's preparation of the 21-page August 18 closure motion, expanding on and reiterating the facts in the August 5, Kingham-Bez affidavit, with four additional detailed substantive exhibits. A1489 - A1623.

10682404.4

- 14 -

- The failure of the U.S. Trustee to take any position on the closure. A0055, ¶ 55-56.

- The Creditors' Committee's belated "short response in support of" the closure motion on September 2, 2005, filed only at the request of Judge Beatty.  A0055, ¶ 57, 61.

- Judge Beatty's explicitly stated understanding of St. Mary's financial problems at an August 23, 2005 hearing five days after McDermott had filed the closure motion ("…no longer able to continue to operate due to its financial problems"; "it is really sad that this hospital that has been here for over a 100 years because of changes in the healthcare industry is no longer able to run … because it is losing money.").  8/23/05 Transcript of St. Vincents hearing before Judge Beatty, at 10:11 – 15, 11:2 – 9.

By August 23, at the latest, Judge Beatty thus knew why St. Mary's had to be closed, and she was able to reach this conclusion only because McDermott had made detailed evidentiary submissions on August 5 and August 18.

Indeed, McDermott's August 18 closure motion itself consisted of the following:

- 21 pages of text supplementing the earlier Kingham-Bez affidavit (underutilization; lack of financial viability; funding of losses; risk to the Debtors' other hospitals; alternative facilities available; negotiations with Kingsbrook; prior efforts to transfer St. Mary's to Kingsbrook; DOH closure process; notice to employees; transfer of employees; continuation of outpatient services by Kingsbrook;

efforts to keep public apprised of closure progress and related community outreach; contracts to be rejected). A1489-A1509.

- An updated version of the St. Mary's closure plan. A1513-A1602.

- The August 4, 2005 response by Kingsbrook to the updated St. Mary's closure plan. A1609-A1621.

- A commitment letter between the League of Voluntary Hospitals & Homes in New York and the Debtors' unionized employees, supplemented by an August 8, 2005 schedule showing how terminated employees of St. Mary's could find jobs with other City hospitals. A1603-A1608.

- A list of nine contracts to be rejected by the Debtors subject to court approval. A1622-A1623.

Aside from a desire to bash McDermott, there can be no explanation for the Debtors' utter disregard of these substantive fact-intensive documents.

Also ignored by the Debtors was Judge Beatty's call to Smith of McDermott on August 30, 2005, stating that "she was going to close St. Mary's, [ but not] on September 7, [because she] would have another one or two hearings before she approved the closure." A0031, ¶ ¶ 221-222. Undisputed and ignored too, was McDermott's bringing Kingham-Bez and four other staff members from the Debtors with specific technical knowledge to the September 7, 2005 hearing, as instructed by Judge Beatty on August 30. A1104, p. 107:25 - 108:17.

Judge Beatty reserved decision on the closure of St. Mary's at the September 7 hearing, but not because of any failure by McDermott. As the September 7 transcript shows, Judge Beatty still needed to "keep thinking about it;" "I'm...caught between what...would be the

right thing to do and what…I have to do…and don't have to do anything today and that's good."

A0625; p. 79:11-12; A0626, p. 89:9-13. Moreover, as Judge Beatty explained, "I think…we

need to let everyone talk for a week and then we will try to schedule another hearing." A0634B,

p. 118:12-14. Again, the Debtors and the lower court failed even to mention Judge Beatty's

explicitly stated reasoning.

### D.    Successor Counsel Added Little To McDermott's Factual Showing Supporting Closure Of St. Mary's.

The Debtors claim that successor counsel (Weil) had "to repair the damage

caused by McDermott's deficient services in seeking court approval of the St. Mary's closure."

DC Brief, at 5. Approval of the closure on September 20, 2005 assertedly was "obtained only

through the efforts of Weil, which, within one week of its appointment, had filed four affidavits

in support of the closing and, unlike McDermott, had 'provide[d] the Court with a documented,

factual predicate necessary for an order to close the Hospital." DC Brief, at 20 (quoting the lower

court). Finally, the Debtors falsely state that Weil "was required essentially to restart the process

from the ground up…." DC Brief, at 21.

Reading the four affidavits filed by successor counsel on the eve of the September

20 hearing shows the utter falsity of the Debtors' assertions. Far from "saving the day" as

Debtors contend, the evidence shows that Weil's submissions were either duplicative of

McDermott's, added non-essential background information, or described events occurring after

McDermott's removal. Thus, the September 19, 2005 declaration of Kingsbrook's Linda Brady,

(A0832-A0837), merely outlines Kingsbrook's failed effort to acquire and operate St. Mary's;

Kingsbrook's willingness to work with the Debtors to help continue services to the community if

and when St. Mary's closes; and the anticipated services that would be provided to St. Mary's

10682404.4                                    - 17 -

patients and the surrounding community. Significantly, Brady said nothing about the underlying financial reasons for the proposed closure.

Similarly, the two declarations of Thomas Barry, Managing Director of Cain Brothers, dated September 19, 2005, (A0838-A0867), only provide historical information about a proposed acquisition of St. Mary's by Brooklyn Safety Net Hospital ("BSN") and describes his firm's evaluation of that proposal. BSN had sent its proposal letter "to the Court on September 14, 2005," a day <u>after</u> the McDermott engagement ended. A0839. Barry explained why the BSN proposal was insufficient and why closure of St. Mary's was preferable. In his second declaration, Barry reported on a meeting held during the evening of September 19, 2005, between representatives of BSN, the Creditors' Committee and the Debtors (Huron Consulting Group was also present). Barry reiterated why closure was preferable to accepting the BSN proposal. Significantly, the two Barry declarations described events occurring after the September 13 termination of McDermott, and addressed matters unrelated to the rationale for closing St. Mary's.

The declaration of Sister Jane Iannucelli, sworn to September 19, 2005, was equally superfluous. A0868-A0874. Iannucelli provides yet another history of St. Mary's; a history of the Board's decision to separate St. Mary's from the Debtors; Kingsbrook's failed attempts to acquire St. Mary's and the Board's eventual decision to close St. Mary's. In concluding, Sister Iannucelli noted the Board's determination "that the best use of St. Mary's property that would be consistent with our mission to the underserved and our responsibility to creditors, would be low to moderate - income housing." A0873, ¶ 17.

The September 19, 2005 declaration of Dawn Gideon, the Debtors' Interim Chief Restructuring Officer, reiterated much of the August 5, 2005 Kingham-Bez affidavit and the

August 18 closure motion, both prepared by McDermott. A0875-A0879. Gideon described the financial distress of St. Mary's; the underutilization of the hospital; the August 31, 2005 approval letter from the DOH; the updated closure plan; the effect of the closure on St. Mary's employees; and how the property will be used or sold upon closure. Most significant, after describing DOH approval of the closure plan on August 31, Gideon described the Debtors' September 12, 2005 letter to the DOH, stating that "the contemplated closure date of the hospital will be extended [by the Debtors] to October 4, 2005," and that the "Debtors received verbal approval from DOH for the extension." A0880, ¶ 13. Gideon thus admitted that, even if Judge Beatty had approved the closure on September 1, the Debtors were unable to close St. Mary's on that date, as the lower court wrongfully presumed, or on September 20, 2005, the "key" date articulated by Kingham-Bez to McDermott in her August 17, 2005 e-mail. A0507. The purported September 1 deadline, imagined by the lower court, was meaningless. A1464, A1478, A1482.

The Debtors' presentation at the September 20, 2005 hearing added little substance to McDermott's prior showing on September 7.[5] Successor counsel summarized and proffered the substance of the four declarations filed the day before. Sister Iannucelli was the only witness, and provided a history of the Sisters of Charity and of St. Mary's. See October 23, 2005 trial exhibits, Tab 125, at 51 – 54. She then went on to briefly describe the process that the board went through to make the decision to close St. Mary's. Id., at 54-57. Finally, she added that the closure decision was "very difficult...for the Board." Id., at 57-58. In fact, she was only asked two questions of substance in the entire hearing.

---

[5] The September 7, 2005 hearing transcript confirms that McDermott had (5) representatives of the Debtors ready to testify, (see Sept. 7, 2005 Hearing Tr. at 7:21 – 9:3) (referencing Bernette Kingman-Bez, Senior Vice President of Communications and Planning; Gerald Connelly, Executive Director of St. Mary's Hospital; Marie Hips, Manager of Nursing Operations at St. Mary's; Juan Ruiz, Administrator Director of St. Mary's support services; and Bill Bivney, M.D.), and that Judge Beatty intended to close the hospital within the period covered by the WARN Act, (Id., at 39:6 – 9 ("I'm going to have to let St. Vincents close the hospital within the period of time for the War[n] Act."), without hearing from the St. Vincents' witnesses. (Id., at 17:19 – 23; 30:11 – end.)

Judge Beatty acknowledged that St. Mary's "is not operating at a profit....[T]his is the third hearing we have had." Id., at 71:3-4, 10-11. Significantly, based on the Kingham-Bez affidavit and the McDermott closure motion, Judge Beatty found the following:

- "The Debtor, Saint Vincents can't continue to keep losing the money it is losing with this hospital." Id., at 147:20-22.

- "Unfortunately, the occupancy rate at Saint Mary's, like at many other hospitals is not where it would need to be to keep the hospital at an economically viable footing. I don't think there is any way to increase the number of patients." Id., at 148:5-11.

In sum, the material facts supporting the closure were derived from McDermott's work product — the Kingham-Bez August 5 affidavit, (A0390-A0500), the August 18 closure motion, (A1486-A1627), and the supporting exhibits. Id. At no time did Judge Beatty criticize the record adduced on McDermott's watch, or even remotely suggest that the record was wanting in any way whatsoever.

The papers prepared by McDermott detailed the relevant financial information, particularly losses at St. Mary's; the underutilization of St. Mary's because of other available hospitals; the continuation of services by Kingsbrook; the Debtors' prior failed efforts to transfer St. Mary's to Kingsbrook; communications about the closure to the community; and the status of the DOH approval process. Moreover, an early and a later updated version of the Debtors' closure plan were attached to the August 5 Kingham-Bez affidavit and to the August 18 closure motion. McDermott thus produced the hard financial facts supporting closure and Judge Beatty's findings. The institutional history of St. Mary's and an analysis of the competing BSN proposal,

prepared by successor counsel, may have been interesting, but were not what drove Judge

Beatty's finding (e.g., losses; underutilization) to support her closure decision.

### III.

### THE LOWER COURT PROPERLY
### EXCLUDED SANSONE'S DECLARATION

The Debtors incorrectly argue that the lower court "abused its discretion in

refusing to consider," (DC Brief, at 22-23), and thus excluding the Sansone trial declaration.

They argue that Sansone's testimony "would have provided direct evidence of the harm

McDermott's services caused to the Debtors' estates." DC Brief, at 23.  Because Sansone had no

personal knowledge of the underlying facts, the lower court properly excluded Sansone's

testimony.  Significantly, the Debtors failed to elicit evidence of damages from their witnesses

who did have personal knowledge of the alleged harm (e.g., Boyle, St. Clair), apparently because

these witnesses could not so testify after working closely with McDermott for one year.

Courts have discretion when deciding whether or not to admit evidence.

Fed. R. Evid. 104(a) ("Preliminary questions concerning the qualification of a person to be a

witness … shall be determined by the court… .).  Bourjailly v. U.S., 483 U.S. 171, 175, 177-78

(1971) (preliminary determinations made using a preponderance of the evidence standard).  The

lower court's evidentiary ruling is entitled to deference and may not be overturned "[a]bsent a

clear abuse of discretion." United States v. Holmes, 44 F.3d 1150, 1157 (2d Cir. 1995).

Ordinarily, it is up to the reasonable trier of fact (in this case the trial judge) to determine

whether a witness possesses the requisite personal knowledge.  U.S. v. Tocco, 135 F.3d 116, 128

(2d Cir. 1998) (the test for admissibility under Federal Rule of Evidence 602 regarding requisite

personal knowledge is "whether a reasonable trier of fact could believe the witness had personal

knowledge.") (citing <u>Folio Impressions, Inc. v. Byer California</u>, 937 F.2d 759, 764 (2d Cir.1991)).

Sansone's declaration, according to the lower court, described events that Sansone had never observed. A1419-20, p. 131:24-132:19. Sansone began working for the Debtors on October 21, 2005, five weeks after McDermott's termination. A1417, p. 130:8. The court correctly held that any evidence relating to McDermott's conduct should best be elicited from the persons with first-hand knowledge, those who participated in the disputed events. A1419-20, p. 131:24-132:19.

## CONCLUSION

For all of the foregoing reasons, the court should dismiss the Debtors' cross-appeal.

Dated: July 7, 2008
New York, New York

SCHULTE ROTH & ZABEL LLP,
Counsel for McDermott Will & Emery LLP

By: /s/: Michael L. Cook
Michael L. Cook (MC 7887)
David M. Hillman (DH 8666)
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955
Email: michael.cook@srz.com
          david.hillman@srz.com